**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| ALAN L., on behalf of himself and his minor child, J.L., | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Civil Action No.: 1:25-cv-13047-FDS |
| LEXINGTON PUBLIC SCHOOLS; LEXINGTON SCHOOL COMMITTEE; DR. JULIE HACKETT, in her individual and official capacity as Superintendent of the Lexington Public School District; DR. GERARDO J. MARTINEZ, in his individual and official capacity as Principal of Joseph Estabrook Elementary School and; ANDREA SO, in her individual and official capacity as Director of Elementary Education, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S**
**MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff, Alan L., on behalf of himself and his minor child, J.L. (hereinafter "Plaintiff"), pursuant to Rule 65, Fed. R. Civ. P., and Local Rule 7.1, by and through counsel, files this memorandum of law in support of Plaintiff's Motion for Preliminary Injunction.[1]

**INTRODUCTION**

This case is governed by the Supreme Court's recent landmark decision in *Mahmoud v. Taylor*, 145 S. Ct. 2332, 2337 (2025). In *Mahmoud*, the Court held that public schools substantially burden parents' free exercise of religion when they compel children to participate in instruction that "poses 'a very real threat of undermining' the religious beliefs and practices that parents wish to

---

[1] This Motion is based on Plaintiff's First, Second, and Third Claims in his Complaint, claims based on the Free Exercise and Due Process Clauses of the Constitution.

instill in their children." *Id.* at 2342 (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 218 (1972)). The Court further held that when such a burden exists, schools must provide advance notice and honor opt-out requests. *Id.* In fact, the Court directly ruled that plaintiffs, under circumstances closely parallel to this one, are entitled to an injunction mandating that parents' right to opt out be protected:

> in light of the strong showing made by the parents here, and the lack of a compelling interest supporting the Board's policies, an injunction is both equitable and in the public interest. The petitioners should receive preliminary relief while this lawsuit proceeds. . . . Specifically, until all appellate review in this case is completed, the Board should be ordered to notify them in advance whenever one of the books in question or any other similar book is to be used in any way and to allow them to have their children excused from that instruction.

*Id.* at 2364. Plaintiff in this case seeks the identical relief awarded by the Supreme Court.

Like the parents in *Mahmoud*, Plaintiff is a person of faith who holds sincere religious beliefs about marriage, gender, and sexuality. Like the school board in *Mahmoud*, Defendants here introduced LGBTQ-themed materials into the elementary school curriculum, showed those materials to very young children, and refused to provide advance notice or honor Plaintiff's opt-out requests.

But Defendants in this case went further. While the school board in *Mahmoud* at least had a facially applicable no-opt-out policy, Defendants here created a Catch-22 designed to frustrate religious parents: they refused to provide curriculum materials in advance, yet demanded that parents submitting an opt-out identify specific objectionable lessons with particularity. Then, while Plaintiff was still waiting for the information he needed, Defendants knowingly and intentionally showed his five-year-old child the very content that conflicted directly with his religious faith and practices.

Under *Mahmoud*, this conduct is unconstitutional. The Court could not have been clearer: schools cannot force parents to choose between their religious faith and the benefits of public education. They cannot "strip away the critical right of parents to guide the religious development of their children." *Id.* at 2358. Yet, that is precisely what happened here. Plaintiff has demonstrated

every element necessary for a preliminary injunction under controlling Supreme Court precedent decided only a few short months ago. The need for immediate relief is acute. J.L. remains enrolled in Lexington Public Schools. More lessons are scheduled. Defendants have not changed their policies. Without a preliminary injunction, constitutional violations will continue.

## FACTUAL BACKGROUND

Plaintiff is a practicing Christian whose faith shapes every aspect of his family life, including his children's moral and spiritual formation. Alan L. Decl. ¶¶ 3-5. His religious convictions include a biblical understanding of marriage as the union of one man and one woman, of two genders as divinely ordained, and of his duty as a parent to instruct his children in these truths. *Id.* ¶¶ 5-6, 8, 10. Before the 2025-2026 school year began, Plaintiff contacted school officials to express his concerns about content in the Health and Diversity, Equity, and Inclusion ("DEI") curricula. *Id.* ¶¶ 26-27. He requested his child's schedule, the course syllabi, and specifically an opt-out from health class and any DEI curriculum. *Id.* ¶¶ 20-27. He emphasized that "as a parent, I am heavily interested in what is being taught to my child and the only way I can be sure is for me to go through everything myself." *Id.* ¶ 27 Ex. A.

