IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALAN L., on behalf of himself and his minor child, J.L.,<br><br>Plaintiff,<br><br>vs.<br><br>LEXINGTON PUBLIC SCHOOLS; LEXINGTON SCHOOL COMMITTEE;<br>DR. JULIE HACKETT, in her individual and official capacity as Superintendent of the Lexington Public School District;<br>DR. GERARDO J. MARTINEZ, in his individual and official capacity as Principal of Joseph Estabrook Elementary School and;<br>ANDREA SO, in her individual and official capacity as Director of Elementary Education,<br><br>Defendants. | Civil Action No.: 1:25-cv-13047-FDS |

### **DECLARATION OF ALAN L.**

Now comes Alan L., pursuant to Fed. R. Civ. P. 56(c)(4) and 28 U.S.C. § 1746, and states as follows to this Honorable Court:

1. My name is Alan L. I am over 18 years of age. I am competent to make this declaration and I have personal knowledge of all of the contents of this declaration.

2. I am the father of J.L., a minor child who attends Kindergarten class at Joseph Estabrook Elementary School, located in Lexington, MA.

3. I am a committed, practicing Christian and attend a local church.

4. My faith shapes all aspects of my life, including my family life, and informs the way I raise my child.

1

5. My religious beliefs are sincere and deeply held. They guide my daily decisions, my parenting, and my family's life together. I am committed to raising my children according to biblical principles and Christian teaching.

6. As a Christian, I believe that the Bible is the inspired Word of God and provides authoritative guidance for all matters of faith and practice, including marriage, sexuality, gender, and family life.

7. I believe that Christianity requires me to follow the teachings of the Bible, including teachings regarding human sexuality.

8. I believe the Bible teaches that God created people in His image, and that they are created either male or female. (Gen. 1:27).

9. I believe that human sexuality is a gift from God and should be treated with honor and respect.

10. I believe that sexuality is designed by God to be expressed only within the context of a one-man, one-woman marriage. (Matt. 19:5).

11. I also believe that God created all people in His image – including their skin color – and that children should be taught to judge others by the content of their character and individual choices rather than the color of their skin. (Acts 10:34-35).

12. I believe that unity in Christ transcends worldly divisions and that the Bible teaches that a person's value or worth is not based on one's race or sexual identity (Galations 3:28) and that we are to treat one another justly and fairly.

13. As the father of J.L., it is my role to instill good, moral, and Christian values in J.L., such as respect, kindness, and empathy, and to shape J.L.'s concept of the world and of different identities. (Prov. 22:6).

14. It violates my religious beliefs to allow J.L. to be instructed in content that focuses on diversity, equity, and inclusion issues, including issues of race, gender, and sexuality, taught from a secular worldview.

15. My religious beliefs require that I protect J.L. from instruction that contradicts or undermines the biblical teachings I am working to instill in him, particularly during his early and formative years when he is most impressionable.

16. Because of my Christian belief that the Bible holds me accountable for the upbringing of my children, I pay particular attention to the classes and curricula in which my child engages.

17. Before the 2025-2026 school year began, I became aware that Lexington Public Schools had introduced curriculum materials addressing topics related to sexual orientation, gender identity, and family structures that conflicted with my religious beliefs.

18. I was concerned that J.L. might be exposed to instruction that would normalize or celebrate same-sex relationships and non-traditional family structures in a way that contradicted our family's biblical beliefs about marriage and sexuality.

19. I was particularly concerned because J.L. is only five years old. At this age, he cannot critically evaluate competing moral claims or compartmentalize contradictory messages from different authority figures. He trusts his teachers and absorbs what they tell him as truth.

20. On August 25, 2025, I sent an email to Joseph Estabrook School and requested J.L.'s full class schedule and the syllabus for the classes.

