UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.  1:25-cv-13047-FDS

ALAN L., on behalf of himself and his minor
Child, J.L.,
          Plaintiff,

v.

LEXINGTON PUBLIC SCHOOLS; LEXINGTON
SCHOOL COMMITTEE; DR. JULIE HACKETT, in
individual and official capacity as Superintendent of
the Lexington Public School District; DR. GERARDO
J. MARTINEZ, in his individual and official capacity
as Principal of Joseph Estabrook Elementary School and;
ANDREA SO, in her individual and official
Capacity as Director of Elementary Education,
          Defendants.

**OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION**

NOW COME the defendants, Lexington Public Schools ("District"), Lexington School

Committee, Dr. Julie Hackett ("Hackett"), Dr. Gerardo Martinez ("Martinez") and Andrea So

("So")[1] and hereby oppose the Motion for Preliminary Injunction (Civ. Doc. No. 25) filed by the

plaintiff, Alan L. ("Plaintiff").  As grounds therefor, Defendants state the following:

I.     **INTRODUCTION**

Citing his Christian beliefs, Plaintiff sought to opt his child, J.L., out of "ANY DEI

curriculum" and all Health curriculum.  So broad were these initial requests that no school district

could responsibly comply with it *and* fulfill its obligation to provide a student—particularly a

disabled student such as J.L.—with a Free Appropriate Public Education ("FAPE").  See M.G.L. c.

76, § 1; 20 U.S.C. § 1400 et seq.  A few days later, Plaintiff requested the District exempt J.L. from,

---

[1] Collectively referred to herein as "Defendants."

among other things, "lessons, events, school assemblies or other instructional activities and programs which *cover* issues of sexual orientation or gender identity…." (Emphasis added). The District promptly responded to Plaintiff's request for curriculum, and invited him clarify his requests and inspect all instructional materials and books that would be presented to J.L. Even if the District *had* been able to comply with such vague and non-specific requests, it was not required to do so under *Mahmoud v. Taylor* or any other existing law or precedent. Plaintiff is not entitled to the relief he seeks, and the Court should deny him this "extraordinary and drastic remedy." *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8-9 (1st Cir. 2012)

## II.     STANDARD OF REVIEW

To determine whether to issue a preliminary injunction, a court must analyze four factors: (1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest. *Esso Standard Oil Co. (P.R.) v. Monroig-Zayas*, 445 F.3d 13, 17-18 (1st Cir. 2006). The last two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435, 129 S. Ct. 1749, 173 L. Ed. 2d 550 (2009). The court may accept as true well-pleaded allegations in the complaint and uncontroverted affidavits, and may also rely upon otherwise inadmissible evidence in deciding a motion for preliminary injunction. *Rohm & Haas Elec. Materials, LLC v. Elec. Circuits Supplies, Inc.*, 759 F. Supp. 2d 110, 114 n.2 (D. Mass. 2010).

## III.     ARGUMENT

### A.  Plaintiff Is Unlikely to Succeed on the Merits of His Claims

> *a.  Plaintiff Is Unable to Demonstrate the Requisite "Substantial Interference" to Succeed on His First Amendment Claim*

The Free Exercise Clause of the First Amendment provides, "Congress shall make no law… prohibiting the free exercise" of religion. U.S. Const. Amend I. A plaintiff alleging a Free Exercise

violation must show he has a sincerely held religious belief, and that a government action has a coercive effect on his religious practice.[2] *Perrier-Bilbo v. United States*, 954 F.3d 413, 429 (1st Cir. 2020) (*quoting Parker v. Hurley*, 514 F.3d 87, 103 (1st Cir. 2008). "When a religiously neutral and generally applicable law incidentally burdens free exercise rights," it generally withstands "constitutional challenge if it is rationally related to a legitimate governmental interest." *Doe v. Mills*, 16 F.4th 20, 29 (1st Cir. 2021); *see also Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U. S. 872, 878– 879. Where government action "substantially interferes with the religious development" of a child, however, strict scrutiny may apply. *Mahmoud v. Taylor*, 145 S. Ct. 2332, 2353, (2025), *citing Wisconsin v. Yoder,* 406 U.S. 205, 221 (1972) (vaguely equating burden on plaintiff's religion to the burden in *Yoder,* where the court held the established religious practices of the Amish "must give way" in light of the challenged policy).

Mahmoud involved a prohibition against religious opt-outs and explicit instruction on LGBTQ+ values that were offensive to the plaintiffs in that case, and the standard set by the court is a deceptively rigorous one: "The question…is whether the educational requirement or curriculum at issue would '*substantially* interfer[e] with the religious development' of the child or pose 'a *very real* threat of undermining' the religious beliefs and practices the parent wishes to instill in the child." (Emphasis added). *Mahmoud*, 145 S. Ct. at 2342, 2356, *quoting* Wisconsin v. *Yoder*, 406 U. S. 205, 218 (1972) ("A government burdens the religious exercise of parents when it requires them to submit their children to instruction that poses 'a very real threat of undermining' the religious beliefs and practices that the parents wish to instill."). Here, the curriculum and alleged failure of Defendants to opt J.L. out of it did not create a "very real threat of undermining" Plaintiff's religious beliefs. Nor

---

[2] For purposes of this motion only, Defendants stipulate that Plaintiff is sincere in his beliefs. *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005).

was there any policy in place banning opt-outs for religious reasons, as was the case in *Mahmoud*. *Id.* at 2377.

