UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALAN L., on behalf of himself and his minor child, J.L., <br><br> Plaintiff, <br><br> v. <br><br> LEXINGTON PUBLIC SCHOOLS, et al., <br><br> Defendants. | Civil Action No. <br> 25-13047-FDS |

MEMORANDUM AND ORDER ON
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

SAYLOR, J.

This case concerns a parent's constitutional right to opt his child out of certain classroom materials and lessons on the ground that they conflict with his religious beliefs. According to the complaint, plaintiff Alan L. is a "devout Christian" whose religious beliefs include traditional views on sexual orientation and gender identity. He has a five-year-old son, J.L., who is currently enrolled in kindergarten at the Joseph Estabrook Elementary School in Lexington, Massachusetts.[1]

Plaintiff objects to the content of certain books concerning sexual orientation and gender identity that are included in the kindergarten curriculum being used to teach J.L. He contends that his child has been compelled "to participate in classroom instruction that promote[s] sexualized and ideological messages directly contrary to his family's faith." (Compl. ¶ 3). He further contends that he has the right to be notified before such materials are shown to J.L. and to

---

[1] The Court previously granted plaintiff's motion to proceed by pseudonym. (Dkt. No. 33).

opt his child out of lessons and other classroom activities involving those materials. Defendants are the Lexington Public Schools; the Lexington School Committee; the Superintendent of Lexington Public Schools; the Principal at Estabrook Elementary School; and the district's Director of Elementary Education.

This case is controlled, almost in its entirety, by the recent decision of the United States Supreme Court in *Mahmoud v. Taylor*, 145 S. Ct. 2332 (2025). In substance, the Supreme Court in *Mahmoud* held that parents have a constitutional right to direct the educational and religious upbringing of their children, and that in order to protect that right, parents may opt their children out of exposure to certain classroom materials that include teachings that run counter to those of their religion. As in this case, the materials in *Mahmoud* involved the depiction or presentation of LGBTQ+ characters and relationships in a variety of different settings. Indeed, that case involved some of the same books at issue here.

The materials at issue from the Lexington kindergarten curriculum involve a range of content touching on LGBTQ+ issues. They include books that many parents might find appropriate or innocuous (such as those simply depicting gay and lesbian couples with children) and others that might be considered provocative or inappropriate for very young children (such as those depicting cross-dressing men or gays and lesbians in black-leather outfits). But the question presented here is *not* whether the viewpoints of plaintiff, or those of the school officials, are "correct" as a matter of religious faith or political or social belief. Nor is it whether the materials should be part of the kindergarten curriculum for other students. And it is certainly not whether *Mahmoud* opens the door to other complaints, by other parents, about other issues. Instead, this case presents a narrow question: whether these specific defendants have provided the required notice and opportunity to review materials that this specific plaintiff may find

objectionable, so that he may opt his child out of classroom instruction that violates his religious beliefs.

Because this case is clearly controlled by *Mahmoud*, and for the reasons that follow, plaintiff's motion for a preliminary injunction will be granted.

I.  **Background**

A.  **Factual Background**

1.  **The Parties**

Alan L. is the father of J.L., a minor child attending kindergarten at Joseph Estabrook Elementary School in Lexington, Massachusetts.  (Decl. of Alan L. ¶¶ 1-2, Dkt. No. 25-2).[2]  He is a "committed, practicing Christian" with "sincere and deeply held" religious beliefs that "guide [his] daily decisions, [his] parenting, and [his] family's life together."  (*Id.* ¶¶ 3, 5).  His beliefs include that "God created people in His image . . . either male or female" and that "sexuality is designed by God to be expressed only within the context of a one-man, one-woman marriage."  (*Id.* ¶¶ 8-10).  For that reason, it "violates [his] religious beliefs to allow J.L. to be instructed in content that focuses on diversity, equity, and inclusion issues, including issues of race, gender, and sexuality, taught from a secular worldview."  (*Id.* ¶ 14).[3]

Defendants are the Lexington Public Schools; the Lexington School Committee; Julie Hackett, the Superintendent of Lexington Public Schools; Gerardo J. Martinez, the Principal of Joseph Estabrook Elementary School; and Andrea So, Director of Elementary Education at Lexington Public Schools.  (Compl. ¶¶ 8-20).

---

[2] For the sake of convenience, the Court will refer to the plaintiff father as "Alan."

[3] The preliminary injunction here addresses only the question of LGBTQ+ content, not content concerning race or gender generally.

2.    **Events Giving Rise to this Case**

J.L. started kindergarten at Joseph Estabrook Elementary School in the fall of 2025.

Prior to the start of the 2025-26 school year, Alan "became aware that Lexington Public Schools

had introduced curriculum materials addressing topics related to sexual orientation, gender

identity, and family structures that conflicted with [his] religious beliefs." (Decl. of Alan L.

¶ 17). On August 25, 2025, he met with J.L.'s teacher, Caroline Chestna, and a "Student Support

Instructor," Alexis Bonavita, "to express concerns about content in the kindergarten curriculum."

(Compl. ¶ 33).[4] Following that meeting, he "sent an email to Joseph Estabrook School and

requested J.L's full class schedule and the syllabus for the classes," and also requested that J.L.

not attend health class the following Tuesday. (Decl. of Alan L. ¶¶ 20-21). He received a link in

response that included high-level overviews of the kindergarten curriculum but did not include

"the actual syllabi and curricula" for J.L.'s classes. (*Id.* ¶ 23). After reviewing these materials,

he replied to Chestna seeking to "opt out J.L. from ANY DEI curriculum" in addition to excusing

him from health class. (Memo. Supp. Prelim. Inj., Ex. A at 3, Dkt. No. 25-3).