The teacher responded with links to generic curriculum overviews that lacked detail about specific lessons. *Id.* ¶ 23. Three days later, on August 28, Defendant Andrea So—the Director of Elementary Education—denied Plaintiff's opt-out requests. *Id.* ¶ 40. She stated that requests "may be denied or returned for clarification if [they do] not clearly identify the specific *required* curriculum or instructional material at issue." *Id.* ¶ 40 Ex. C. She characterized Plaintiff's requests as "overly broad" and requiring "further clarification." *Id.* This response created an impossible burden: Defendants refused to provide the information Plaintiff needed, yet faulted him for not

identifying specific lessons that he could not find or access. *See Id.* Plaintiff could not comply with Defendants demand because only they possessed the information necessary for compliance.

On August 30, Plaintiff submitted another written opt-out request, this time specifying that he sought to excuse his child from "lessons, events, school assemblies or other instructional activities and programs which cover issues of sexual orientation or gender identity." *Id.* ¶ 46, *see also Id.* Ex. D. On September 5, Defendant So again rejected the request, demanding that Plaintiff "re-submit [his] opt-out request with more information regarding a specific lesson." *Id.* ¶ 48 Ex. E. But Defendants still had not provided the specific lesson information Plaintiff needed to identify objectionable content. On September 10, Plaintiff's counsel sent a detailed letter further clarifying Plaintiff's beliefs and opt-out requests. *Id.* ¶ 48 Ex. F. Defendants did not respond.

On September 16—six days after counsel's letter, 17 days after Plaintiff's formal opt-out request, and 22 days after his initial request to review "everything" his child would be taught—Defendants showed J.L. a video depicting same-sex couples with children. *Id.* ¶ 57. The video was a read-aloud of "Families, Families, Families" by Suzanne Lang, which shows "two roosters in neckties holding each other and their chicks" with the text "some children have two dads," and "two female koalas with their babies" with the text "some children have two mothers." *Id.* ¶ 58 Ex. G. The book concludes: "whatever it might be, if you love each other, then you are a family." *Id.* As Defendants knew at the time this video was shown to Plaintiff's son, this teaching directly contradicted Plaintiff's closely held religious beliefs. Plaintiff learned of the violation only after reviewing curriculum materials belatedly provided a week later. *Id.* ¶ 60. Upon information and belief, Defendants also showed J.L. another book, "All Are Welcome," which contains illustrations of same-sex couples, including a pregnant lesbian mother, that violated Plaintiff's opt-out request. *Id.* ¶ 72. Only on September 19—nearly a month after Plaintiff's initial request—did Defendant

provide *some* of the information requested by Plaintiff which included links to the Health curriculum. *Id.* ¶ 63 Ex. H. Even then, the links to Units 2 and 3 ("Families are Special" and "We're All Different and Special") were inaccessible. *Id.* ¶ 64. When Plaintiff finally gained access days later, he discovered that J.L. had already been shown the objectionable content. *Id.* ¶ 65.

J.L. remains enrolled in Lexington Public Schools. *Id.* ¶ 84. Additional Social Studies lessons and other potentially objectionable content are scheduled for the remainder of the school year. *Id.* ¶ 85. Defendants have not changed their policies or committed to honoring future opt-out requests. *Id.* ¶ 86. They continue to place the burden on Plaintiff to identify specific lessons without providing the information necessary for him to do so. *Id.* ¶¶ 85-86. And Defendants have represented that the curriculum is subject to change throughout the year; which means Plaintiff has no guarantee that other content that violates his religious beliefs will not be shown to J.L. *Id.* ¶ 85. The threat of further constitutional violations is real and imminent.

## ARGUMENT

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits; that he is likely to suffer irreparable harm in the absence of preliminary relief; that the balance of equities tips in his favor; and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008). This case involves the deprivation of fundamental constitutional rights—free exercise of religion and parental autonomy—for which the law presumes irreparable harm: when it comes to the First Amendment, the overall burden is on the Government to justify its infringement of constitutional rights. *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 816 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions.") (citations omitted). Defendants bear the burden of demonstrating that their restriction on speech is constitutional. *See Ashcroft v.*

*Am. Civil Liberties Union*, 542 U.S. 656, 665–66 (2004). Defendants here cannot satisfy this heavy burden.