21. In that same email, I requested that J.L. not attend Health class on Tuesday. *Id*.

22. In response to my email and requests, I was provided a link to by the Kindergarten teacher, Mrs. Caroline Chestna.

23. This link is a landing page for Curriculum in Lexington public schools. While it provides links to information regarding curriculum standards and links to, among other things, 1) "learning expectations by grade," and family guides to learning standards, it generally "provides families high level overviews of literacy, mathematics, science and social studies as they are taught in Lexington Public Schools" for K-5 core curriculum. What it does not provide are the actual syllabi and curricula for my child's classes.

24. On August 25, 2025, I was also informed via email by Ms. Alexis Bonavita, IEP Lead Teacher, that J.L. would not be required to attend health class and could instead leave to receive 1:1 time in an ILP classroom as long as it was in writing. She further informed me that my email sufficed as that required for written request. Attached hereto as Exhibit A is a true and accurate copy of my August 25, 2025 email exchange.

25. On the same day, I received the "Kindergarten Scope and Sequence" for the school year from Mrs. Chestna. She informed me that she does not teach any OAP classes, such as health, art, P.E., music, or library, so she did not have access to any of that curriculum. *Id*. at 2.

26. That same day, I reviewed what I received from Mrs. Chestna and sent an email to her letting her know that I was going to pull J.L. out of any DEI curriculum. I also told her if she needed an official letter from me, to please let me know. *Id*. at 3.

27. In another email, I also made it clear that "I am heavily interested in what is being taught to my child and the only way I can be sure is for me to go through everything myself." *Id*. at 6.

4

28. The "Kindergarten Scope and Sequence" document I received from Mrs. Chestna was a spreadsheet identifying eight different subjects: 1) Reading, 2) Writing, 3) Phonics and PA, 4) Mathematics, 5) AMC Benchmarks, 6) Science/Social Studies, 7) Big Backyard, and 8) DEI Curriculum.

29. Within each subject were overarching lesson themes for each subject, with a few links to documents that described the overviews of the classes or required permission to access.

30. I requested access to view the file, and it was denied by Andrea So, the Director of Elementary Education. I then sent an email to Mrs. Chestna to inquire how I could escalate the matter to gain access. *Id*. at 4.

31. Mrs. Chestna informed me that most of the links in the spreadsheet she sent were only accessible to Lexington public educators, since they led to curriculum websites that required logins. She stated that she would look into the matter for me to learn if there was a place that parents could find more detailed information regarding class curriculum information as well as syllabus by units. *Id*. at 5.

32. I reiterated my request to remove J.L. from any DEI curricula, as that subject contained no links information, not even a general overview of the subject. *Id*. at 6.

33. Mrs. Chestna responded the same day, stating that she had edited the scope and sequence with more parent-accessible information and added hyperlinks. She stated that she would refer my DEI opt-out question to other school officials, including Ms. Lexi Bonavita and Ms. Johanna Hoxie. *Id*. at 7,

34. On or about August 26, 2025, Ms. Hoxie, the Evaluation Team Supervisor, emailed me offering to schedule an IEP Team meeting to discuss J.L.'s goals, objectives, and services.

5

I agreed and requested that the meeting be scheduled as soon as possible. Attached hereto as Exhibit B is a true and accurate copy of my August 26-28, 2025 email exchange.

35. In that same email, she stated, "we will not go into a heavily detailed discussion around curriculum." *Id*. at 1.

36. Over the following days, I asked Ms. Hoxie whether Estabrook had an official opt-out form for parents to fill out with the principal's office. She responded that Central Office administration would contact me regarding the opt-out request. *Id*. at 2.

37. I then clarified to Ms. Hoxie that, since Estabrook did not yet have a parent-approved IEP for J.L, the school should continue following the plan from J.L's previous program (LCP), which did not include any DEI curriculum. I also reiterated that I was awaiting the official opt-out form from Central Office. *Id*. at 2-3.

38. Ms. Hoxie confirmed that the school was following the last accepted IEP from December 2024 through December 2025. I responded that I wanted to amend J.L.'s IEP to specifically exclude any DEI curriculum from J.L.'s schedule, in addition to my formal opt-out request. *Id.* at 3.