Plaintiff gives short shrift in his motion to how the books, "Families, Families, Families!" and "All Are Welcome" substantially interfere with his right to direct J.L.'s religious upbringing, and he does so for good reason: it's a tough sell. Families, Families, Families! simply references the undeniable fact that some children have two dads, and others have two mothers, and teaches students the basic concept of "family." (See Families, Families, Families!, attached as Exhibit 1). The imagery presented is of two seemingly-male roosters (based on their neckties), and two (apparently nongendered) koalas as mothers. (Ex. 1, pp. 6, 13). Setting aside the fact that these images depict creatures that neither marry, nor practice religion, nor operate on a system of morals, the book does not reference gay *marriage* or hold out same-sex couples or any other potential family grouping as being morally correct or equivalent to same-sex marriages. It simply holds them out as…*in existence.* While Plaintiff might have sincerely held religious beliefs as to what a *marriage* is, there is no reference to the roosters' or koalas' marital status and no clarifying information is provided to eliminate the possibility, e.g., that one of those two roosters or koalas is a stepfather or stepmother, or a biological versus adoptive parent.

All Are Welcome, the other book to which Plaintiff alleges J.L. was unlawfully exposed, contains an illustration of two female-appearing figures, one with her arm around the other woman, who appears pregnant and holding a child's hand, with the text, "You have a place here." (See All Are Welcome, attached as Exhibit 2, p. 31). (They're later depicted together in a school gym, where the "All" who "Are Welcome" actually gather. (Id. at 36).) The clear, sole purpose of the book is to show that schools welcome all kinds of people from all walks of life, including a Muslim-appearing couple and a child in a wheelchair. (Id. at 36).

The facts before the *Mahmoud* court were markedly different: a school district that had previously allowed curriculum opt-outs for religious reasons instituted a ban prohibiting religious-based curriculum opt-outs and instructed teachers to influence students and disrupt their thinking on LGBTQ+-related values, identities and lifestyles.  145 S.Ct. 2332.  The *Mahmoud* court was particularly focused on whether the books, paired with the accompanying instruction aides, shaped or influenced ideas; one discussion guide asserted, "When we are born, our gender is often decided for us based on our sex…But at any point in our lives, we can choose to identify with one gender, multiple genders, or neither gender." *Id.* at 2344.  Students were also instructed that "doctors guessed at their sex when they were born and that anyone who disagrees is hurtful and unfair," and gave teachers responses to help shape the students' thinking on these issues in the event a student expressed disagreement.[3]  The record before the *Mahmoud* court also contained guidance materials for teachers instructing that, if a student states "a boy can't be a girl because he was born…a boy," teachers should respond by saying, "That comment is hurtful, and we shouldn't use negative words to talk about people's identities."[4]  Going even further, the school board in *Mahmoud* instructed teachers "to select books that will disrupt cis-normativity, disrupt hetero-normativity."[5]

Neither Families, Families, Families! nor All Are Welcome instruct its audience on how to *become* gay, or that being gay is something that should be lauded or encouraged, or is morally correct. Both, in the best-case scenario for Plaintiff, are geared toward mere *tolerance*—i.e., the acceptance of those who are different from us as being part of our world.  They are not the tutorials on the moral equivalency of one's gayness that Plaintiff would have this Court believe.

---

[3] See Official Transcript of Oral Argument in Mahmoud v. Taylor ("*Mahmoud* Transcript"), https://www.supremecourt.gov/oral_arguments/argument_transcripts/2024/24-297_p8k0.pdf, at pp. 4, 15.
[4] *Mahmoud* Transcript at p. 111.
[5] *Mahmoud* Transcript, p. 47.

Uncle Bobby's Wedding, a book considered by the *Mahmoud* court, depicts the relationship and marriage of two men (and a niece's struggle to understand just why Uncle Bobby was getting married) that culminates with the two men embracing under a wedding arbor, or chuppah, and one of them lovingly touching the other's cheek while the niece gazes at them with adoration and approval. (See Uncle Bobby's Wedding (as pub'd in *Mahmoud v. Taylor*), attached as Exhibit 3, pp. 24-25). The *Mahmoud* court focused on the words "*Everyone* was smiling and talking and crying and laughing." (Emphasis added by the *Mahmoud* court). *Id.* at 2353. Then, the court homed in on the express message that, "When grown-up people love each other that much, sometimes they get married," stating the book "therefore presents a specific, if subtle, message about marriage" and "asserts that two people can get married," regardless of sex, "so long as they 'love each other.'" *Id.* But the *Mahmoud* court stopped short of saying that *any* depiction of gay characters, or reference to a character's sexual orientation, or even any reference to same-sex marriage, would cross a similar line; indeed, the court expressly stated that, "*It is significant that this book does not simply refer to same-sex marriage as an existing practice.* Instead, it presents acceptance of same-sex marriage as a perspective that should be celebrated." (Emphasis added). *Mahmoud*, 145 S. Ct. 2354. Here, quite unlike Uncle Bobby's Wedding, the books to which Plaintiff claims J.L. was unlawfully exposed merely—and at best—present the *existence* of same-sex couples…along with the fact that some children happen to live with their grandmother, some with their aunt, some with their cousins, etc., and that different types of people are welcomed into a school's community. (Ex. 1; Ex. 2).