On August 28, 2025, Alan received a response from Andrea So denying his requests to

opt J.L. out of any DEI-related curriculum and from health class. (Decl. of Alan L. ¶¶ 40-41).

As for the "DEI curriculum," So's response noted that "parents have the right to opt-out of

*required* curriculum based on a sincerely held religious belief," but denied Alan's request on the

grounds that his request "[was] not tied to a sincerely held religious belief and is not specific as

to what required curriculum is objectionable." (Memo. Supp. Prelim. Inj., Ex. C at 1, Dkt. No.

25-5).[5] Alan replied to that email, saying that he and J.L. "are both Christians and we both

---

[4] J.L. has an individualized education plan ("IEP") as a result of "limited" or "emerging
social/communication skills." (Opp. Pl.'s Mot. Prelim. Inj., Ex. 7 at 4-5, Dkt. No. 26-7).

[5] So also denied Alan's request to opt J.L. out of health class, noting that while "[p]arents may opt out of
the sexual reproduction unit of health education," "health and physical education is required instruction under

attend church on Sunday" and reiterating his request that J.L. be removed from health class and from any DEI-related curriculum.  (*Id.*).

After some additional communications with So and Estabrook's principal, Gerardo Martinez, Alan submitted a "formal written opt-out letter to" Martinez on August 30, 2025. (Decl. of Alan L. ¶ 46).  As relevant here, the letter requested that J.L. be exempted from "lessons, events, school assemblies or other instructional activities and programs which cover issues of sexual orientation or gender identity, pursuant to the U.S. Supreme Court's decision in *Mahmoud v. Taylor*."  (Memo. Supp. Prelim. Inj., Ex. D at 4, Dkt. No. 25-6).  The letter noted that "[t]he school's views on these issues conflict with our religious beliefs and instructing our child on these topics at school would substantially interfere with our constitutional right to instill our religious values in our child, as well as our fundamental parental rights."  (*Id.*).

Alan received a response to that letter from So on September 5, 2025.  (Decl. of Alan L. ¶ 48).  In her reply, So "request[ed] further clarification regarding [the] opt-out requests." (Memo. Supp. Prelim. Inj., Ex. E at 1, Dkt. No. 25-7).  She noted that "a request for religious opt-out may be denied or returned for clarification if it does not clearly identify the specific *required* curriculum or instructional material at issue, or if it lacks sufficient detail to allow for meaningful review," adding that "[r]equests that seek to opt-out of an entire course, subject area, or broad category of instruction without narrowly identifying a specific required curriculum may be rejected as overbroad."  (*Id.*).  She said that Alan's request was "overly broad and require[d] further clarification as [it sought] to opt out of broad topics."  (*Id.*).[6]  She invited Alan to "re-

---

Massachusetts law," and the sexual reproduction unit was "not addressed in our health curriculum until upper elementary."  (Memo. Supp. Prelim. Inj., Ex. C at 1, Dkt. No. 25-5).

[6] So also contended that "under *Mahmoud v. Taylor*, you may opt your child out of *required* curriculum, but not general school events or activities."  (Memo. Supp. Prelim. Inj., Ex. E at 1, Dkt. No. 25-7).

submit [his] opt-out request with more information regarding a specific lesson," or to contact her if he "would like to review required curricular materials to better inform [his] request." (*Id.*).

Contending that he was frustrated by the obstacles he perceived to "exercis[ing] [his] rights as a parent in good faith under Massachusetts law," Alan retained counsel, who sent Martinez another letter on September 10, 2025. (Decl. of Alan L. ¶¶ 50-51). That letter reiterated Alan's request that J.L. "be opted out of any instruction or other required activities that normalize or promote LGBTQ identities or lifestyles," as well as the "Kindergarten 'DEI Curriculum' outlined in" a curriculum document Alan had received. (Memo. Supp. Prelim. Inj., Ex. F at 2, Dkt. No. 25-8). The letter explained that "[e]xposing [J.L.] to this content would burden [Alan's] religious beliefs by interfering with his ability to instill those beliefs into [J.L.]" and that therefore "pursuant to *Mahmoud*, [J.L.] should be given an alternative assignment whenever this content is going to be taught." (*Id.*). "Accordingly," the letter concluded, "we expect that [Alan] will be notified and given an opportunity to opt [J.L.] out of any instruction or other required activities that normalize or promote LGBTQ identities or lifestyles," as well as "the Kindergarten DEI Curriculum." (*Id.*).

Alan received a response to that letter from counsel for Lexington Public Schools on September 23, 2025. The response once again denied his opt-out request on the ground that his request to opt out of "all DEI instruction" was "overly broad." (Decl. of Alan L. ¶ 55). The district's counsel invited Alan "to review the kindergarten curriculum" and "classroom books" with So in order to narrow his opt-out request to specific materials. (*Id.* ¶ 56).