## I. Plaintiff Is Likely to Succeed on the Merits.

Plaintiff brings claims under the Free Exercise Clause and the Due Process Clause. Those claims are directly resolved by the application of the Supreme Court's analysis in *Mahmoud.* "In the First Amendment context, the likelihood of success on the merits is the linchpin of the preliminary injunction analysis." *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10 (1st Cir 2012); *see also Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 9-10 (1st Cir. 2013).

### A. Plaintiff is Likely to Succeed on His Free Exercise Claim.

In *Mahmoud v. Taylor*, the Supreme Court definitively resolved the question presented here. Public schools substantially burden parents' free exercise of religion when they compel children to participate in instruction that "poses 'a very real threat of undermining' the religious beliefs and practices that parents wish to instill in their children." 145 S. Ct. at 2342 (quoting *Yoder*, 406 U.S. at 218). When such a burden exists, strict scrutiny applies, and schools must provide advance notice and honor religious opt-out requests.

In other words, the Free Exercise Clause analysis is straightforward and in two parts. Under *Mahmoud v. Taylor*, Plaintiff can and must first demonstrate that Defendants substantially burdened his religious exercise, which triggers strict scrutiny review. Then, Defendants must prove that their actions satisfy strict scrutiny's demanding requirements. They cannot do so here.

### 1. Defendants Have Substantially Burdened Plaintiff's Religious Exercise.

This case is *Mahmoud* applied. Here, just as there, the Defendants' "introduction of the 'LGBTQ+-inclusive' storybooks, combined with its no-opt-out policy, burdens the parents' right to the free exercise of religion." *Id.* at 2360. Strict scrutiny is mandated because the Defendants

have interfered with the Plaintiff's right to direct his children's religious upbringing. Strict scrutiny applies to laws that restrict the "right of parents . . . to direct the [religious] education of their children." *Employment Division v. Smith*, 494 U.S. 872, 881 (1990) (citing *Yoder*, 406 U.S. 205). The Supreme Court has long recognized this right. *See, e.g., Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534-35 (1925). It is rooted in "[t]he history and culture of Western civilization," which "reflect a strong tradition of parental concern for the nurture and upbringing of their children." *Yoder*, 406 U.S. at 232; *see also Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2261 (2020). Under the Free Exercise Clause, this parental right is "now established beyond debate as an enduring American tradition." *Yoder*, 406 U.S. at 214, 232.

In *Yoder*, the Court invoked this right to protect Amish parents opting their children out of high school entirely. 406 U.S. at 214, 232. The Court emphasized that the rights of parents to direct "the religious upbringing and education of their children in their early and formative years have a high place in our society." *Id.* at 213-14. And because "exposing Amish children to worldly influences" at school could "substantially interfer[e]" with their religious development "at the crucial adolescent stage," the Court applied strict scrutiny. *Id.* at 218.

*Mahmoud* held that strict scrutiny applies whenever government action "substantially interferes with the religious development" of a child. *Mahmoud*, 145 S. Ct. at 2353. The law mandates this review: "it is sufficient to note that the burden imposed here is of the exact same character as that in *Yoder*. That is enough to conclude that here, as in *Yoder*, strict scrutiny is appropriate regardless of whether the policy is neutral and generally applicable." *Id.* at 2361 n. 14. The same principle is true here: Defendants' actions substantially interfere with J.L.'s religious development, triggering strict scrutiny under *Mahmoud*. The state's interest in compulsory education does not permit it to override parental religious authority over moral formation. A burden

exists when government action "substantially interferes with the religious development" of a child. *Mahmoud*, 145 S. Ct. at 2353. The Court in *Mahmoud* emphasized that such requirements imposed a substantial burden because they were "unmistakably normative" and presented "certain values and beliefs as things to be celebrated, and certain contrary values and beliefs as things to be rejected." *Id.* The books did not merely expose children to the existence of diverse families—they conveyed a moral message about which family structures are valid and worthy of celebration. *Id.*