39. On August 28, 2025, Ms. Hoxie scheduled a virtual IEP meeting for September 4, 2025. *Id*. at 4.

40. On August 28, 2025, I also received an email from Ms. So, responding to my DEI and Health class opt-out requests. Attached hereto as Exhibit C is a true and accurate copy of my August 28, 2025 email exchange with Ms. So.

6

41. Ms. So stated that parents could opt out of required curriculum only if the request was based on a sincerely held religious belief and that my request was not tied to such a belief. She denied my opt-out request on that basis. *Id*. at 1.

42. I responded to Ms. So the same day, explaining that J.L. and I are both Christians and attend church regularly, and again requested that J.L. be removed from Health and DEI curriculum. I asked what additional requirements were necessary to formalize the request. *Id*. at 2.

43. Later that day, I asked Ms. So to provide the formal opt-out requirements at Estabrook. *Id*. I also emailed Principal Dr. Gerardo Martinez requesting contact information for the school's Freedom of Information Act (FOIA) representative, so I could obtain detailed syllabi for J.L's kindergarten curriculum. Attached hereto as Exhibit D is a true and accurate copy of my email exchange with Dr. Martinez.

44. Dr. Martinez responded on August 29, 2025, referring me to Ms. Kristen McGrath, who provided me with the link to the district's public records request process and a Google Form to submit my public records (or "FOIA") request. Exhibit D, at 2.

45. I proceeded to file a formal public records request to obtain the specific curriculum materials in question that same day.

46. On August 30, 2025, I submitted a formal written opt-out letter to Dr. Martinez. In that letter, I requested that J.L be excused from all lessons, events, assemblies, or other instructional activities covering:

    a. sex education or human sexuality under M.G.L. c. 71, § 32A;
    b. issues of sexual orientation or gender identity pursuant to *Mahmoud v. Taylor*, 145 S. Ct. 2332 (2025);

7

    c. any surveys concerning sexual orientation, gender identity, religion, politics, or similar personal matters under the PPRA, 20 U.S.C. § 1232h; any

    d. use of alternate names or pronouns for my child that would reflect a gender identity inconsistent with our beliefs.

The letter also pointed to a Massachusetts Department of Elementary and Secondary Education advisory opinion that would allow exempted students to be accommodated in another class, or otherwise provided alternative educational as I had previously requested be provided for J.L. *Id.* at 3-4.

47. On September 3, 2025, Dr. Martinez acknowledged receipt of my opt-out letter and informed me that I would receive a response from Ms. So. *Id.* at 3.

48. On September 5, 2025, Ms. So emailed me again, acknowledging that my August 30 letter requested an opt-out based on religious beliefs. She stated that the district would accommodate my request regarding sexual education under Massachusetts law, but claimed that there is no sexual education in kindergarten. She further stated that my other opt-out requests were overly broad, required clarification, and could be denied if not tied to a specific sincerely held religious belief or specific required curriculum materials. Attached hereto as Exhibit E is a true and accurate copy of Ms. So's email.

49. Ms. So requested that I re-submit my opt-out request with greater specificity regarding the particular lessons or required materials I objected to and offered to allow me to review the materials before resubmitting – even though I had requested to review the materials before I submitted my first request and did not receive access. *Id.*

50. Throughout this process, I consistently requested transparency and the ability to review all DEI-related curriculum materials before allowing my child to participate, and I sought to exercise my rights as a parent in good faith under Massachusetts law.

51. As I was not able to secure an opt-out for J.L. on my own, I retained counsel who, on September 10, 2025, sent a clarification and formal opt-out letter to Dr. Martinez on my behalf. Attached hereto as Exhibit F is a true and accurate copy of my legal request to Dr. Martinez.

52. That letter reaffirmed that my opt-out request was based on sincerely held Christian beliefs, as described above, and specifically sought to exclude J.L. from any instruction, events, or activities that normalize or promote LGBTQ identities or lifestyles or teach DEI content from a secular worldview. Exhibit F.

53. The letter further explained that exposing J.L. to such content would burden my religious exercise and parental rights. *Id*.