The other books considered by the *Mahmoud* court are even further afield from the two books at issue here. The discussion guide in the book "Intersection Allies," which asserted that "at any point in our lives, we can choose to identify with one gender, multiple genders, or neither gender," delved into pronoun preferences and posed the question to the students, "What pronouns fit *you* best?" (Emphasis added). *Mahmoud*, 145 S. Ct. at 2344. "Love Violet" involves a girl crush

and a Valentine's Day romance that made Violet's "heart skip," ending with Violet and another girl skipping off together in the snow.  *Id.*  And Born Ready: The True Story of a Boy Named Penelope is about a girl who wants it known that, "Inside [she's] a boy."  *Id.*  Penelope's mother says, "If you feel like a boy, that's okay," and is then corrected by Penelope, who says, "No, Mama, I don't feel like a boy. I AM a boy."  *Id.*  Finally, "Prince and Knight" was considered by the *Mahmoud* court and is a fairy-tale-style story of a male-male relationship that leads to marriage.  Employing all the tropes of a damsel-in-distress story, two men fall in love, get married, and presumably live happily ever after.[6]

When compared with the books considered by the court in *Mahmoud*, where the driving force behind the court's decision was the encouraging, instructive and inescapable themes of those books, it is clear Families, Families, Families! and All Are Welcome are not the class of books considered by the *Mahmoud* court to pose "'a very real threat of undermining' the religious beliefs and practices that the parents wish to instill." *Mahmoud v. Taylor*, 145 S. Ct. at 2342, *quoting Wisconsin v. Yoder*, 406 U. S. at 218.  The *Mahmoud* books and associated discussion guides are in fact worlds apart from Families, Families, Families! and All Are Welcome—neither of which is "designed to present certain values and beliefs as things to be celebrated, and certain contrary values and beliefs as things to be rejected." *Id.* at 2338-2339.  Nor do they exert upon children a psychological "pressure to conform" to their specific viewpoints. *Id.* at 2339 (2025), *quoting Yoder,* 406 U.S. at 211.  Moreover, the *Mahmoud* court specifically held it was the *combination* of (1) the school district's policies of not allowing opt-outs for religious reasons, and (2) the "instruction related to the storybooks," that would substantially interfere with the parents' ability to direct the "religious

---

[6] While Prince and Knight is in the LPS Kindergarten curriculum, Defendants intend to exclude J.L. from this portion of the curriculum if and when it is presented to his class.

development" of their children. *Mahmoud*, 145 S. Ct. at 2355, *quoting Yoder*, 406 U.S. at 218; *id.* at 2361. Neither that combination, nor either of its factors, is present here.

In stark contrast to the school district in *Mahmoud,* Defendants not only do not have a policy *prohibiting* religious opt-outs; they have an express policy *providing* for religious opt-outs. (See LPS Elementary Handbook (Relevant Portions), attached as Exhibit 4, p. 4). So's correspondence to Plaintiff shows the District recognized parents' right to opt out of portions of the curriculum based on their sincerely held religious beliefs, and notified Plaintiff his request (that initially did not cite religious beliefs as the basis for the request) needed to be tied to a sincerely held religious belief. (Doc. 25-5, p. 2). When Plaintiff responded by submitting a request to opt J.L. out of instruction, activities and programs that "cover" issues of sexual orientation or gender identity, (Doc. 25-6, p. 4), So responded by asking Plaintiff to "re-submit" his "overly broad" request "with more information regarding a specific lesson," and invited Plaintiff to review the curricular materials." (Doc. 25-7, p. 1). The correspondence between Plaintiff and Defendants clearly demonstrates Defendants permit opt-outs for religious reasons and did not categorically deny Plaintiff's request, but rather engaged Plaintiff in an interactive dialogue—similar to that for a request for a medical accommodation—regarding which materials Plaintiff sought to have J.L. opted out of. *See Tobin v. Liberty Mut. Ins. Co.*, 433 F.3d 100, 108 (1st Cir. 2009).