Alan alleges that on September 16, J.L. was shown a "read-aloud" video of the book *Families, Families, Families!* by Suzanne Lang in his health class. (*Id.* ¶ 57).[7] He viewed that

_____

[7] In her affidavit, Chestna noted that J.L. is typically present for only the first 15 minutes of Health and Social Studies classes because of his IEP, and that she "ha[d] no recollection as to whether J.L. was present for the

lesson as "directly contradict[ing] [his] religious beliefs," and it occurred "despite [his] explicit

opt-out request." (*Id.* ¶ 58). Alan's counsel sent a further letter to the school on October 2, 2025,

contending that "J.L. had been shown the *Families, Families, Families!* video in violation of

[his] opt-out request." (*Id.* ¶ 66). That letter also identified further materials "that promote

secular moral values, LGBTQ themes, or activism contrary to [Alan's] faith." (*Id.* ¶ 67). Alan

later learned that J.L. was shown the book *All Are Welcome* by Alexandra Penford, which he said

"also directly violated [his] opt-out requests." (*Id.* ¶¶ 72-74).[8]

    According to Alan, as a result of the district's actions, "J.L. has been exposed to moral

instruction about marriage, sexuality, and family that directly contradicts the biblical teachings in

which [his] family believes." (*Id.* ¶ 76). This has required Alan to "be prepared to discuss

sensitive topics related to sexuality, marriage, and family structures much earlier than [he]

wanted or believe[s] is appropriate for [his] child's age and maturity level." (*Id.* ¶ 79). "Despite

[his] repeated requests," the district and its employees "refuse to commit to providing [him] with

advance notice of content that conflicts with [his] religious beliefs or to honoring [his] opt-out

requests for such content." (*Id.* ¶ 86). "Without a preliminary injunction," Alan "fear[s] that J.L.

---

portion of the Health class" during which *Families, Families, Families!* was read. (Decl. of Caroline Chestna ¶¶ 8, 12, Dkt. No. 26-10). Caroly Custodio Mendez, a "Student Support Instructor" who frequently works with J.L., reported that she was with J.L. for the entirety of the kindergarten Health class on September 16, 2025, and that she did not recall *Families, Families, Families!* being presented to the class. (Decl. of Caroly Custodio Mendez ¶¶ 16-20, Dkt. No. 26-12). And Morgan Brogie, the health and wellness teacher who presented *Families, Families, Families!* to the class on September 16, "[did] not recall J.L. being present in the . . . classroom at the time [she] presented" the book. (Decl. of Morgan Brogie ¶ 7, Dkt. No. 26-11).

    For present purposes, at least, the Court need not make findings as to whether J.L. has actually been exposed to the book; for the purpose of obtaining injunctive relief, what matters is the likelihood that he will be exposed to similar books going forward. *Cf. Murthy v. Missouri*, 144 S. Ct. 1972, 1987 (2024) (for standing inquiry, where "plaintiffs are seeking only forward-looking relief, the past injuries are relevant only for their predictive value"). Furthermore, whether J.L. was exposed to the book is not necessarily probative of whether he will be exposed to other, similar books in the future. And the *Mahmoud* Court itself rejected the view that it needed to "'wait and see' how a particular book is used in a particular classroom on a particular day before evaluating the parents' First Amendment claims." *Mahmoud*, 145 S. Ct. at 2358.

    [8] Defendants also contest whether J.L. was shown this book, but the Court need not resolve that dispute.

will continue to be exposed to instruction that undermines the religious teachings [he is] working to instill."  (*Id.* ¶ 87).

      **3.**      <u>**Books at Issue**</u>

Plaintiff has provided evidence as to ten books (or portions of books) that are part of the Lexington school's kindergarten curriculum.  As noted, two of those books, *Families, Families, Families!* and *All Are Welcome*, have been used in the classroom, whether or not they were actually shown to J.L.  Plaintiff's supplemental declaration also includes images from and a description of eight other books to which he objects.  (Suppl. Decl. of Alan L. ¶¶ 4-5, Dkt. No. 32-1).

      **a.**      <u>***Families, Families, Families!***</u>

The book *Families, Families, Families!*, features illustrations of anthropomorphized animals in various family arrangements.  (Memo. Supp. Prelim. Inj., Ex. G at 1, Dkt. No. 25-9). It includes a picture of two roosters wearing neckties, with the caption "Some children have two dads," and a picture of two (apparently female) koalas, accompanied by several baby koalas, with the caption "Some children have two mothers."  (*Id.*).  The book ends with the line, "[I]f you love each other, then you are a family."  (Decl. of Alan L. ¶ 58).

      **b.**      <u>***All Are Welcome***</u>

The book *All Are Welcome* includes an image featuring several couples with children: one couple is pushing a child in a wheelchair, another couple features both a mother and a daughter wearing headscarves, and—as relevant here—another features what appears to be a lesbian couple holding the hand of their child, with one of the partners depicted as pregnant. (Memo. Supp. Prelim. Inj., Ex. I at 1, Dkt. No. 25-11).

### c.     *Prince and Knight*

The book *Prince and Knight* was one of the books at issue in *Mahmoud*.  The Supreme

Court described it as follows:

> Prince & Knight tells the story of a coming-of-age prince whose parents wish to
> match him with "a kind and worthy bride."  After meeting with "many ladies," the
> prince tells his parents that he is " 'looking for something different in a partner by
> [his] side.' "  Later in the book, the prince falls into the "embrace" of a knight after
> the two finish battling a fearsome dragon.  After the knight takes off his helmet,
> the prince and knight "gaz[e] into each other's eyes, [and] their hearts beg[in] to
> race."  The whole kingdom later applauds "on the two men's wedding day."

*Mahmoud*, 145 S. Ct. at 2344 (citations omitted).