The Supreme Court has regularly emphasized the particular susceptibility of and risk to school children in the presence of mandatory public education. *Edwards v. Aguillard*, 482 U.S. 578, 583-84 (1987). "[T]here are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools." *Lee v. Weisman*, 505 U.S. 577, 592 (1992). This heightened concern reflects this Court's common-sense recognition that "[s]tudents in such institutions are impressionable and their attendance is involuntary." *Edwards*, 482 U.S. at 584. The Court emphasized as crucial to any analysis of the government's "coercive power" the authority of the state to mandate attendance and "the students' emulation of teachers as role models and the children's susceptibility to peer pressure." *Id.*

*Mahmoud* is indistinguishable from the present case. Like the parents in *Mahmoud*, Plaintiff's sincerely held Christian belief is that marriage is ordained by God as the union of one man and one woman, and that children should be raised in accordance with biblical teachings about family. These beliefs directly conflict with curriculum materials that normalize same-sex relationships and gender identity concepts. Plaintiff's sincerely held religious belief is also that that God created all people in His image and that children should be taught to judge others by the content of their character and individual choices rather than the color of their skin. He believes that as the father of J.L., it is his role to instill good, moral, and Christian values in J.L. and to

shape J.L.'s concept of the world and of different identities. Plaintiff's religious objections are precisely the type *Mahmoud* protects. The Supreme Court noted that parents from "diverse religious backgrounds"—including Muslim, Catholic, and Ukrainian Orthodox families—all asserted similar objections to LGBTQ-themed materials based on their faith traditions. *Mahmoud*, 145 S. Ct. at 2342. Plaintiff's Christian beliefs fit comfortably within this framework.

Age only strengthens the case. J.L. is five years old—a kindergartner. *Mahmoud* emphasized that "[e]ducational requirements targeted toward very young children, for example, may be analyzed differently from educational requirements for high school students" because they are more susceptible to moral messaging and less able to critically evaluate competing viewpoints. *Id.* at 2353. J.L. falls squarely within this protected group. At age five, a child such as J.L. cannot compartmentalize conflicting messages from parents and teachers. He cannot engage in critical analysis of moral claims. He absorbs what trusted authority figures tell him as truth. When the school tells him that "whatever it might be, if you love each other, then you are a family," he has no framework to reconcile that with his parents' religious teaching that God designed marriage as the union of one man and one woman. This is precisely the vulnerability *Mahmoud* recognized. Exposure at a formative age "substantially interferes with the religious development" of the child and "imposes the kind of burden on religious exercise that Yoder found unacceptable." *Id.* at 2353.

The materials shown to J.L. were not presented neutrally. Like the books in *Mahmoud*, they conveyed unmistakably normative messages. Consider the "Families, Families, Families" video. It depicts same-sex couples and states affirmatively that "some children have two dads" and "some children have two mothers." Alan L. Decl. ¶ 58 Ex. G. The video concludes with the moral claim: "whatever it might be, if you love each other, then you are a family." *Id.* This is not neutral exposition. It is moral instruction. The message directly contradicts Plaintiff's religious conviction

that marriage and family have a divinely ordained structure. "Like many books targeted at young children, the books are unmistakably normative. They are clearly designed to present certain values and beliefs as things to be celebrated and certain contrary values and beliefs as things to be rejected." *Mahmoud*, 145 S. Ct. at 2353. They are celebratory depictions designed to normalize and affirm same-sex relationships as morally equivalent to traditional marriage.

In *Mahmoud*, the Supreme Court found similar materials substantially burdensome. Justice Alito's majority opinion noted that one book featured a character who initially expressed reservations about same-sex marriage, only to be corrected by her mother—a narrative structure designed to teach children that opposition to same-sex marriage is wrong. *Id.* at 2353-54. The Court concluded that such materials "convey a particular viewpoint about same-sex marriage and gender. That goes far beyond mere 'exposure.'" *Id.* at. 2356. The materials here are indistinguishable and convey the particular viewpoint that all family structures are equally valid and should be celebrated—a viewpoint Plaintiff's faith rejects.

If anything, this case presents a stronger claim of substantial burden than *Mahmoud* because Defendants not only showed objectionable content but actively prevented Plaintiff from exercising his opt-out rights. In *Mahmoud,* the school board adopted a clear no-opt-out policy. Parents knew where they stood. Here, Defendants created something worse: a procedural maze designed to frustrate religious objections. They demanded specific identification of objectionable lessons while refusing to provide the curriculum information necessary to make such identifications. They ignored statutory deadlines for public records requests. And then, while Plaintiff was still seeking information, they showed his child the objectionable content. This procedural obstruction is itself a substantial burden on religious exercise, making it functionally impossible for Plaintiff to opt out before his child was exposed to objectionable content.