54. I further requested that J.L. be excused from all instruction or activities promoting LGBTQ identities or lifestyles and from the Kindergarten DEI Curriculum, and that J.L. receive an alternative assignment—preferably IEP services—during those times. *Id.*

55. In response, counsel for Lexington Public Schools sent a letter on September 23rd stating that while the district recognizes that *Mahmoud v. Taylor* requires notice and a religious opt-out for required instruction that substantially burdens a family's sincerely held beliefs, my request to opt out of "all DEI instruction" was "overly broad." The letter asserted that many DEI principles—such as promoting respect, preventing bullying, and fostering inclusion—are integral to the school's educational mission and required by non-discrimination laws.

9

56. The District's attorney invited me to meet with Ms. So to review the kindergarten curriculum and after-hours classroom books so I could identify specific "read-aloud" materials for which I sought an exemption. The letter stated that the school would provide notice and a process for requesting opt-outs from "specific, required curriculum or instructional materials" but would not approve an opt-out from all DEI instruction or all content that promoted LGBTQ identities or lifestyles, as I had requested.

57. On or about September 16, 2025, after my counsel's letter and before any such meeting or notice occurred as outlined in the District's letter, J.L. was shown a "read-aloud" video of *Families, Families, Families!* by Suzanne Lang in Health class.

*58.* The book features animal characters representing same-sex couples (i.e., two roosters together with their chicks and two female koalas together with their baby) and teaches that all family structures are equally valid, ending with "if you love each other, then you are a family." This lesson directly contradicted my religious beliefs and occurred despite my explicit opt-out request. Attached hereto as Exhibit G are true and accurate screenshots of the pages of *Families, Families, Families!*

59. I later learned that J.L. was shown this video when Ms. So belatedly provided links to Units 2 and 3 of the Health curriculum—"Families Are Special" and "We're All Different and Special"—on September 22, 2025. These materials confirmed that *Families, Families, Families!* had been shown on September 16.

60. I did not learn that this video had been shown to J.L. until about a week after it was shown, after I finally received access to some of the curriculum materials I had been requesting.

61. When I learned about the video and viewed it myself, I was shocked and deeply upset. The video depicts same-sex couples with children and conveys the message that all family arrangements are equally morally acceptable.

62. Specifically, the video shows two male roosters wearing neckties, holding each other and their chicks, with the text "some children have two dads." It then shows two female koalas with their babies and states "some children have two mothers." *See* Exhibit G.

63. On September 19, 2025—four days after the ten-business-day deadline for my public-records request expired—I received partial Health-curriculum information, but links to the two lessons containing the video were missing. Only after further follow-up were those links provided. Attached hereto as Exhibit H is a true and accurate copy of Ms. So's email.

64. However, even in this September 19 email, the links to two units—Unit 2 ("Families are Special") and Unit 3 ("We're All Different and Special")—were not accessible to me. These were the very units most likely to contain content related to family structures and LGBTQ topics. Exhibit H.

65. I had to send a follow-up email specifically requesting access to Units 2 and 3. It was only after this follow-up request that I was finally granted access to these materials—days after J.L. had already been shown the *Families, Families, Families* video.

66. On October 2, 2025, my counsel sent a legal-demand letter explaining that J.L. had been shown the *Families, Families, Families!* video in violation of my opt-out request. The letter demanded that J.L be excused from any future instruction normalizing or promoting LGBTQ lifestyles or DEI content.

67. The demand letter also detailed how the school delayed providing curriculum access, forced me to file a public-records request, and then exposed my child to the very content I

had sought to prevent. It further identified objectionable materials in the DEI and Social Studies curricula—including *Say Something*, *You Have a Voice*, *Love Makes a Family*, *Julian Is a Mermaid*, and *This Day in June*—that promote secular moral values, LGBTQ themes, or activism contrary to our faith.

68. This message directly contradicts the biblical teaching about marriage and family that I am working to instill in J.L. The video presents same-sex relationships as a normal and acceptable form of family structure—indeed, as morally equivalent to marriage between one man and one woman.