       *b.  A Rational Basis Standard Should Apply to Defendants' Response to Plaintiff's Request to Opt J.L. Out of "ANY DEI" and All Health Curriculum; Alternatively, Defendants Have a Compelling Interest in Limiting Opt-Outs to Instruction that "Substantially Interferes" with Plaintiff's Rights*

The government is "generally free to place incidental burdens on religious exercise so long as it does so pursuant to a neutral policy that is generally applicable." *Mahmoud*, 145 S. Ct. 2360. *Mahmoud* applied a strict scrutiny analysis due to the combination of the school board's ban on religious opt-outs, and the instruction related to the storybooks—neither of which is present here. *Mahmoud*, 145 S. Ct. at 2355. And unlike in *Wisconsin v. Yoder*, where the policy was so

comprehensive it required the "established religious practices of the Amish" to "give way" and "contravene[] the basic religious tenets and practice" of that faith, Defendants' policy is calibrated to *protect* Plaintiff's right to the free exercise of religion. 406 U.S. at 218, 221; (Ex. 2, p. 4). "If prohibiting the exercise of religion is not the object of the policy, but merely the incidental effect of a generally applicable and otherwise valid provision, the First Amendment has not been offended." *Employment Div. v. Smith*, 494 U.S. 872, 878 (1990). Here, there is no policy prohibiting free exercise. *Id.* at 881. The effect of Defendants' policy is, of course, the opposite. (Ex. 4, p. 4). Therefore, any burden this policy or its implementation might create is "merely incidental" and the Court should forgo the strict scrutiny standard applied in *Mahmoud* in favor of the typically-applicable rational basis standard. *Doe v. Mills*, 16 F.4th at 29. A law survives rational basis review so long as the law is rationally related to a legitimate governmental interest. *E.g., Nordlinger v. Hahn*, 505 U.S. 1, 11-12, 112 S. Ct. 2326, 120 L. Ed. 2d 1 (1992). Both Defendants' policies, and their conduct, were rationally related to the legitimate government interest in an undisrupted school session conducive to learning, with minimal burdens on teachers and administrators. (See Affidavit of Andrea So ("So Affidavit"), attached as Exhibit 5, ¶¶ 17-33).

Yet, even were these two innocuous books deemed to "substantially interfere" with Plaintiff's rights and the Court were to apply a strict scrutiny analysis, Defendants had a compelling interest in not opting J.L. out of "ANY DEI" and all "Health" curriculum, because, as even the *Mahmoud* court acknowledged, "schools have a 'compelling interest in having an undisrupted school session conducive to learning.'" *Mahmoud,* 145 S. Ct. at 2341*, quoting Grayned v. City of Rockford,* 408 U.S. 104, 119 (1972); (So Affidavit, Ex. 5, ¶¶ 17-33). The plaintiffs in *Mahmoud* brought claims related to specific curriculum materials (the school board's "Pride Storybooks"), and sought an injunction, among other things, (1) declaring that the school board's outright *ban* on religion-based opt-outs was unconstitutional , and (2) enjoining the school district from subjecting students to

those specific books. (See *Mahmoud* Motion for Preliminary Injunction, attached as Ex. 6, p. 1). Here, both in his request for religious-based opt-outs and for injunctive relief, Plaintiff seeks to have Defendants sift through the universe of storybooks and other instructional materials from which teachers might choose to determine which ones "depict in any manner" LGBTQ relationships, lifestyles and identities, as well as "depict in any manner political or other ideologies promoting the LGBTQ Pride Movement or Black Lives Matter." (See Complaint, Doc. 1, p. 22, para. 1; Plaintiff's Motion, Doc. 25, p. 1). Plaintiff's requests are far from clear-cut. Attempting to parse through these materials and accommodate plaintiff's requests will take significant time and resources, not to mention burden Defendants on an ongoing basis given the flexibility of the curriculum. (So Affidavit, Ex. 5, ¶¶ 17-18). Then, communicating the material from which J.L. should be exempted requires multiple levels of coordination by teachers and administrators to weigh in and cross-check whether substitutes are aware of the opted-out material on tap for the day. (Id., ¶¶ 20-22, 31). The Herculean effort required to effectuate parents' overbroad opt-out requests for materials that so much as *mention* a group whose existence runs counter to some religious value will, over time, result in the suppression of the curriculum for all students and the reduction of the rich LPS curriculum to one that is universally-unobjectionable, but bland.

       c.   *Plaintiff Cannot Demonstrate a Violation of His Rights Under the Fourteenth Amendment*

          i.   Municipal Liability

Municipalities cannot be held liable for the conduct of their employees unless the municipality itself is also responsible in some way for that conduct. *See Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 691 (1978). No governmental policy, other than the one *providing for* religious opt-out requests and which Plaintiff does not challenge, is at issue here, and there is no suggestion that a "government body itself" subjected Plaintiff to any deprivation. *Connick v. Thompson*, 563 U.S. 51, 60, 131 S. Ct. 1350, 179 L. Ed. 2d 417 (2011) (*citing Monell*, 436 U.S. at 692). Therefore, the

complaint does not include any factual allegations of a policy or custom necessary to support a *Monell* claim. *See Abdisamad v. City of Lewiston*, 960 F.3d 56, 60 (1st Cir. 2020) (dismissing *Monell* claims where the factual allegations "include no facts whatsoever about a . . . policy that would be unconstitutional and create municipal liability").