### d.     *Maiden and Princess*

The book *Maiden and Princess*, by the same author as *Prince and Knight*, appears to tell

a similar story about a same-sex romance set at a royal court.  The main character is the

"maiden," and it features a "beautiful girl . . . who took the maiden's breath away," who "sat

down close to the maiden, and asked if she could stay."  (Suppl. Decl. of Alan L., Ex. J at 8, Dkt.

No. 32-2).  "Soon," the book continues, "the maiden had forgotten about the prince and his

throne.  Summoning all her courage, she took the girl's hands in her own."  (*Id.* at 9).  Later, the

two "held each other close as they spun across the floor.  And when they shared a kiss?  Their

hearts began to soar."  (*Id.* at 11).  The book ends with the two characters marrying:  "When the

day finally came to prove their love was true, the maiden and the princess happily said, 'I do.'"

(*Id.* at 12).

### e.     *Stella Brings the Family*

In the book *Stella Brings the Family*, a teacher tells her class that they are "going to have

a celebration for Mother's Day,  . . . and each of you can invite a special guest."  (*Id.* at 14).

Most of the children in the class talk about how they plan to bring their mothers, but Stella, the

main character, has two fathers.  (*Id.*).  Deciding what to do for the Mother's Day party causes

Stella a great deal of anguish.  (*Id.* at 15-16).  The resolution comes when Stella brings her whole family to the party, including her dads, grandmother, aunt, uncle, and cousin.  (*Id.* at 17).  In the end, "[t]he party was better than Stella had imagined," and "Stella had the biggest crowd of all" her classmates.  (*Id.*).  The book includes illustrations of Stella's two fathers together.  (*Id.* at 14).

#### f.    ***Lovely***

The book *Lovely*, from which plaintiff provided only two pages, includes an illustration featuring the lower legs and feet of several different cartoon characters with the labels "fancy," "sporty," "graceful," and "stompy."  (*Id.* at 20-21).  The one labeled "fancy" features what appear to be hairy male legs wearing red high-heeled shoes with pearls on them.  (*Id.* at 20).  The one labeled "stompy" features a person wearing black leather boots with a large platform sole along with fishnet stockings.  (*Id.*).  The following page reads, "We are all lovely," and features an assortment of different characters.  (*Id.* at 21).  One of those characters appears to be a man—as indicated by a typically male haircut, mustache, and beard—wearing a red dress and a skirt. (*Id.*).

#### g.    ***Love Makes a Family***

The book *Love Makes a Family* features several illustrations of family scenes, some of which include same-sex couples as parents.  For example, a page captioned, "Love is waking up bright and early," features two men lying in bed in their pajamas with their children coming in to wake them up with loud musical instruments.  (*Id.* at 23).  Another page, captioned "Love is reading one more book," features what appear to be two women reading with their children in a blanket fort.  (*Id.* at 25).  Finally, another page, captioned "Love is a kiss before bed," features two women kissing their children good night.  (*Id.* at 27).

### h.    *A Family is a Family is a Family*

The book *A Family is a Family is a Family* includes an illustration of a young boy saying, "One of my dads is tall and one is short.  They both give good hugs," accompanied by a picture of his two dads tucking the young boy into bed.  (*Id.* at 29).  Another page features a young girl saying, "Both my moms are terrible singers.  And they both like to sing really loud," accompanied by a picture of them singing.  The final page features what appears to be a classroom full of students and their teacher, all having drawn their various families, and saying in unison, "A family is a family is a family!"  (*Id.* at 31).

### i.    *This Day in June*

The book *This Day in June* features various illustrations of large crowds at what appears to be a Pride parade.  One page, captioned "Clad in leather, perfect weather," depicts numerous characters in various black-leather outfits, including pants, shorts, jackets, and vests; one character is wearing leather shorts with suspenders and no shirt.  Another, captioned "Loving kisses, so delicious," depicts several same-sex couples kissing one another.  Another, captioned "Artists painting, sisters sainting," is somewhat ambiguous; it appears to depict one or more men dressed as nuns, which may be a reference to the group called the "Sisters of Perpetual Indulgence."  (*Id.* at 34-36).[9]

### j.    *You Have A Voice*

The book *You Have a Voice* apparently features children learning about various civil rights figures.  It includes a page with several children drawing the image of Tommie Smith and John Carlos raising their fists in protest at the 1968 Olympics in Mexico City, with the caption,

---

[9] The "Sisters of Perpetual Indulgence" are "a charity that raises money for LGBTQ causes and performs in drag dressed as nuns," which has been criticized as disrespectful by some Catholics.  *See* Conor Murray, *Dodgers Reverse Decision:  Sisters of Perpetual Indulgence Included In LGBTQ Pride Night Over Objections* (May 23, 2023, at 09:34 ET), https://perma.cc/7E6D-W3VL.

"When someone is being treated differently because of the color of their skin, speak up, stay 'Stop!  This isn't right!  I won't let racism win.'"  (*Id.* at 40).  Another page features a crowd of people carrying protest signs with the caption, "You know what's right, you know what's wrong, you have a voice, so speak up, be strong!"  (*Id.* at 41).  One of these signs is labeled "BLM," presumably in support of the Black Lives Matter movement, and another features the LGBTQ+ Pride flag with the phrase "Love is Love" written on it.  (*Id.*).