Even if this Court were to analyze Defendants' actions under *Employment Division v. Smith*'s framework—and *Mahmoud* makes clear such analysis is unnecessary here—Defendants' policies fail the general applicability requirement. "A law is not generally applicable if it 'invite[s] the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions.'" *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021) (citation omitted). Massachusetts law requires schools to allow parents to opt their children out of certain sex education content. M.G.L. c. 71, § 32A. Defendants must regularly provide notice and an opportunity to opt other students out of content that their parents find objectionable, including these sex education materials. In *Mahmoud*, the school board continued "to permit opt outs in a variety of other circumstances, including for 'noncurricular' activities" and "g[oes] to great lengths to provide independent, parallel programming for many other students[.]" *Mahmoud*, 145 S. Ct. at 2362. The Court held that this "conduct undermines [the board's] assertion that its no-opt-out policy is necessary." *Id.* The same principle applies here. If Defendants can provide opt-outs for sex education, English language learners, and students with individualized education programs, they can provide opt-outs for religious objections. *Mahmoud* and *Fulton* render the conclusion inescapable; Defendants' conduct is subject to strict scrutiny.

**2. Defendants Cannot Satisfy Strict Scrutiny**

To survive strict scrutiny, the government must demonstrate that its policy "advances 'interests of the highest order' and is narrowly tailored to achieve those interests." *Fulton v. Philadelphia*, 593 U.S. 522, 541 (2021) (quoting *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546 (1993)). The Defendants here cannot justify the burden they have imposed on Plaintiff's free exercise rights.

Start with the compelling interest requirement. Defendants may claim an interest in teaching tolerance or preventing discrimination. But whatever interest the state has in promoting such values, it does not extend to overriding parental religious convictions about marriage and sexuality, especially for a five-year-old child. While the state has authority to ensure children receive a basic education, it does not have authority to standardize their moral views or indoctrinate them in values contrary to their parents' faith. *See Yoder*, 406 U.S. at 233 (rejecting the notion that the state may "standardize its children").

Even if Defendants could identify a compelling interest, their actions are not narrowly tailored. Narrow tailoring requires the government to prove "that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting parties." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728 (2014). In *Mahmoud*, the Court emphasized that "the Board's conduct undermines its assertion that its no-opt-out policy is necessary to serve that interest." *Mahmoud*, 145 S. Ct. at 2362. The Respondent continued "to permit opt outs in a variety of other circumstances." *Id.* Under Massachusetts law, opt outs are available to students in a variety of circumstances. For example, 71 M.G.L., § 32A requires that parents have the right "to exempt their children from any portion" of any "curriculum which primarily involves human sexual education or human sexuality issues." In *Mahmoud*, Maryland had a similar law: Code of Md. Regs., tit. 13a, §04.18.01(D). The school has a robust system of "independent, parallel programming for many other students," with many individualized education programs ("IEPs"), such as the program J.L. himself utilizes. *See* Alan L. Decl. ¶ 38. The school, in short, provides many opt outs. Because of these available exceptions, the Supreme Court emphasized that the "robust 'system of exceptions' undermines the Board's contention that the

provision of opt outs to religious parents would be infeasible or unworkable." *Mahmoud*, 145 S. Ct. at 2362.

Multiple less restrictive alternatives were available and obvious: First, Defendants could have provided advance notice and honored opt-out requests. This is the remedy *Mahmoud* prescribed. Defendants already, as mandated by law, allow other students to opt out for other reasons. Adding religiously inclusive content to that list requires no additional infrastructure. Second, Defendants could have, at a minimum, disclosed curriculum materials promptly upon request. Plaintiff asked repeatedly, beginning in August. Defendants could have provided comprehensive information immediately instead of creating delay, withholding key units, and ignoring statutory deadlines. Plaintiff should not have been required to make official public record requests in order to review his child's own curriculum. Even then, if Defendants had fulfilled his public records request on time, he could have identified objectionable content and exercised his opt-out rights before any violation occurred. Third, Defendants could have provided alternative instruction. Schools routinely provide alternative assignments. Providing alternative lessons during opted-out periods would impose minimal burden.