69. This is precisely the type of content I had been trying to prevent J.L. from being exposed to through my repeated opt-out requests. The school showed this video to my five-year-old child despite having received multiple written communications from me explaining my religious objections to such content.

70. Again, I was not notified in advance that this video would be shown on September 16, 2025, or at any time prior to the lesson. If I had been notified, I would have exercised my right to opt J.L. out of that lesson

71. The school's delay in providing these materials—and the specific withholding of the units most relevant to my religious concerns—prevented me from exercising my parental rights in a meaningful way.

72. Upon information and belief, while I was waiting for copies of the Social Studies curriculum, J.L. was also shown a book in Social Studies class called *All Are Welcome* by Alexandra Penfold.

73. I have since learned that this book contains illustrations of same-sex couples and their children, including a pregnant lesbian mother. Attached hereto as Exhibit I is a true and accurate copy of one of the pages from this book.

74. This content also directly violated my opt-out requests. Like the *Families, Families, Families* video, this book presents same-sex relationships as normal and acceptable, which contradicts the biblical teachings I am working to instill in J.L.

75. Once again, I was not notified in advance that this book would be shown to J.L., and I had no opportunity to opt-out of that lesson.

76. As a direct result of the school's actions, J.L. has been exposed to moral instruction about marriage, sexuality, and family that directly contradicts the biblical teachings in which our family believes.

77. At age five, J.L. cannot understand or process the conflict between what the school is teaching and what we teach at home. J.L. cannot critically evaluate competing moral claims. As any child does, J.L. simply absorbs what trusted authority figures—including teachers—say.

78. When the school taught that "if you love each other, then you are a family," my child received a message that contradicts what we teach at home about God's design for marriage and family. This has created confusion during a critical period of moral and spiritual development.

79. I have now had to engage in "damage control" with my five-year-old child. I have been forced to be prepared to discuss sensitive topics related to sexuality, marriage, and family structures much earlier than I wanted to or believe is appropriate for my child's age and maturity level.

80. These are conversations I wanted to have with J.L. at a much later age. I wanted to introduce these topics gradually, in an age-appropriate way, and in accordance with our family's faith. The school is taking that right and duty away from me.

81. J.L.'s innocence on these subjects has been compromised. My child has been exposed to concepts and ideas from which I specifically sought to shield J.L.

82. I am deeply concerned about the long-term impact of this exposure on J.L.'s spiritual development. I fear that the school's instruction—delivered by trusted authority figures during J.L.'s most impressionable years—will undermine the biblical foundation I am trying to build in my child's life.

83. The trust I once had in Lexington Public Schools has been destroyed. I no longer believe that school officials will respect my parental rights or my family's religious convictions.

84. J.L. remains enrolled at Joseph Estabrook Elementary School in the Lexington Public School District and continues to attend kindergarten there.

85. To the best of my ability, I have now reviewed available curriculum materials and identified specific lessons in the Health, DEI, and Social Studies curricula that violate our family's religious beliefs. However, I continue to lack access to some materials, and Defendants have represented that the curriculum is subject to change throughout the year.

86. Despite my repeated requests, Defendants refuse to commit to providing me with advance notice of content that conflicts with my religious beliefs or to honoring my opt-out requests for such content.

87. Without a preliminary injunction, I fear that J.L. will continue to be exposed to instruction that undermines the religious teachings I am working to instill. The constitutional violations that occurred in September 2025 will be repeated.

88. I should not have to choose between enrolling my child in public school and protecting J.L.'s religious upbringing. But that is the choice Defendants are forcing me to make.

89. I am considering whether I may need to seek alternative educational opportunities for J.L.—whether that means private school, homeschooling, or some other option. But these alternatives would impose significant financial and logistical burdens on my family. Moreover, I should not be forced to remove my child from public school simply to exercise my constitutional rights as a parent.

90. I verify under penalty of perjury under the laws of the United States of America that the factual statements in this Declaration concerning myself, my activities, and my intentions are true and correct pursuant to 28 U.S.C. § 1746.

Executed on 10/25/2025, 2025,

Signed by: [signature]
A6B5FA462C8041C...

Alan L.

15