        ii.      Procedural Due Process

To establish a procedural due process claim under § 1983, a plaintiff must demonstrate he was deprived of a property interest by state-actors and without the availability of a constitutionally adequate process. *Maymi v. P.R. Ports Auth.*, 515 F.3d 20, 29 (1st Cir. 2008). Plaintiff cannot show Defendants deprived him or J.L. of a constitutionally protected interest, however, since, as outlined below, he cannot show J.L. was exposed to either read-aloud. Even if Plaintiff were able to prove J.L. was exposed to these two books, however, Plaintiff cannot show he was denied an opportunity "to be heard at a meaningful time and in a meaningful manner." *Christensen v. Kingston Sch. Comm.*, 360 F. Supp. 2d 212, 222 (D. Mass. 2005). "Exactly what sort of notice and what sort of hearing the Constitution requires . . . vary with the particulars of the case." *Clukey v. Town of Camden*, 717 F.3d 52, 59 (1st Cir. 2013). In *Mahmoud*, the court addressed whether the plaintiffs were entitled to notice of the curriculum, but did not attempt to define at the granular level what appropriate "notice" of the curriculum would entail. It is clear from Plaintiff's correspondence with Defendants that he was provided with the curriculum scope and sequence almost immediately upon request, and that Defendants were responsive to his piecemeal requests for any and all associated materials. (Doc. 25-3, pp. 1-7). For example, J.L.'s Kindergarten teacher revised the curriculum information she had previously sent to Plaintiff in an attempt to make it more "parent accessible." (Id., p. 7). Importantly, Plaintiff also did not take So up on her offer to review the curricular materials. (Doc. 25-7, p. 1).

Defendants provided Plaintiff with notice of the curriculum (albeit with some links that were initially inaccessible to him) upon his request, and could not have provided any pre-deprivation procedural safeguard to address the risk of confusion among school employees regarding which materials had been provided. *Parratt v. Taylor*, 451 U.S. 527, 541 (1981). Nor could Defendants have created any more of a procedural safeguard against the prolonged interactive dialogue that naturally flowed from Plaintiff's broad requests for opt-outs and curriculum materials, most of which were not associated with any mention of religious reasons by Plaintiff. *Id.*, *citing Ingraham v. Wright*, 430 U.S. 651, 682 (1977) (declining to impose a requirement for additional procedural safeguards geared toward the safe delivery of prison mail). It appears only Plaintiff's Kindergarten teacher was provided with any request for Health-related materials until August 29, when Plaintiff submitted a public records request. (Doc. 25-22, ¶¶ 44-45). However, the public records law does not distinguish among requesters, and treats all requestors equally. *Attorney General v. District Attorney for the Plymouth Dist.*, 484 Mass. 260, 271 (2020); A Guide to the Massachusetts Public Records Law, 2022, p. 43[7]. Plaintiff cannot seek to hold Defendants liable for failing to provide the requested curricular materials within 10 business days, given that only a response to his request was required within that timeframe—not the materials, themselves. M.G.L. c. 66, § 10(b).

As the *Parratt* court explained, any loss of notice to the Plaintiff was not a result of some "established state procedure" and Defendants could not have predicted precisely when his loss would occur. *Id.* (questioning how the government could provide a meaningful hearing before the deprivation occurred). "'[N]o matter how significant the private interest at stake and the risk of its erroneous deprivation,'" the government cannot be required "'to do the impossible by providing predeprivation process.'" *Brown v. Hot, Sexy & Safer Prods.*, 68 F.3d 525, 536 (1st Cir. 1995), *quoting Zinermon v. Burch*, 494 U.S. 113, 129 (1990). Defendants could not have divined in advance that

---

[7] https://www.sec.state.ma.us/divisions/public-records/download/guide.pdf

certain links to the curricular materials were not working, nor did any of the Defendants, themselves, appreciate that Plaintiff had requested and not been provided with certain information.

        iii.      Substantive Due Process

"The substantive component of due process protects against 'certain government actions regardless of the fairness of the procedures used to implement them.'" *Souza v. Pina*, 53 F.3d 423, 425-26 (1st Cir. 1995) (*quoting Daniels v. Williams*, 474 U.S. 327, 331 (1986)). To prevail on his claim, Plaintiff must show that the government deprived him or J.L. of a constitutionally protected "life, liberty, or property interest" and that the challenged government action either shocks the conscience, *Clark v. Boscher*, 514 F.3d 107, 112 (1st Cir. 2008), or is not rationally related to a legitimate governmental purpose, *Collins v. Nuzzo*, 244 F.3d 246, 250 (1st Cir. 2001). Executive acts that shock the conscience must be "truly outrageous, uncivilized, and intolerable," *Hasenfus v. LaJeunesse,* 175 F.3d 68, 72 (1st Cir. 1999), and "the requisite arbitrariness and caprice must be stunning, evidencing more than humdrum legal error," *Amsden v. Moran*, 904 F.2d 748, 754 n.5 (1st Cir. 1990). Indeed, "[a] hallmark of successful challenges is an extreme lack of proportionality, as the test is primarily concerned with violations of personal rights so severe[,] so disproportionate to the need presented, and so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." *González-Fuentes v. Molina*, 607 F.3d 864, 881 (1st Cir. 2010). Defendants' alleged conduct does not meet this high bar. There is no factual allegation suggesting Defendants were hostile to Plaintiff's beliefs, or intentionally seeking to deprive Plaintiff of his or J.L.'s rights. That J.L. may have been exposed to two objectionable storybooks during the time Defendants were seeking to clarify Plaintiff's opt-out requests and respond to his requests for curricular materials cannot rise to the conscience-shocking level, particularly where Defendants were unaware at the time that these particular books were objectionable to Plaintiff. Additionally, Plaintiff pleads no