### 4.    Curriculum

Plaintiff also provided a document outlining the kindergarten curriculum at Estabrook Elementary School.  (Suppl. Decl. of Alan L., Ex. K, Dkt. No. 32-3).  It includes several different "modules" for instruction, titled "Classroom Community and Discovering Nature"; "Family Community and Seasons"; "Earth, Our Home"; "Responsibility to Each Other and our Earth"; and "Wrapping Up the Year."  (*Id.*).  The document also includes an overview of "Kindergarten DEI Curriculum At-A-Glance," describing various lessons teaching themes related to diversity, equity, and inclusion to be taught throughout the year.  (*Id.* at 88-100).  Each of the books identified by plaintiff is included in this document, suggesting that they are likely to be taught at some point in the kindergarten curriculum.  (*See generally id.*).

### B.    Procedural Background

The complaint was filed on October 17, 2025.  On November 6, 2025, plaintiff moved for a preliminary injunction.  (Dkt. No. 25).  Defendants opposed the motion for a preliminary injunction on November 19, 2025, and plaintiff filed a reply in support of his motion on December 1, 2025.  (Dkt. Nos. 26, 31).  On December 11, 2025, plaintiff moved for leave to file a supplemental declaration in support of his motion for preliminary injunction, which the Court granted on December 12, 2025.  (Dkt. Nos. 32, 33).  The Court held a hearing on the preliminary-injunction motion on December 12, 2025.

## II.    Legal Standard

A preliminary injunction is an "extraordinary and drastic remedy" that "is never awarded as of right."  *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (quoting *Yakus v. United States*, 321 U.S. 414, 440 (1944)).  A plaintiff seeking a preliminary injunction must establish that (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction serves the public interest.  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).  A plaintiff's likelihood of success on the merits "weighs most heavily" in the court's determination; without it, the remaining factors "become matters of idle curiosity."  *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020) (citing *New Comm Wireless Servs. v. SprintCom Inc.*, 287 F.3d 1, 9 (1st Cir. 2002)).  "[A]n inquiring court need not conclusively determine the merits of the movant's claim; it is enough for the court simply to evaluate the likelihood . . . that the movant ultimately will prevail on the merits."  *Id.* at 18.  In ruling on a preliminary-injunction motion, the court may accept as true "well-pleaded allegations [in the complaint] and uncontroverted affidavits."  *Rohm & Haas Elec. Materials LLC v. Electronic Circuits Supplies, Inc.*, 759 F. Supp. 2d 110, 114 n.2 (D. Mass. 2010).

## III.    Analysis

### A.    Likelihood of Success on the Merits

Plaintiff seeks a preliminary injunction on the basis that defendants' actions violate the Free Exercise Clause of the First Amendment, made applicable to the states through the Fourteenth Amendment.  (Memo. Supp. Prelim. Inj. 6).[10]  In order to evaluate the claim, it is

_____

[10] Plaintiff also contends that defendants' actions violate his procedural and substantive due-process rights. Because the Court resolves the matter, at least on a preliminary basis, on the free-exercise claim, it does not reach the due-process claims.

necessary to address the relevant Supreme Court precedents on this issue, including its decision

from earlier this year in *Mahmoud v. Taylor*, 145 S. Ct. 2332 (2025).

### 1.     <u>Parental-Rights Jurisprudence</u>

For more than a century, the Supreme Court has recognized a substantive due-process

right of parents to direct the upbringing and education of their children, such as by having them

learn a foreign language from an early age or by sending them to a religious school.  *See Meyer*

*v. Nebraska*, 262 U.S. 390, 403 (1923); *Pierce v. Society of Sisters*, 268 U.S. 510, 534-35 (1925).

In *Wisconsin v. Yoder*, 406 U.S. 205, 234 (1972), the Court expanded that doctrine to

recognize a right to oversee the religious development of one's children, grounded in the First

Amendment's Free Exercise Clause.  *Yoder* involved members of the Old Order Amish sect who

refused to send their children to public school after eighth grade and were subsequently

convicted under Wisconsin's compulsory-attendance law.  *Id.* at 207-08.  Amish opposition to

secondary education was "firmly grounded in [their] central religious concepts" because "the

values" secondary schools "teach are in marked variance with Amish values and the Amish way

of life," and they therefore "view[ed] secondary school education as an impermissible exposure

of their children to a 'worldly' influence in conflict with their beliefs."  *Id.* at 210-11.  In light of

the unique nature of Amish life and beliefs, the Court found that compelling Amish children to

attend secondary school would "substantially interfer[e] with the religious development of the

Amish child and his integration into the way of life of the Amish faith community" and pose "a

very real threat of undermining the Amish community and religious practice as they exist today,"

and that this was "precisely the kind of objective danger to the free exercise of religion that the

First Amendment was designed to prevent."  *Id.* at 218.  The Court therefore applied strict

scrutiny and, finding that the Wisconsin law did not advance a compelling interest as applied to

the Amish children, reversed the convictions.  *Id.* at 221, 228-29.

2.      **The *Mahmoud* Decision**

The facts of *Mahmoud* are very similar to those of this case. *Mahmoud* involved a

challenge by a group of parents in Montgomery County, Maryland, to the school district's policy

of not providing parents notice or an opportunity to opt their children out of lessons involving

certain "LBGTQ+-inclusive storybooks" that included material that ran counter to the parents'

religious beliefs. *See Mahmoud*, 145 S. Ct. at 2343-49. The parents argued that "the Board's

introduction of the 'LGBTQ+-inclusive' storybooks—combined with its decision to withhold

notice and opt outs—unconstitutionally burden[ed] their religious exercise." *Id.* at 2350.