The Defendants cannot escape liability by relying on how difficult they have made it to identify objectionable curriculum. "The Board cannot escape its obligation to honor parents' free exercise rights by deliberately designing its curriculum to make parental opt outs more cumbersome." *Mahmoud*, 145 S. Ct. at 2362. If Defendants had fulfilled Plaintiff's repeated requests for detailed curriculum information, he could have identified objectionable content and exercised his opt-out rights before any violation. Defendants chose none of these alternatives. Instead, they created administrative barriers, withheld information, and proceeded with instruction they knew would violate Plaintiff's religious beliefs. This is the opposite of narrow tailoring.

Because Defendants' actions substantially burden Plaintiff's religious exercise and cannot survive strict scrutiny, Plaintiff is likely to succeed on his Free Exercise claim. The imposition of such a curriculum "places an unconstitutional burden on the parents' religious exercise if it is imposed with no opportunity for opt outs." *Id.*

**B. Plaintiff Is Likely to Succeed on His Substantive Due Process Claim**

The Due Process Clause in the Fourteenth Amendment protects the fundamental right of parents to direct the upbringing and education of their children. For over a century, the Supreme Court has repeatedly upheld this right. In *Meyer v. Nebraska*, the Court held that the liberty protected by the Fourteenth Amendment includes "the right of parents" to control the education of their own children. 262 U.S. 390, 400 (1923). Two years later, in *Pierce,* the Court struck down a law requiring attendance at public schools, holding that "the child is not the mere creature of the State" and that "those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." 268 U.S. at 535.

In 2000, in *Troxel v. Granville*, the Supreme Court again affirmed that "the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court." 530 U.S. 57, 65 (2000). Justice O'Connor's plurality opinion emphasized that this right encompasses parents' "fundamental right to make decisions concerning the care, custody, and control of their children." *Id.* at 66. The right at issue here is not merely the right to make educational decisions in a general sense. It is the right to direct the *moral and religious* formation of one's child—a right that lies at the very core of parental liberty and is likewise protected by the First Amendment. In *Yoder*, the Court emphasized that "the values of parental direction of the religious upbringing and education of their children in their early and formative years have a high place in our society." 406 U.S. at 213. If parents have a constitutional

right to withdraw their children from public school entirely based on religious objections to the curriculum, they certainly possess the right to opt their children out of specific lessons that conflict with their faith while keeping them enrolled.

Defendants have infringed Plaintiff's fundamental parental rights in two ways. First, as discussed above they compelled his five-year-old child to receive moral instruction contrary to the family's religious beliefs. The state has no authority to override parental moral instruction in this way. "The fundamental theory of liberty upon which all governments in this Union repose excludes any general power of the State to standardize its children by forcing them to accept instruction from public teachers only." *Pierce*, 268 U.S. at 535. Defendants substituted the state's moral judgment—that all forms of family are equally valid—for Plaintiff's religious conviction about marriage between one man and one woman.

Second, Defendants blocked Plaintiff's ability to exercise his parental rights by withholding curriculum materials and creating administrative obstacles. By refusing to provide advance notice or curriculum access, Defendants made it impossible for Plaintiff to make informed decisions about his child's education. This procedural obstruction itself is a substantive violation of parental rights.

Because Defendants have infringed a fundamental right, their actions must survive strict scrutiny. *See Smith*, 494 U.S. at 881. For the reasons explained above in Plaintiff's Free Exercise claim, Defendants cannot meet this exacting standard. The state has no compelling interest in forcing a five-year-old to receive moral instruction contrary to his parents' religious convictions. And Defendants' actions were not narrowly tailored. Numerous less restrictive alternatives were available—providing notice, honoring opt-out requests, offering alternative instruction—yet Defendants chose none of them. Plaintiff is likely to succeed on his substantive due process claim.