facts suggesting either of the municipal defendants had a "policy or custom" of denying religion-based opt-out requests or refusing to provide curricular materials.  Defendants had a policy providing for curricular opt-outs, (Ex. 4, p. 4), and there are no allegations suggesting there were other instances in which religious-based opt-out requests were denied or curricular materials were not provided.  While Plaintiff alleges Defendants had a policy of requiring parents to identify specific lessons, this allegation is conclusory and should be disregarded; So's request that Plaintiff clarify and re-submit his request cannot be attributed to the municipal defendants on the theory of vicarious liability.  (Doc. 1, ¶ 69; Doc. 25-7, p. 1).

Plaintiff's Complaint is nearly silent as to any conduct by either Hackett or Martinez.  There are no allegations in Plaintiff's complaint to support an assertion that Hackett received any request for opt-outs or for curricular materials, or played any part in the responses to these requests.  There is also no indication that Martinez played any role in responding to Plaintiff's request for J.L. to be opted out of DEI and Health classes beyond forwarding the issue to So, the Director of Elementary Education and the curriculum administrator.  (Ex. 5, ¶¶ 2, 4).  So, as outlined above, promptly responded to Plaintiff's requests to opt J.L. out of broad swaths of the curriculum by requesting Plaintiff clarify his request and inviting him in to review the curricular materials at issue—which Plaintiff declined to do.  (Ex. 5, ¶¶ 8, 11, 12).

   *d.  So, Martinez and Hackett are Entitled to Qualified Immunity*

Government officials sued in their individual capacities are immune from damages liability unless the plaintiff plausibly alleges both that: (1) an official violated a federal constitutional or statutory right; and (2) that the right was clearly established at the time of the challenged conduct so that a reasonable official would have understood that their conduct was unlawful.  *Eves v. LePage*, 927 F.3d 575, 582-583 (1st Cir. 2019).  While *Mahmoud* may have held its plaintiffs were entitled to some degree of notice and some ability to opt out of portions of the curriculum, neither the contours of

the notice Defendants might have been required to provide Plaintiff with, nor the breadth of his opt-out rights (entire classes, e.g.), were addressed by the court. *Mahmoud* merely held that a school board's introduction of the "LGBTQ+-inclusive" storybooks, "combined" with its decision to withhold notice to parents and to forbid opt outs, substantially interfered with the religious development of their children. *Mahmoud v. Taylor*, 145 S. Ct. at 2338. Moreover, this was in the specific setting of a school board that had instituted a prohibition against any religion-based opt-outs. Any right to notice or to opt out under the markedly different circumstances in this case, however, where religion-based opt-outs *were* permitted and Plaintiff was provided with the curriculum and given the option to review it and all associated materials, was not clearly established at the time, nor would any reasonable official have understood their conduct to be unlawful.

     *e)*   *Plaintiff Cannot Prove J.L. Was Exposed to Either Read-Aloud*

An essential element of Plaintiff's claims is establishing that J.L. was, more likely than not, exposed to one, or both, of the two read-alouds at issue in this case. Plaintiff cannot do this, himself, because he was not present for either of these events. J.L. very likely also cannot do this, given his young age and significant developmental delay that impacts his ability to communicate. (See J.L. Individualized Education Program ("IEP"), attached as Exhibit 7, pp. 4-5) And, none of J.L.'s teachers who were present for these read-alouds or with J.L. on the dates in question can help Plaintiff establish this because none can testify whether J.L. was in class.

Thus, the Court is left to discern from J.L.'s IEP, his seven-page behavioral plan, and affidavits from teachers and staff who were either present for the read-alouds, assigned to support J.L. on those days, or familiar with his routines and schedule, whether Plaintiff is likely to be able to prove J.L. was exposed to either book.

J.L. is on an IEP due, in part, to his limited communication skills that impact his ability to communicate with peers and adults and fully access "many of the learning opportunities" in the

classroom setting.  (Ex. 7, pp. 4-5).  J.L. has difficulty completing age-appropriate classroom

activities independently and enjoys time outside the classroom playing games or with toys.  (Id. at p.

7).  His IEP provides for "[a]ccess to a quiet, enclosed area in which to take a break" from the

stimulating classroom environment, as well as "frequent breaks."  (Id. at p. 8).  J.L. has a Behavior

Intervention Plan ("BIP") that includes the use of reinforcements (rewards), and his classroom

instruction involves "modified individualized curriculum" that "is presented in a slower manner with

visuals and multi-sensory approaches." (Id., pp. 8-9).  He also receives "1:1 or small group"

instruction. (Id. at p. 9).  During a baseline session, J.L. answered 0 out of 5 social questions

(including dad's name, his age and birthday) accurately.  (Id. at p. 13).  He "does not consistently

attend whole-class activities or lessons without prompting to remain seated and engaged" and

requires verbal prompts to recall details regarding his school day, and his IEP contains a short-term

objective of "return[ing] to the original activity/expectation following a break."  (Id. at pp. 14-16).