The Supreme Court agreed. It began by reaffirming that the protections of the Free

Exercise Clause include "the rights of parents to direct the religious upbringing of their

children." *Id.* at 2351 (quoting *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246, 2261

(2020)). And that right, the Court noted, "extends to the choices that parents wish to make for

their children outside the home." *Id.* at 2351. The right extends not only to "policies that *compel*

children to depart from the religious practices of their parents," but also to "policies that impose

more subtle forms of interference with the religious upbringing of children," as in *Yoder*. *Id.* at

2352. The Court therefore held that government action that "substantially interferes with the

religious development of a child" presumptively constitutes a burden on the parents' free-

exercise rights. *Id.* at 2353, 2360 (citation modified). And such a burden is justified only if the

action in question satisfies strict scrutiny—that is, if it "advances interests of the highest order

and is narrowly tailored to achieve those interests." *Id.* at 2361 (quoting *Fulton v. City of

Philadelphia*, 141 S. Ct. 1868, 1881 (2021) (internal quotation marks omitted)). If the policy in

question does not survive strict scrutiny, then parents must be given notice and the opportunity to

have their children excused from the relevant lessons. *Id.* at 2364.

According to *Mahmoud*, "[t]he question in cases of this kind is whether the . . . curriculum at issue would 'substantially interfere with the religious development' of the child or pose 'a very real threat of undermining' the religious beliefs and practices the parent wishes to instill in the child." *Id.* at 2356 (quoting *Yoder*, 406 U.S. at 218) (citation modified). The Court noted that the inquiry "will always be fact-intensive" and will "depend on the specific religious beliefs and practices asserted," but provided several touchstones to guide a lower court's review. *See id.* at 2353. Those include the age of the children involved, because "young, impressionable children" are "likely to accept without question any moral messages conveyed by their teachers' instruction," and the "specific context in which the instruction or materials at issue are presented," including whether they are "presented in a neutral manner" or in a manner "hostile to religious viewpoints and designed to impose upon students a pressure to conform." *Id.* (internal quotations omitted). And a parent's free-exercise rights can be burdened not only by books that directly convey a message contrary to their religious teachings, but also by books that present a "specific . . . subtle message" about such topics. *Id.* at 2354.

### 3. **Analysis**

This case is squarely controlled by *Mahmoud*. As in that case, a parent has objected to his child being shown certain materials at school concerning LGBTQ+ relationships or values on the ground that the materials pose a threat of undermining the religious beliefs and practices the parent wants to instill in his child. As in that case, the school has indicated that it intends to continue showing the child at least some of the materials to which the parent objects. And as in that case, the parent seeks a preliminary injunction on the basis that the school's failure to provide him notice and a reasonable opportunity to opt his child out of classroom instruction utilizing those materials violates his free-exercise rights.

*Mahmoud* establishes a two-step framework for resolving such claims.  The first step is to determine "whether the educational requirement or curriculum at issue would substantially interfere with the religious development of the child or pose a very real threat of undermining the religious beliefs and practices the parent wishes to instill in the child."  *Mahmoud*, 145 S. Ct. at 2356 (citation modified).  If that first step is satisfied—that is, if the challenged lesson burdens the plaintiff's free-exercise rights—such a burden can be upheld only if it satisfies strict scrutiny. *Id.* at 2361.

Starting with the first step of the inquiry, it is likely that the books identified by plaintiff burden his free-exercise rights because they "pose a very real threat of undermining the religious beliefs and practices" he wishes to instill in J.L.  *Id.* at 2356 (internal quotation marked omitted). The *Mahmoud* Court explicitly found that one of these books, *Prince & Knight*, would burden the free-exercise rights of those who, like plaintiff, "advocate with utmost, sincere conviction that, by divine precepts, same-sex marriage should not be condoned."  *Id.* at 2353 (quoting *Obergefell v. Hodges*, 576 U.S. 644, 679 (2015)).  As the *Mahmoud* Court explained:

> Those celebrating the same-sex wedding [in *Prince & Knight*] are not just family members and close friends, but the entire kingdom.  For young children, to whom this and the other storybooks are targeted, such celebration is liable to be processed as having moral connotations.  If this same-sex marriage makes everyone happy and leads to joyous celebration by all, doesn't that mean it is in every respect a good thing?  High school students may understand that widespread approval of a practice does not necessarily mean that everyone should accept it, but very young children are most unlikely to appreciate that fine point.

*Id.* at 2353.

The *Mahmoud* Court also concluded that books that are not clearly didactic may likewise impose a free-exercise burden.  In response to the argument that a book called *Uncle Bobby's Wedding* imposed no burden because it merely referred to same-sex marriage as an existing practice, rather than something to be encouraged or celebrated, the Supreme Court found that the

book "presents a specific, if subtle, message about marriage.  It asserts that two people can get married, regardless of whether they are of the same or the opposite sex, so long as they 'love each other.'"  *Mahmoud*, 145 S. Ct. at 2353-54.  It further noted that "[t]he book's narrative arc reaches its peak with the actual event of Uncle Bobby's wedding, which is presented as a joyous event that is met with universal approval," and that while many Americans agree with that sentiment, "other Americans wish to present a different moral message to their children.  And their ability to present that message is undermined when the exact opposite message is positively reinforced in the public school classroom at a very young age."  *Id.*