### C. Plaintiff Is Likely to Succeed on His Procedural Due Process Claim

Even if Defendants could identify a compelling reason for exposing J.L. to this curriculum—and they cannot—they violated Plaintiff's rights by denying him adequate procedural protections before doing so.  As explained above, Plaintiff possesses a fundamental liberty interest in directing his child's upbringing and education. *Troxel*, 530 U.S. at 65. The interest at stake is profound. This is not a case about grades, discipline, or academic placement. It concerns Plaintiff's fundamental right to direct the moral and religious formation of his young child. That interest is "perhaps the oldest of the fundamental liberty interests recognized by this Court." *Id.*

"The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). Before the government deprives someone of a protected liberty interest, it must provide notice and an opportunity to be heard. *Id.* Defendants provided neither. Despite Plaintiff's repeated requests beginning in August 2025, Defendants refused to disclose the specific curriculum materials his child would encounter. When Plaintiff submitted a formal public records request on August 29, Defendants ignored the statutory deadline. When they finally provided partial curriculum access on September 19, they withheld the very units most likely to contain objectionable content. Meanwhile, on September 16—while Plaintiff was still waiting for information—Defendants showed J.L. the "Families, Families, Families" video. Plaintiff received no advance notice. He had no opportunity to object before his child was exposed to the content. He learned of the violation only after the fact, when it was too late to protect his son from the instruction he had explicitly sought to avoid.

This sequence of events violated the most basic requirements of procedural due process. The Supreme Court has held that due process requires "notice reasonably calculated, under all the

circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). Defendants provided no such notice. Without advance notice or curriculum access, Plaintiff had no way to identify objectionable content before his child was exposed to it. The violation here was not erroneous—it was inevitable. Defendants created a system that was seemingly designed to frustrate parental oversight. Additional safeguards—notice, curriculum disclosure, and a reasonable opportunity to opt out—would have prevented this deprivation entirely.

The government's interest does not justify inadequate procedures, and the burden of additional safeguards is minimal. Massachusetts law already requires notice and opt-out rights for certain sex education content. M.G.L. c. 71, § 32A. Extending similar protections to other sensitive content would impose no significant burden on the school's operations. The procedures Defendants employed were constitutionally inadequate. Plaintiff is therefore likely to succeed on his procedural due process claim.

### II. The Relief Plaintiff Seeks Tracks Mahmoud's Remedy

This Court need not craft novel remedies or balance competing interests in a vacuum. *Mahmoud* provides a clear blueprint. After finding that the school board's policies substantially burdened parents' free exercise rights, the Supreme Court ordered specific injunctive relief: "the Board should be ordered to notify [parents] in advance whenever one of the books in question or any other similar book is to be used in any way and to allow them to have their children excused from that instruction." *Mahmoud*, 145 S. Ct. at 2364. The injunction Plaintiff seeks here mirrors this remedy: (1) advance notice of any LGBTQ-themed curriculum materials addressing sexual orientation, gender identity, or family structures; and (2) the right to opt J.L. out of such instruction

based on Plaintiff's religious objections. These requirements are neither novel nor burdensome—they are the accommodations the Supreme Court held the Constitution requires just months ago. *Mahmoud* emphasized that such relief is "both equitable and in the public interest" because it protects parents' constitutional rights while allowing schools to teach their curriculum to willing students. *Id.* The injunction simply requires that they notify Plaintiff in advance and honor his religious opt-out requests. The same constitutional violations *Mahmoud* condemned will continue absent immediate injunctive relief. This Court should apply the remedy the Supreme Court prescribed.

### III. The Plaintiff Will Suffer Irreparable Harm Absent Relief

The Plaintiff will suffer immediate and irreparable harm if the Court does not prohibit Defendants from enforcing their discriminatory policy. *Mahmoud* itself establishes that the harm Plaintiff faces is irreparable. After finding that the school board's policies violated parents' free exercise rights, the Court held that "an injunction is both equitable and in the public interest" and ordered immediate preliminary relief. *Mahmoud*, 145 S. Ct. at 2364. If the harm was irreparable in *Mahmoud,* it is certainly irreparable here, where J.L. has already been exposed to objectionable content and faces ongoing exposure to additional materials.

"'Irreparable injury' in the preliminary injunction context means an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). The First Circuit has affirmed that where, as here, the Plaintiff has made "a strong showing of likelihood of success on the merits of [his] First Amendment claim, it follows that the irreparable injury component of the preliminary injunction analysis is satisfied as well." *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 15

(1st Cir. 2012). Irreparable harm is easily satisfied in cases where a plaintiff would otherwise be prevented from exercising his constitutional right to free speech. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

Plaintiff faces three forms of irreparable harm. J.L. remains enrolled in Lexington Public Schools and will continue to be exposed to curriculum that violates Plaintiff's religious beliefs. Additional Social Studies lessons and other potentially objectionable content are scheduled for the remainder of the year. Defendants have not changed their policies or committed to honoring future opt-out requests. Without an injunction, the constitutional violations will continue.