J.L.'s IEP service delivery grid provides that J.L. will be in the general-education classroom 1550

minutes per week ("inclusion" time), and outside the general-education classroom 1750 minutes per

week (time spent out of the classroom).  (Id. at p. 17).  In other words, J.L. spends more of his

school day outside his general-education Kindergarten classroom than inside it.  Only up to 60

minutes per month of therapy services in the "C grid"—i.e., out-of-classroom time—can be

reallocated to other types of services.  (Id.).

    An Evaluation Team Supervisor assigned to the Intensive Learning Program ("ILP"), a

separate classroom dedicated to servicing students with autism and related disabilities, attests that

J.L. spends a portion of his daily learning in the ILP classroom and other separate (non-gen-ed)

locations.  (Affidavit of Joanna Hoxie, attached as Exhibit 8, ¶¶ 2-5; see also Ex. 7 at p. 20).

    A Board Certified Behavior Analyst who works with J.L. attests J.L. has behavioral issues,

including non-compliance, inappropriate vocalizations, tantrums, grabbing, bolting, property

destruction and aggression. (Affidavit of Katharine Smith, attached as Exhibit 9, ¶¶ 6-7; see also Ex. 8 at ¶¶ 6-10). J.L.'s behavioral plan employs a token system that permits him to redeem rewards throughout his school day, including during inclusion time.  (Ex. 7, p. 8; Ex. 9, ¶¶ 7-13; Ex. 8, ¶¶ 7-10).  J.L. can redeem a reward after earning ten tokens.  (Ex. 9 at ¶ 8).  J.L. usually chooses a reward of 5 minutes of engagement on an iPad or with toys, which can be redeemed outside the general-education classroom when it is not play time in the general-education classroom.  (Ex. 9 at ¶ 9; Ex. 8 at ¶ 9).  J.L. typically redeems his rewards as soon as possible.  (Ex. 9 at ¶ 11.). Depending on how much time is left for the instructional activity and J.L.'s level of regulation, J.L.'s classroom teacher, special educator, student support instructor ("SSI") and/or BCBA might deem it more appropriate for J.L. to remain outside the general-education classroom and in the ILP classroom for the remainder of the class time.  (Ex. 8 at ¶ 10; Ex. 9 at ¶ 13).

J.L.'s general-education Kindergarten teacher, Caroline Chestna, confirms that J.L.'s IEP calls for more time outside the general-education classroom than in it.  (Affidavit of Caroline Chestna, attached as Exhibit 10, ¶ 6).   Health and Social Studies blocks are 30 minutes long, but because of his behavioral issues, J.L. is typically only present for the first 15 minutes of Health and Social Studies blocks, after which time he leaves the general-education classroom with his SSI to work on other assignments. (Ex. 10, ¶¶ 7-8).  J.L. typically does not attend Math blocks in the general-education classroom, and is usually in the ILP classroom during Math. (Ex. 10, ¶ 9).

On August 9, 2025, Ms. Chestna presented the read-aloud "All Are Welcome" to the general-education class at approximately 9:30 A.M., during a time at which J.L. is typically out of the general-education classroom and working in the ILP classroom.  (Ex. 10, ¶ 11).

Ms. Chestna also has "no recollection" as to whether J.L. was present for the portion of the Health class on September 16, 2025 during which time the read-aloud Families, Families, Families! was presented to the general-education class.  (Ex. 10, ¶ 12).

Morgan Brogie is the Health & Wellness teacher who presented the Families, Families, Families! read-aloud to J.L.'s general-education Kindergarten classroom.  (Affidavit of Morgan Brogie, attached as Exhibit 11, ¶¶ 2, 5).  The read-aloud was presented during the second half of the 30-minute Health block, (id., ¶¶ 5-6), by which time J.L. typically has already returned to the ILP classroom. (Ex. 10, ¶¶ 7-8).  Despite being the teacher who presented the Families, Families, Families! read-aloud to the class, Ms. Brogie "do[es] not recall J.L. .being present" in his general-education Kindergarten classroom at the time she presented the Families, Families, Families! read-aloud.  (Ex. 11, ¶ 7).

Caroly Custodio Mendez is an SSI at Estabrook who is regularly assigned to work with J.L. (Affidavit of Caroly Custodio Mendez, attached as Exhibit 12, ¶¶ 2, 4, 8).  When working with J.L., Ms. Custody Mendez and J.L. "move back and forth between the general-education classroom…to take breaks, or to access rewards that have been earned by J.L." (Ex. 12, ¶ 9).  Ms. Custody Mendez also confirms "J.L. is more often than not provided with support services and instruction outside of his general-education classroom," and that J.L. typically redeems his rewards "as soon as he has earned ten tokens," and can redeem these rewards outside the general-education classroom.  (Ex. 12, ¶¶ 10-13).  J.L. "may or may not return to the general-education setting" after redeeming his rewards.  (Ex. 12, ¶ 13).

When books are read aloud to the general-education classroom while Ms. Custody Mendez is in it, she "typically remember[s]" and is familiar with these read-alouds because she provides direct support to students like J.L. during them to ensure they are able to access this portion of the curriculum.  (Ex. 12, ¶ 15).