Applying that standard, the books at issue here are likely to impose a substantial burden on plaintiff's free-exercise rights.[11]  *Maiden & Princess*, for example, tells nearly the same story as *Prince & Knight* with the gender of the principal characters changed from male to female.  *This Day in June* depicts a jubilant crowd at a Pride parade, where some of the participants are wearing black leather.  *Lovely* depicts one, and perhaps two, cross-dressing males.  *Families, Families, Families!*, *A Family is a Family is a Family*, *Stella Brings the Family*, and *Love Makes A Family*, all appear to teach that any arrangement of people—of whatever sex—can be a family so long as they "love each other"—just as *Uncle Bobby's Wedding* taught that "two people can get married, regardless of whether they are of the same or the opposite sex, so long as they 'love each other.'"  *Mahmoud*, 145 S. Ct. at 2354.[12]

---

[11] In their opposition, defendants note that they "have already identified five books" that fall within the scope of plaintiff's opt-out request—that is, "content that encourages or promotes LGBTQ+ lifestyles, values, and identities"—and "plan to opt J.L. out of these presentations if and when they are made to J.L.'s class."  (Defs.' Opp. 19, Dkt. No. 26).  But because they do not identify which books those are, and because they do not commit to providing plaintiff notice when similar books are to be presented to J.L.'s class, that concession does not moot plaintiff's claim or narrow the set of books the Court may consider in ruling on the present motion.

[12] It is an open question whether a book that neither directly nor "subtl[y]" takes a position on an issue of sexuality or gender, but instead merely features a depiction of a gay or lesbian couple, can constitute a substantial burden on plaintiff's free-exercise rights under *Mahmoud*.  For example, one of the books at issue in this case, *All Are Welcome*, features an illustration that includes a small image of what appears to be a lesbian couple with their child, but does not include any storyline or caption directly suggesting acceptance of gay or lesbian couples.

Plaintiff has therefore established a likelihood of success on his claim that his free-exercise rights are burdened by the classroom materials in the kindergarten curriculum.

Moving to the second step of the *Mahmoud* analysis, defendants are unlikely to show that their policy and practices can survive strict scrutiny.  Defendants correctly note that "as a general matter, schools have a compelling interest in having an undisrupted school session conducive to the students' learning."  *Mahmoud*, 145 S. Ct. at 2362 (internal quotation omitted).  But defendants have failed to show that denying plaintiff the specific notice and opt-out procedure he seeks here is necessary to serve that interest.  Defendants agree that plaintiff must be allowed to opt his child out of at least some classroom instruction.  (Defs.' Opp. 19-20).  Furthermore, many of the concerns defendants raise—which involve the possibility of granting notice and opt-out rights to other parents in other contexts—are not directly implicated in this case, and will exist (in light of *Mahmoud*) whether or not the Court grants an injunction.  (Defs.' Opp. 10).  For present purposes, it is enough to conclude that defendants are unlikely to show that denying plaintiff the additional notice and opt-out rights he seeks here is necessary to serve the compelling interest in avoiding classroom disruption.  *See Mahmoud*, 145 S. Ct. at 2362 (noting that the presence of a "robust 'system of exceptions' undermines the Board's contention" that extending broader opt outs to "religious parents would be infeasible or unworkable" (quoting *Fulton*, 141 S. Ct. at 1882)).

To be sure, there are some factual differences between this case and *Mahmoud*, but none present a principled basis for a different outcome here.  In *Mahmoud*, the school district explicitly prohibited religious opt-outs; here, defendants do have a system for religious opt-outs,

---

(Memo. Supp. Prelim. Inj., Ex. I at 1).  For present purposes, however, the Court will not draw any such distinctions among the books to which plaintiff objects.

but plaintiff contends that the system is effectively unavailable because defendants require more specificity in his requests than he can provide. *Mahmoud* also focused on a discrete collection of books that were added to the curriculum at the same time, at least partly with the explicit intent to "'disrupt' children's thinking about sexuality and gender." *Mahmoud*, 145 S. Ct. at 2342. Here, by contrast, there is no evidence concerning when and for what reason the relevant books were added to the curriculum. But neither of those differences affects the applicability of the central principles of *Mahmoud*: that parents must be permitted to opt their children out from lessons that "would substantially interfere with the religious development of the child or pose a very real threat of undermining the religious beliefs and practices the parent wishes to instill in the child." *Mahmoud*, 145 S. Ct. at 2356 (citation modified). The *Mahmoud* Court did not say that opt-outs must be prohibited entirely, or that school officials must expressly intend to disturb traditional teachings, for the principles outlined in that decision to apply.

Defendants also note that the *Mahmoud* Court relied in part on the fact that education in Maryland is compulsory beginning at age five. *See* 145 S. Ct. at 2359 ("Moreover, since education is compulsory in Maryland, the parents are not being asked simply to forgo a public benefit. They have an obligation—enforceable by fine or imprisonment—to send their children to public school unless they find an adequate substitute." (citation omitted)); *id.* at 2342 ("As a general matter, Maryland law requires that resident children ages 5 to 18 'attend a public school regularly during the entire school year.'" (quoting Md. Educ. Code Ann. § 7-301(a-1)(1) (2025))).

By contrast, compulsory education in Massachusetts does not begin until the age of six. *See* 603 Mass. Code Regs. 8.02 (2025) ("Each child must attend school beginning in September of the calendar year in which he or she attains the age of six. Each school committee may

establish its own minimum permissible age for school attendance . . . ."); *see also* Mass. Gen. Laws ch. 76, § 1.  The Lexington Public Schools have enacted a policy that "[c]hildren who will be five years of age before September 1 of the school year during which they wish to enroll will be eligible to enter kindergarten in September."  (*See* Defs.' Suppl. Submission, Ex. 1, Dkt. No. 36-1).