Second, the harm already suffered cannot be undone. J.L. has been exposed to moral instruction contrary to his family's faith. That exposure has created confusion and required Plaintiff to engage in "damage control"—explaining to his five-year-old why the school's teaching conflicts with the family's beliefs. The child's innocence on these subjects has been compromised. This psychological and spiritual harm cannot be remedied by money damages after the fact.

Third, Plaintiff faces ongoing anxiety and loss of trust. He now feels he is in an adversarial relationship with the school and will need to work to convince his child that his family's religious beliefs, and not the school's values, are correct. This burden on the parent-child relationship and the family's religious life constitutes irreparable harm. Plaintiff should not have to choose between enrolling his child in public school and protecting his religious upbringing.

### IV. The Balance of the Equities Favors Preliminary Injunctive Relief

The balancing of the equities overwhelmingly favors the Plaintiff. On one side of the scale is a parent's fundamental right to direct his child's religious upbringing—a right the Supreme Court

has protected for nearly a century. On the other side is the school's interest in teaching its curriculum without accommodating religious objections.

Defendants cannot claim an interest in continued enforcement of an unconstitutional practice, a policy that discriminates against religion. *See ACLU v. Ashcroft*, 322 F.3d 240, 251 n.11 (3d Cir. 2003). In the absence of a compelling state interest in regulating the plaintiff's speech, the public interest strongly favors the preservation of the plaintiff's constitutional free speech and associational rights. Schools across Massachusetts already provide notice and opt-out rights for sex education. Extending similar protections to other sensitive content that offends religious rights would require minimal additional effort and ensure that families with religious objections are not forced to participate.

### V. The Injunction Is in the Public Interest.

Finally, the public interest also supports granting preliminary injunctive relief. "Surely, upholding constitutional rights serves the public interest." *Newsom Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003); *Carey v. Klutznick*, 637 F.2d 834, 839 (2d Cir. 1980). Protecting First Amendment rights is by definition in the interest of the general public. *Machesky v. Bizzell*, 414 F.2d 283, 288–90 (5th Cir. 1969) ("First Amendment rights are not private rights . . . so much as they are rights of the general public.") The protection of constitutional rights clearly outweighs any purported concerns of Defendants. Granting this injunction would serve the public interest by reaffirming the government's duty to respect religious conscience. The public interest is necessarily served by an injunction that preserves the constitutional rights of the Plaintiff.

### CONCLUSION

For these reasons, the Plaintiff respectfully requests that the Court issue a preliminary injunction.

SAMUEL J. WHITING
*/s/ Samuel J. Whiting*
MASSACHUSETTS LIBERTY LEGAL CENTER
  (Massachusetts Bar No. 711930)
sam@mafamily.org


ABIGAIL SOUTHERLAND*
*/s/Abigail Southerland*
  (TN Bar No. 026608)
THE AMERICAN CENTER FOR LAW & JUSTICE
625 Bakers Bridge Ave., Suite 105-121
Franklin, Tennessee 37067
Tel. 615-599-5572
Fax: 615-599-5180


JORDAN SEKULOW*
  (D.C. Bar No. 991680)
STUART J. ROTH**
  (D.C. Bar No. 475937)
ANDREW EKONOMOU*
  (GA Bar No. 242750)
OLIVIA F. SUMMERS*
  (D.C. Bar No. 1017339)
NATHAN MOELKER*
  (VA Bar No. 98313)
THE AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Avenue, NE
Washington, D.C. 20002
Telephone: (202) 546-8890
Facsimile: (202) 546-9309


* Admitted Pro Hac Vice.

**<u>CERTIFICATE OF SERVICE</u>**

I, Abigail Southerland, hereby certify that on November 6, 2025, the foregoing document was filed electronically using the Court's CM/ECF system, which will send notification of this filing to all registered participants. Paper copies will be sent to those indicated as non-registered participants.

<u>/s/ Abigail Southerland</u>
Abigail Southerland