On September 16, 2025—the date on which Families, Families, Families! was presented to J.L.'s general-education Kindergarten class—Ms. Custody Mendez worked directly with J.L. from 1:45 P.M. to 3:30 P.M.  (Ex. 12, ¶ 16).  The Health lesson block—the same block during which

Families, Families, Families was presented—took place during this time.  (Ex. 12, ¶ 18).  Ms.
Custody Mendez does not recall the presentation of the Families, Families, Families! read-aloud, and,
because of this, she is confident that this read-aloud was not presented to J.L. at any point during
which she was assigned to provide J.L with support services on September 16, 2025 (or at any other
time).  (Ex. 12, ¶¶ 19-20).

      Ms. Custody Mendez also does not recall any presentation of All Are Welcome as a read-
aloud, and is similarly confident J.L. was never presented with this read-aloud at any point during
which she was providing services to him.  (Ex. 12, ¶¶ 19-20).

      Given the unlikelihood of any direct evidence supporting Plaintiff's claim that J.L. was
subjected to either of these two read-alouds, and the strong evidence supporting Defendants'
position that J.L. was not, in fact, even in the general-education Kindergarten classroom at the time
these read-alouds were presented to his general-education Kindergarten class, Plaintiff is unable to
show what he must in order to prevail: that the two read-alouds in question were actually presented
to J.L.

      For the foregoing reasons, Plaintiff is unlikely to succeed on the merits of his claims and his
motion for preliminary injunction should be denied.

### B.  Neither Plaintiff Nor J.L. Is at Risk of Suffering Irreparable Harm

      Defendants have a policy of permitting opt-out requests for religious reasons and have been
and will continue to be willing to exclude J.L. from content that encourages or promotes LGBTQ+
lifestyles, values and identities to the extent they can identify these notwithstanding Plaintiff's vague
requests.  To the extent Plaintiff identifies specific portions of the curriculum that are objectionable,
Defendants are willing to address these materials on a case-by-case basis to determine whether the
content encourages or promotes these issues.  Defendants have already identified five books that
meet this criterion, and plan to opt J.L. out of these presentations if and when they are made to

J.L.'s class.  J.L. will not be exposed to any instruction on which pronouns he or others use, or instructed that some children identify as a different gender than their biological sex; nor will he be taught that a homosexual marriage is the moral equivalent of a heterosexual marriage.  Underscoring the lack of potential irreparable harm is the absence of any statement in Plaintiff's Declaration suggesting J.L. was exposed to or impacted by the two read-alouds at issue.  (Doc. 25-2 at ¶¶ 59-60, 72).  Plaintiff claims he's had to engage in "damage control," yet his declaration lacks any statements describing any impact these read-alouds had on J.L. or how J.L.'s "innocence on these subjects has been compromised."  (Id. at ¶¶ 79, 81).  Plaintiff only learned of the Families, Families, Families! read-aloud a week after it was presented, and his Declaration is silent as to any suggestion that J.L.'s value system was shifted by any measure.  (Id. at ¶ 59).  Finally, because Plaintiff has little chance of success on the merits of his claims, he is not entitled to any presumption that irreparable harm will follow.  *Cf. Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 15 (1st Cir. 2012).

### C.  Balance of Equities/Public Interest

The balance of equities and public interest analysis also tips in Defendants' favor.  If Plaintiff's motion is denied, J.L. will not be exposed to any books that attempt to shape or influence him with respect to the morality of homosexual marriage or LGBTQ+ lifestyles, values and identities.  If, however, Plaintiff's motion is granted, Defendants will be faced with the near-impossible task of supplanting their judgment for Plaintiff's, and will be required to scour each element of the curriculum for imagery, statements or instruction that could possibly be interpreted by Plaintiff as "depict[ing] in any manner" LGBTQ+ values, lifestyles or identities. (So Affidavit, Ex. 5, ¶¶ 17-22, 31-32).  Additionally, Defendants will be prevented from achieving their objectives of educating students on social-emotional learning that is essential not only for students, but for a positive, bullying-free school community that leads to increased attendance and academic

achievement, and that furthers the interests of state and federal anti-harassment laws.  (Ex. 5, ¶¶ 23-28).

## IV.      CONCLUSION

WHEREFORE, Defendants respectfully request Plaintiff's Motion for Preliminary

Injunction be **DENIED**.


Respectfully submitted,

Defendants,
LEXINGTON PUBLIC SCHOOLS,
LEXINGTON SCHOOL COMMITTEE; DR.
JULIE HACKETT; DR. GERARDO J.
MARTINEZ and ANDREA SO,
By their attorney:

*/s/ Alexandra M. Gill*
Douglas I. Louison (BBO# 545191)
dlouison@lccplaw.com
Alexandra 'Sasha' M. Gill (BBO# 663040)
sgill@lccplaw.com
Louison, Costello, Condon & Pfaff, LLP
Ten Post Office Square, Suite 1330
Boston, MA  02109
617-439-0305


## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through ECF system on November 19, 2025, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on this date. Email copies will be sent to those listed as non-participants on the ECF system.

*/s/ Alexandra M. Gill*
Alexandra 'Sasha' M. Gill