Again, that distinction is not sufficient to require a different result here.  It is true that Massachusetts law does not compel kindergarten attendance for five-year-olds.  But it is surely beyond debate that kindergarten is a substantial and important government benefit—a benefit that is universally available, for free, to all five-year-olds and their parents in the Commonwealth.  Among other things, children who attend kindergarten, particularly full-time kindergarten, perform better in language, reading, mathematics, and other basic skills.  *See, e.g.,* Harris Cooper et al., *Effects of Full-Day Kindergarten on Academic Achievement and Social Development*, 80 REV. EDUC. RSCH. 34, 61-62 (2010).  And parents with children enrolled in kindergarten, particularly working parents, obviously gain substantial benefits as well.

Under well-established constitutional principles, defendants cannot force plaintiff to choose between foregoing the valuable benefit of having his child attend public kindergarten and exposing his child to materials that would burden his free exercise of religion.  The Supreme Court has "repeatedly held that a State violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits."  *Carson v. Makin*, 142 S. Ct. 1987, 1996 (2022).  And although the *Mahmoud* Court did address the compulsory nature of public education in Maryland in reaching its holding, it also stated that parents' ability to place their children in private school or home-school them was "no answer to the parents' First Amendment objections" to the materials taught in their public schools.  *Mahmoud*, 145 S. Ct. at 2359.

21

Instead, the Court reiterated that "when the government chooses to provide public benefits, it may not 'condition the availability of those benefits upon a recipient's willingness to surrender his religiously impelled status.'"  *Id.* (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 462 (2017)) (citation modified).  That broad language strongly suggests that *Mahmoud*'s holding was not meant to be limited only to compulsory education.  Therefore, the fact that kindergarten attendance is not compulsory in Massachusetts does not defeat plaintiff's free-exercise claim.

Accordingly, plaintiff is likely to show that the materials at issue burden his free-exercise rights by "pos[ing] 'a very real threat of undermining' the religious beliefs and practices" he wishes to instill in J.L., and defendants are not likely to show that their decision not to provide plaintiff with notice and the opportunity to opt J.L. out of these lessons survives strict scrutiny. Plaintiff is therefore likely to succeed on the merits of his First Amendment claim.  *See Mahmoud*, 145 S. Ct. at 2356 (quoting *Yoder*, 406 U.S. at 218).

### B.    <u>Likelihood of Imminent Irreparable Harm</u>

Plaintiff has also shown that he is likely to suffer irreparable harm in the absence of a preliminary injunction.  When a plaintiff has shown a likelihood of success on a First Amendment claim, such a finding is essentially automatic:  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mahmoud*, 145 S. Ct. at 2364 (quoting *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam)) (citation modified); *see also Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 15 (1st Cir. 2012) ("Because we conclude that plaintiffs have made a strong showing of likelihood of success on the merits of their First Amendment claim, it follows that the irreparable injury component of the preliminary injunction analysis is satisfied as well.").  Neither a permanent injunction at the conclusion of this case nor money

damages could properly remedy the harms that plaintiff would face during the pendency of the litigation.[13]

### C.    Balance of Equities

The balance of equities also favors plaintiff.  "The heart of the matter is whether 'the harm caused plaintiff without the injunction, *in light of* the plaintiff's likelihood of eventual success on the merits, outweighs the harm the injunction will cause defendants.'"  *United Steelworkers of Am., AFL-CIO v. Textron, Inc.*, 836 F.2d 6, 7 (1st Cir. 1987) (emphasis in original) (quoting *Vargas-Figueroa v. Saldana*, 826 F.2d 160, 162 (1st Cir. 1987)).  Assuming that plaintiff ultimately succeeds on the merits, he would suffer the real and immediate harm of interference with his child's religious upbringing in the absence of a preliminary injunction—a harm that, as discussed above, could not adequately be remedied at final judgment.  While defendants contend that implementing the notice and opt-out procedures contemplated by plaintiff's proposed injunction would burden them to some degree, any potential harm they face does not outweigh that faced by plaintiff—particularly where defendants concede that J.L. must be opted out of at least some materials.

### D.    Public Interest

Finally, an injunction would be in the public interest.  "[I]t is always in the public interest to prevent the violation of a party's constitutional rights."  *Doe v. Trump*, 766 F. Supp. 3d 266, 286-87 (D. Mass. 2025) (quoting *Dorce v. Wolf*, 506 F. Supp. 3d 142, 145 (D. Mass. 2020)); *accord American Bev. Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) (en banc).  Where plaintiff has made a strong showing that he is likely to succeed on his First

---

[13] Defendants' concession that they "plan to opt J.L. out of" the presentation of the specific books they have identified does not eliminate the irreparable harm plaintiff faces where defendants have not committed to providing plaintiff with notice of the broader set of materials that will be presented in J.L.'s class and an opportunity to opt him out.  (Defs.' Opp. 19-20).

Amendment claim, an injunction protecting his constitutional rights must be in the public interest.

**IV.    <u>Conclusion</u>**

For the foregoing reasons, plaintiff's motion for a preliminary injunction is GRANTED. A separate preliminary injunction order will be entered in accordance with this Memorandum and Order.

**So Ordered.**

/s/  F. Dennis Saylor IV_____
F. Dennis Saylor IV

Dated:  December 30, 2025                    United States District Judge