UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.  1:25-cv-13047-FDS

ALAN L., on behalf of himself and his minor
Child, J.L.,
　　　　Plaintiff,

v.

LEXINGTON PUBLIC SCHOOLS; LEXINGTON
SCHOOL COMMITTEE; DR. JULIE HACKETT, in
individual and official capacity as Superintendent of
the Lexington Public School District; DR. GERARDO
J. MARTINEZ, in his individual and official capacity
as Principal of Joseph Estabrook Elementary School and;
ANDREA SO, in her individual and official
Capacity as Director of Elementary Education,
　　　　　Defendants.

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS
BY DEFENDANTS LEXINGTON PUBLIC SCHOOLS, LEXINGTON SCHOOL
COMMITTEE, DR. JULIE HACKETT, DR. GERARDO MARTINEZ AND ANDREA SO**

## I.    INTRODUCTION

This case arises out of Defendants'[1] alleged exposure to five-year-old J.L. to two storybooks

included in the LPS 2025-2026 kindergarten curriculum.  Alan, the plaintiff on his own behalf and

on behalf of his five-year-old son, J.L., contends his and J.L.'s rights were violated when J.L. was

subjected to moral instruction contrary to his faith and when Defendants failed to provide him with

advance notice of classroom curriculum that would have permitted him to object to, or seek an

accommodation to opt J.L. out of, any materials he believed were contrary to his faith.

---

[1] "Defendants" refers, collectively, to Lexington Public Schools ("LPS"), Lexington School
Committee, Dr. Julie Hackett, Dr. Gerardo Martinez and Andrea So.  The plaintiff, Alan L. is
referred to herein as "Alan" for convenience.

## II.    FACTUAL ALLEGATIONS[2]

Alan alleges the following facts in his Complaint.  Alan is a devout Christian who subscribes
to a biblical view of marriage, gender and equality; believes God created people either male or
female; believes human sexuality is a gift to be expressed only within the context of a one-man, one-
woman marriage; and believes it is his role as a parent to instill values and shape his child's concept
of the world and different identities exclusively from a Christian worldview.  (Compl. ¶¶ 6, 29, 31).
J.L. was enrolled at the Joseph Estabrook Elementary School ("Estabrook").  (Id. ¶ 2).  On August
25, 2025, Alan raised "concerns" about curriculum content, asked to review the curriculum for
Health and DEI, and asked that J.L. be opted out of the first Health lesson and all DEI lessons.  (Id.
¶¶ 33-35).  He told J.L.'s teacher (Chestna) and an LPS Student Support Instructor (Bonavita) that,
"as a parent," he was "heavily interested" in what was being taught to J.L. "and the only way I can
be sure is for me to go through everything myself."  (Id. ¶ 35).  That same day, Chestna provided
Alan with a curriculum overview and indicated she would try to obtain more detailed curriculum
information.  (Id. ¶ 36).  On August 28, 2025, So, the Director of Elementary Education, responded
to Alan's opt-out request, stating "Your request is not tied to a sincerely held religious belief and is
not specific as to what required curriculum is objectionable."[3]  (See So's 8/28/25 Correspondence
to Alan, attached hereto at Exhibit 1, p. 1).[4]  So also invited Alan to reach out for additional

---

[2] Defendants dispute many allegations in the Complaint; however, they accept as true all well-
pleaded, non-conclusory allegations solely for the purposes of this motion.  *See Erickson v. Pardus*,
551 U.S. 89, 94 (2007).
[3] In the Complaint, Alan misquotes So's correspondence dated August 28, 2025 as containing the
precise language from So's correspondence dated September 5, 2025.  (Compare Compl. ¶¶ 37-38,
with, Dkt. No. 1-1, p. 3, and Ex. 1, pp. 2-3).
[4] When the complaint relies upon a document, whose authenticity is not challenged, such a
document "merges into the pleadings" and the court may properly consider it under a Rule 12(b)(6)
motion to dismiss. *Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir.
2001), *citing Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 17 (1st Cir. 1998); *see also Shaw v. Digital
Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996) (*citing Watterson v. Page*, 987 F.2d 1, 3-4 (1st Cir. 1993)
(explaining that the main problem of looking to documents outside the complaint—lack of notice to

information, saying, "If you have questions or concerns regarding any required curriculum based on a sincerely held religious belief, please let me know." (Id.). In response, Alan made the same opt-out requests, this time pairing his request with the simple fact that he and J.L. "are Christians"—his first reference to religion. (Compl. ¶ 39). On August 29, 2025, Alan submitted a public records request via the Town of Lexington's general online portal, requesting information regarding each of the Health, Social Studies and DEI lessons J.L. would be taught. (Id. ¶ 40). Alan does not allege his request reached So, Martinez or Hackett, or that he tied this request to any religious reason. (Id.). Alan did not receive a response to his public records request by the 10-business-day statutory deadline, but received some of the curricular information he requested. (Id. ¶ 41). On August 30, 2025, Alan submitted a written request to Martinez, Principal of Estabrook, seeking to opt his child out of classroom lessons and materials addressing moral or social topics inconsistent with his family's faith, in particular that he be exempted from lessons and instruction that "cover" issues of sexual orientation or gender identity.[5] (Id. ¶¶ 42-43). Within three business days,[6] So responded to Alan's letter on September 5, agreeing to opt J.L. out of any sex education and "requesting further clarification" regarding Alan's other opt-out requests. (Dkt. No. 1-1, p. 3). So did not reject Alan's request, but returned his request seeking clarification, stating,

> a request for a religious optout may be denied **or** returned for clarification if it does not clearly identify the specific *required* curriculum or instructional material at issue, or if it lacks sufficient detail to allow for meaningful review. Requests that are based on general educational disagreements, pedagogical preferences, philosophical views, or personal opinions, rather

---

plaintiff—is dissipated "where plaintiff has…relied upon these documents in framing the complaint")); *see also Clorox Co. v. Proctor & Gamble Commer. Co.*, 228 F.3d 24, 32 (1st Cir. 2000) ("It is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations.").

[5] Though Alan had previously described himself and J.L. as "Christians," this is the first time he described his religious beliefs to Defendants (or anyone within LPS). (See Dkt. No. 1-1, p. 1, ¶ 2).

[6] Due to the Labor Day holiday.

than sincerely held religious beliefs, do not qualify for exclusion under the *Mahmoud v. Taylor* standard.

…

Your requests as written are overly broad and **require further clarification as they seek to opt out of broad topics**.

…

Kindly **please re-submit** your opt-out request with more information regarding a specific lesson, **or if you would like to review required curricular materials to better inform your request**. I will promptly review your updated request when it is received.

(Emphasis added in bold). (Compl. ¶¶ 37-38, 44; Dkt. No. 1-1, p. 3; Ex. 1, pp. 2-3).[7] So then invited Alan to contact her with "any questions" regarding his request, or her "decision to return his request for further clarification." (Dkt. No. 1-1, p. 3; Ex. 1, pp. 2-3). Alan does not allege he took So up on this offer, or that he requested that materials he knew he still needed to make his request more specific. On September 10, Alan sent a letter, through his attorney, to LPS, reiterating his requests to opt his child out of the entire DEI curriculum and any instruction or other required activities that "normalized or promoted LGBTQ identities or lifestyles." (Compl. ¶ 46; Dkt. No. 1-1, p. 5). The letter specifically references So's request for "more information regarding a specific lesson," describes "'DEI curriculum' outlined in *this* Scope and Sequence document" (emphasis added), and even includes a hyperlink to the referenced curriculum materials. (Dkt. No. 1-1, p. 5). No reference is made in the letter to Alan not having received *all* curriculum materials he had previously requested, nor does the letter contain or reiterate any request for additional curriculum materials. (Dkt. No. 1-1, p. 5). In fact, the letter pushes back against So's request for Alan to identify specific lessons, stating, "Parents are not required to scour a school's curriculum to identify any content that

---

[7] These statements by So are misstated by Alan as having been contained in So's August 28, 2025 correspondence; So actually made these statements in her September 5, 2025 correspondence to Alan. (See Dkt. No. 1-1 at p. 3; cleaner copy of Dkt. No. 1-1, p. 3 at Ex. 1, pp. 2-3).

may contain themes that conflict with their religious beliefs"—insisting, instead, that "the burden is on the school." (Dkt. No. 1-1, p. 5).

Nevertheless, So sent additional curriculum materials to Alan on September 19. (Compl. ¶ 47). Two of the links included in the materials were non-working, however, so Alan notified Defendants of this issue and within "days" the issue was rectified and Alan was able to access all materials that had been shared with him. (Id. ¶ 48). He then learned on September 22 that a lesson including the read-aloud book "Families, Families, Families," which states some children have same-sex parents, was presented during Health class on September 16. (Id. ¶ 49). Alan alleges J.L. was presented with the book *All Are Welcome* at some point after August 29. (Compl. ¶¶ 40, 55).

## III.    STANDARD OF REVIEW

To survive a motion to dismiss for failure to state a claim, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 550 (2007). "At bottom, a complaint's non-conclusory factual content must 'allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Gianfrancesco v. Town of Wrentham*, 712 F.3d 634, 639 (1st Cir. 2013) (quoting *Iqbal*, 556 U.S. at 663).

## IV.    ARGUMENT

### A.    Alan and J.L. Lack Standing and Their Claims Should Be Dismissed Pursuant to Fed. R. Civ. P. 12(b)(1)

To establish standing, Alan must plausibly plead an injury in fact—i.e., "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)., 504 U.S. at 560; *Spokeo, Inc. v. Robins*, 578 U.S. 330, 136, as revised (May 24, 2016). Where the question of standing is based on the pleadings, Alan must establish "sufficient factual matter to plausibly demonstrate" standing to bring the action," *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 731 (1st Cir. 2016). To

establish injury in fact, a plaintiff must demonstrate "an invasion of a legally protected interest" that is "concrete" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560.

The Complaint clearly alleges J.L. is a five-year-old kindergartener. Where Alan's claim relies wholly on the compulsory nature of education as established in *Mahmoud v. Taylor*, this reliance is misplaced where J.L.'s attendance is voluntary rather than mandated. See 603 Mass. Code Regs. 8.02 (2025). Standing requires actual injury from government compulsion. 606 U.S. 522; (Compl. ¶¶ 79(1), 80(1), 81, 89, 95(3), 103, B1[8]). Therefore, J.L.'s voluntary attendance at kindergarten precludes a finding that his education was compulsory. *Mahmoud,* 606 U.S. at 524; *see Curtis v. School Comm.*, 420 Mass. 749, 753 (1995) (holding a voluntary program "in no way intrudes into the realm of constitutionally protected rights" and concluding voluntary program "lacks any degree of coercion or compulsion in violation of the plaintiffs' parental liberties"); *id.* at 759-760 *Curtis v. School Comm.* ("Because we conclude the program lacks any degree of coercion or compulsion in violation of the plaintiffs' parental liberties, or their familial privacy, we conclude also that neither an opt-out provision nor parental notification is required by the Federal Constitution.").[9] (See Section D, below).

**B. LPS and School Committee: Alan Has Not Identified Any Policy, Custom or Practice to Trigger Municipal Liability Under *Monell* or the Massachusetts Constitution**

---

[8] (Compl., p. 22).

[9] Nor is J.L. being denied public benefits on the basis of his religion. To be sure, the availability of public benefits cannot be conditioned or denied on the basis of religion. *See Everson v. Board of Ed. of Ewing*, 330 U. S. 1, 16 (1947) (a State "cannot exclude" individuals "because of their faith, or lack of it, from receiving [] benefits"); *cf. Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 462 (2017) (Department of Natural Resources policy expressly discriminated against eligible-recipient churches by disqualifying them (entirely) from a public benefit solely because of their religious character). Yet, by not opting J.L. out of those two portions of the curriculum using a neutrally applicable law, J.L. received precisely the same public benefit as his classmates and Defendants did not condition the availability of benefits on his beliefs. (See Section D, below).

Alan seeks to hold LPS and the School Committee liable on all counts except MCRA (Count VI). (Compl., pp. 13, 17-19  But a plaintiff seeking to impose liability on a municipality under § 1983 must identify a municipal "policy" or a "custom" that caused the plaintiff's injury. *See Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978).  The "policy" or a "custom" must also be the cause and moving force behind the alleged deprivation of constitutional rights. *See Connick v. Thompson*, 563 U.S. 51, 60 (2011) (*quoting Monell*, 436 U.S. 658, 692 (1978)) (plaintiff "must prove that 'action pursuant to official municipal policy' caused their injury").  Such policies include only "the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Id.*  The Supreme Judicial Court has also stated that MCRA and section 1983 are parallel statutes and that it should be presumed that the state legislature was aware of existing case law under section 1983 when it patterned MCRA after the federal act. *See, e.g., Duarte v. Healy*, 405 Mass. 43, 47, 537 N.E.2d 1230, 1232 (1989); *Kunz v. Town of Northbridge*, No. 14-13894-TSH, 2017 U.S. Dist. LEXIS 147452, at *33-34 (D. Mass. Mar. 13, 2017) ("there is no private cause of action directly under the Massachusetts Constitution"); *Martino v. Hogan*, 37 Mass. App. Ct. 710, 720-21, 643 N.E.2d 53 (1994) (holding there is no authority upon which to base a damages claim or an equitable claim directly under the State's Declaration of Rights, and stating that the existence of the MCRA occupies the field, similar to that of 42 U.S.C. § 1983).

No such policy or custom is properly alleged here.  Alan alleges the School Committee has policymaking authority. (Compl. ¶ 9).  After that, he is silent with respect to any action by, or communication with, it.[10]  This is wholly insufficient to trigger municipal liability.  *See Gianfrancesco v. Town of Wrentham*, 712 F.3d at 639 (accusatory adverbs like 'wrongfully,' 'deliberately,' and

---

[10] Alan's allegations of "a policy or custom" of denying opt-outs, refusing to provide curriculum materials in advance, requiring parents to identify specific lessons or materials to which they object, and refusing to honor categorical opt-out requests and inadequate training of officials regarding parental rights are conclusory and should be disregarded. (Id. ¶ 69).

'selectively' cannot carry a factually inadequate complaint across the pleading threshold.  Alan also fails to properly allege the School Committee had any policy prohibiting opt-outs or notice of curriculum to parents, or that Defendants had a history of preventing students from being opted out of curricular content on religious grounds.  What Alan *does* allege in considerable detail, however, is that he had individual communications with So regarding his concerns, that she responded promptly to his requests seeking clarification and asking he re-submit his request with additional details, and that So invited him to come in to review the curricular materials.  He also fails to allege any facts suggesting he took So up on her offer or notified her he did not have the specific materials she asked him to review and identify.  To the contrary, So's correspondence demands the inference that such opt-outs were permitted, and that any request to review curricular materials would be allowed.  Thus, the "moving force," here is clearly the lack of clarity Alan presented (beginning with his secular request to opt J.L. out of two subject matters (DEA and Health), entirely, over general "concerns"), So's attempts to divine what Alan was asking for, and Alan's radio silence in response to So's multiple offers to provide him with more information—not any policy or custom attributable to the municipality.  Finally, there is no allegation of any other instances of denial with respect to other students, or any facts plausibly suggesting a pattern or history of denials of requests for curricular materials or opt-outs.

### C.  Hackett, Martinez and So

Only parties who have directly participated or are otherwise directly involved in the conduct that deprived a plaintiff of his federal constitutional rights can be held liable under § 1983.  *Cepero-Rivera v. Fagundo*, 414 F.3d 124, 129 (1st Cir. 2005); *see Denicola v. Potter*, 2019 U.S. Dist. LEXIS 137889, 2019 WL 3842936, at *3 (D. Mass. Aug. 15, 2019) (denying claim on grounds that while plaintiff identified an individual defendant, he did not identify any conduct by that defendant).  While identified as defendants, Hackett and Martinez are markedly absent from Alan's factual

allegations.[11, 12, 13]  Additionally, official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985), quoting *Monell v. N.Y. City Dep't of Social Servs.*, 436 U.S. 658, 690, n.55 (1978).  Therefore, to the extent Alan brings claims against Hackett, Martinez and So in their official capacities, these claims fail as outlined above and below.

### D. Alan Fails to State a Claim Pursuant to § 1983 for Violation of His and J.L.'s First Amendment Right to Free Exercise of Religion

The Free Exercise Clause provides that "Congress shall make no law . . . prohibiting the free exercise" of religion.  *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022).  In *Mahmoud*, the court held that "[t]he compulsory-education law [in *Yoder*] 'carrie[d] with it precisely the kind of objective danger to the free exercise of religion that the First Amendment was designed to prevent." *Mahmoud*, 606 U.S. at 549-55, quoting *Wisconsin v. Yoder*, 406 U.S. at 218.

First, Alan does not allege any non-conclusory facts that suggest J.L. was exposed to *Families, Families, Families* or *All Are Welcome*.  He alleges Defendants acknowledged the lesson involving *Families, Families, Families* "had taken place," but does not allege J.L. attended those lessons or any facts suggesting J.L. was typically in the classroom more than 50 percent of the time—just that he was enrolled in kindergarten.  (Id. ¶¶ 28, 49, 55, 57).  Nor does he allege any facts suggesting J.L. remembered or was impacted by these books. The conclusory allegation J.L. was shown these books should be disregarded.  Second, from the time he submitted his request for public records on

---

[11] Hackett is simply alleged to have a managerial and supervisory role over "District policy," and to manage and supervise "the school system" and Martinez, respectively. (Compl. ¶¶ 10-12).
[12] Martinez is alleged to have been responsible for the "supervision, operation, and management of the school and school property" and "enforcement of District policy," and been sent a letter on August 30 to which So responded within three business days.  (Id. ¶¶ 14-15; Dkt. No. 1-1, pp. 1, 3).
[13] The only act that can be properly attributed to Martinez is his receipt of Alan's August 30 letter (that was promptly responded to by So within three business days).  Not a single act or decision is alleged to have been made by Hackett.

Case 1:25-cv-13047-FDS    Document 45    Filed 01/20/26    Page 10 of 21

August 29, Alan made no further requests for curricular materials.[14]  In any event, he was provided

with curricular materials on September 19—a mere 14 business days after his public records request.

That two links were inaccessible for "days" also should not trigger a constitutional violation or

permit the inference that any delay by the Town of Lexington in responding to his general request

for curriculum materials was intentional.  In spite of his clear awareness that he had "no way to

comply" with So's request for more specificity, Alan did not notify Defendants he was unable to

comply or that he continued to lack certain information. (Id. ¶ 45).

    Moreover, no inference can be made that Alan 1) expressed sincerely held religious beliefs to

Defendants and 2) requested notice of the curriculum—in that order.  In fact, he did the opposite:

he requested curricular materials—not from Defendants, but first, from J.L.'s teacher and Student

Support Instructor, (Compl. ¶¶ 34-34), and then, through a generic Town portal for public records

requests, (Id. ¶ 40)—omitting any mention of a religious-based purpose with each request.  Only

*after* making these generic requests for curriculum information did Alan convey any information

regarding his sincerely held religious beliefs to Defendants, and he did so to an entirely different

person: Martinez. (Dkt. No. 1-1, p. 1).  Then, when he received only partial curriculum materials, he

did not notify Defendants of the missing information, but instead remained silent.

---

[14] In response to So's September 5 correspondence asking him to provide "more information regarding a specific lesson," Alan does not allege he notified So or anyone else that the teacher's response to his records request was incomplete—i.e., that he did not have all information he needed to make opt-out requests regarding specific lessons.  Nor does he allege he responded to So's August 28 correspondence letting her know he did not have these materials.  Meanwhile, after Alan sent Martinez the letter on August 30, which was the Saturday of Labor Day Weekend, it is beyond debate that within three business days, Martinez forwarded Alan's letter to So and So promptly responded to Alan (at the busy start of the school year, no less).  So's response also did not deny Alan's request for an opt-out or indicate the matter was closed; on the contrary, So repeatedly invited Alan to inquire further, to re-submit his request, and to review the curriculum materials. (Ex. 1, pp. 2-3).

In *Mahmoud,* the school board explicitly stated no notice or opt-outs would be provided. *Mahmoud*, 606 U.S. at 530.  Here, So attempted to work with Alan on his opt-out request, and Alan did not send his request to school administrators or tie his requests to any religious reason. Parents are entitled to notice of the curriculum under *Mahmoud* after they have identified religious beliefs and curricular materials.  *See Mahmoud v. Taylor,* 606 U.S. 522, 543 (2025) (notice entitlement arose after plaintiffs identified both their religious beliefs and the curricular materials they found objectionable). Conversely, Alan did not even mention religion until August 28 (when he merely stated he and J.L. are "Christians"), and did not describe any sincerely held religious beliefs to Defendants (or anyone else at LPS) until August 30, 2025.  (Compl. ¶ 39; Dkt. No. 1-1, p. 1).  While *Mahmoud* held that notice must be provided "in advance" of the materials' use in instruction, the Court did not address or specify a timeframe (days, weeks, months, etc.) or procedure for such notice.

The *Yoder* analysis also doesn't apply here.  A government is generally free to place incidental burdens on religious exercise so long as it does so pursuant to a neutral policy that is generally applicable. *Mahmoud v. Taylor*, 606 U.S. 522, 564 (2025), citing *Smith*, 494 U. S., at 878-879, 110 S. Ct. 1595, 108 L. Ed. 2d 876.  The *Mahmoud* court skipped over the neutrally-or-generally-applicable question only because of the compulsory nature of the Maryland plaintiffs' education, a factual predicate that is lacking here.  *Id.* (premising application of strict scrutiny on "same character" burden as in *Yoder* based on "compulsory-attendance requirement").  A policy that kindergarten students at LPS participate in all curricular requirements—despite none having been alleged here— would be neutrally and generally applicable, even if it "has the incidental effect of burdening a particular religious practice," *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993), and demands the same result as in *Parker v. Hurley.* 514 F.3d 87, 95, 98-99 (1st Cir. 2008) (refusal to opt student out of curriculum would survive rational-basis test where Massachusetts recognized gay marriage, and did not present a constitutional burden under *Yoder*).

### E.  Due Process Claims

The Fourteenth Amendment provides that "no State shall . . . deprive any person of life liberty or property without due process of law." U.S. Const. amend XIV.  Defendants' conduct amounted to an executive action and cannot meet the high standard for conscience-shocking behavior, nor did it violate Alan's or J.L.'s right to due process as outlined below.

#### 1.  Defendants' Conduct Was Not Conscience-Shocking

The allegations in the Complaint do not plausibly suggest Defendants' conduct in responding to Alan's opt-out requests or requests for curricular materials rises to "conscience-shocking" level.  "[A]n abuse of power practiced by the executive branch of state government," which includes school boards and school officials, "sinks to a level cognizable under the Due Process Clause only when it is so extreme and egregious as to shock the contemporary conscience." *DePoutot v. Raffaelly*, 424 F.3d 112, 118 (1st Cir. 2005); *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998); *see Brown v. Hot, Sexy & Safer Prods.*, 68 F.3d 525, 531 (1st Cir. 1995) ("we have found 'conscience shocking' conduct only where the state actors engaged in 'extreme or intrusive physical conduct'); *see Doucette v. Jacobs*, 106 F.4th 156, 171 (1st Cir. 2024) ("only if the facts cross the shocks-the-conscience threshold" should courts move on to assess whether a fundamental right was violated).  Courts do not need to determine whether "to recogniz[e] a substantive due process right to be free of [the alleged] executive action" unless they first determine that the "necessary condition of egregious behavior" has been satisfied. *Lewis*, 523 U.S. at 847 n.8.

Alan has not alleged the "pungent facts" that would be required to show that any behavior by school officials was "so extreme as to 'shock the conscience.'" *Hasenfus v. LaJeunesse*, 175 F.3d 68, 72 (1st Cir. 1999).  There is nothing "conscience-shocking" about teachers or school officials who respond only partially to a parent's request for curricular materials (particularly when that request is not tied to any religious reason), or about a school official who provides prompt and detailed

responses to a parent's request to opt his child out of broad swaths of the curriculum—responses

that invite the parent to clarify and re-submit his request with materials the parent did not tell the

school official he was lacking,[15] or about school officials' (Hackett's and Martinez's) reliance on

another administrator to deliver a response, or about a Town that provides a 4-day late, albeit

incomplete, response to a request for public records.  Here, the allegations that any of the

defendants attempted to provide J.L. with the full benefit of the kindergarten curriculum cannot

meet that standard, particularly in light of the government interest in providing a public education.[16]

*See Harron v. Town of Franklin*, 660 F.3d 531, 533 (1st Cir. 2011) (police crack-down on tavern "not

truly outrageous, uncivilized, and intolerable, particularly in light of the government interest in

enforcing liquor licensing laws).  So's back-and-forth communications with Alan inviting him to

resubmit his request and to review the curricular materials to "further inform" his request also

precludes any inference of intentional or "uncivilized" deprivation of Alan's and J.L.'s constitutional

rights.  With respect to *All Are Welcome,* Defendants were not aware of Alan's curriculum request, as

his public records request for the Social Studies curriculum was not tied to any curriculum concerns

and he does not allege facts suggesting the individual defendants received notice of it.  (Id. ¶ 40).

### 2.  No Substantive Due Process Violation

"Substantive due process is not a license for judges to supersede the decisions of local

officials and elected legislators" on discretionary matters relating to the internal operations of

---

[15] Particularly in light of the requirement that Massachusetts "[a]cademic standards shall be designed to avoid perpetuating gender, cultural, ethnic or racial stereotypes." See G.L. c. 69, § 1D.
[16] Alan's claims are better characterized, if at all, as claims for negligence.  *See id.* at 848-49 (holding Due Process Clause "does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm," nor does it "guarantee due care" by government officials; "were the law otherwise, the Constitution would be downgraded to a "font of tort law."). "Executive acts that shock the conscience must be 'truly outrageous, uncivilized, and intolerable.'" *Harron v. Town of Franklin*, 660 F.3d 531, 533 (1st Cir. 2011), quoting *Hasenfus v. LaJeunesse*, 175 F.3d at 72.

schools. *Hasenfus v. LaJeunesse*, 175 F.3d at 74. The majority opinion in *Mahmoud* made no reference to substantive due process rights, and Defendants have found no authoritative or persuasive sister-circuit case holding that the Due Process Clause permits parents to demand an exemption for their children from exposure to certain books used in public schools on religious grounds. *See, e.g., Parker v. Hurley,* 514 F.3d 87, 102 (1st Cir. 2008); *Foote v. Ludlow Sch. Comm.*, 128 F.4th 336, 353 (1st Cir. 2025); (see also Dkt. No. 37 at p. 16 ("as in [*Mahmoud*], the parent seeks a preliminary injunction on the basis that the school's failure to provide him notice and a reasonable opportunity to opt his child out of classroom instruction utilizing those materials violates his free-exercise rights"); *cf. Parker v. Hurley*, 514 F.3d 87, 101 (1st Cir. 2008), *citing Troxel v. Granville*, 530 U.S. 57, 66 (2000) (recognizing only a narrow substantive due process right).

### 3. No Procedural Due Process Violation

To assert a procedural due-process claim under § 1983, a plaintiff must show that he was deprived of a protected interest and that the deprivation was accomplished without due process of law. *See Khelfaoui v. Lowell Sch. Comm.*, 496 F. Supp. 3d 683, 691 (D. Mass. 2020) (citing *Perez-Acevedo v. Rivero-Cubano*, 520 F.3d 26, 30 (1st Cir. 2008). Procedural due process requires the opportunity to be heard at a meaningful time and in a meaningful manner, *Bibiloni Del Valle v. Puerto Rico*, 661 F. Supp. 2d 155, 182 (D.P.R. 2009), but "'[n]o rigid taxonomy exists'" for evaluating procedural adequacy. *Larrieux-Cruz v. Consejo de Educación de Puerto Rico*, Civ. No. 17-2030, 2020 U.S. Dist. LEXIS 59134, 2020 WL 1623664, at *11 (D.P.R. 2020) (citing *González-Droz v. González-Colón*, 660 F.3d 1, 13 (1st Cir. 2011)). Instead, due process is flexible and calls for such procedural protections as the particular situation demands. *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). Defendants could not have created any more of a procedural safeguard to avoid the prolonged interactive dialogue that naturally flowed from Alan's overly-broad requests for opt-outs and curriculum materials, most of

which were not associated with any mention of religious reasons.[17] *Id.*, *citing Ingraham v. Wright*, 430 U.S. 651, 682 (1977) (declining to impose a requirement for additional procedural safeguards geared toward the safe delivery of prison mail).

In the context of school disciplinary measures, the rights to notice and an opportunity to be heard arise only because an official has already proposed adverse action against the student. *Schomburg v. Johnson*, No. 08-11361-GAO, 2009 U.S. Dist. LEXIS 24390, at *11 (D. Mass. Mar. 25, 2009). Here, Alan requested the materials on or about the start of the school year, leaving minimal time for Defendants to respond. Nevertheless, So's responses were prompt, first advising Alan his request to be opted out of "any DEI activities" and "Health class" was overly broad and inviting him to reach out to her with questions or concerns, and the second time explaining more information was needed to accommodate his request and inviting Alan to review the required curricular materials. To the extent Alan was entitled to notice and an opportunity to be heard, So provided it on two occasions. Any delays caused by Alan's communications with So did not give rise to a constitutional violation. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 535 (1985) (finding no constitutional violation where administrative delays stemmed in part from the thoroughness of the procedures).

### F. No Violation of art. 46, § 1, of the Amendments to the Massachusetts Constitution

Under Article 46, § 1, of the Amendments to the State Constitution, claims that the State is improperly burdening the free exercise of religion are assessed using a similar balancing test as in

---

[17] Alan expressed general "concerns" and made general inquiries regarding the curriculum on August 25 and 30; however, that Alan's concerns or the reason for his inquiry might have been grounded on religious reasons was not known by So until August 28, when Alan merely informed So he and J.L. were "Christians," or by So or Martinez until August 30. (Compl. ¶¶ 39, 42; Dkt. No. 1-1, p. 1). The letter dated August 30 was the first time Alan described his religious beliefs or his potential objections to curricular materials based on those beliefs. (Id., ¶ 42; Dkt. 1-1, p. 1).

*Yoder. Attorney Gen. v. Desilets*, 418 Mass. 316, 321-323 (1994); *Care & Protection of Eve*, 496 Mass. 42, 50 (2025).[18]  But Massachusetts courts reach its own conclusions on whether a specific interest qualifies as compelling under the state framework, and federal determinations are not binding. *Attorney General v. Desilets,* 418 Mass. at 321 (explicitly declining to follow post-*Smith* federal weakening of protections and remanding for an independent assessment of the state's interest).  In *Care & Protection of Charles*, the SJC recognized the state's compelling interest in the compulsory education of its citizens to prepare children for societal participation, promote good citizenship, and foster self-reliance.  399 Mass. 324, 335 (1987); *see id.* (emphasizing education as "perhaps the most important function of state and local governments").  The compelling interest of a state in educating its students on matters pertaining to sexual orientation, gender identity and DEI is therefore clear. See 603 CMR 26.05(1) (Public schools shall "through their curricula, encourage respect for the human and civil rights of all individuals regardless of race, color, sex, gender identity, religion, national origin or sexual orientation."); see also M.G.L. c. 71 § 101.

### G.  No Violation of the Massachusetts Civil Rights Act

The Massachusetts Civil Rights Act ("MCRA") provides a private right of action similar to that which is provided pursuant to Section 1983 but requires an additional showing that the interference or attempted inference with civil rights was "by threats, intimidation or coercion." Mass. Gen. Laws ch. 12, §§ 11H and 11I; *see Bally v. Northeastern Univ.*, 403 Mass. 713, 532 N.E.2d 49, 51-52 (Mass. 1989); *Nolan v. CN8*, 656 F.3d 71, 76 (1st Cir. 2011).  No threats or intimidation are alleged here.  "Coercion" in the context of MCRA is "the use of physical or moral force to compel [another] to act or assent." *Freeman v. Planning Bd. of W. Boylston*, 419 Mass. 548, 565, 646 N.E.2d 139 (1995).  There is no non-conclusory allegation plausibly suggesting Hackett's, Martinez's or So's

---

[18] Defendants' arguments regarding Alan's and J.L.'s right to free exercise, above, therefore, are incorporated herein.

conduct involved coercion.[19]  Even if Alan properly alleged facts suggesting any delays were a

deliberate attempt by Hackett, Martinez or So to frustrate his and J.L.'s religious beliefs (he does

not), this would only amount to a direct deprivation of rights rather than an attempt at coercion.

*See, e.g., Pheasant Ridge Assocs. Ltd. Partnership v. Burlington,* 399 Mass. 771, 781 (1987) (taking was an

attempted direct, preemptive act and did not seek to coerce any plaintiff to do or not to do

anything). Violations of MCRA also generally involve actual or potential physical confrontations

involving a threat of harm. *See, e.g., Shabazz v. Cole,* 69 F. Supp. 2d 177 (1999), citing *Planned*

*Parenthood League of Massachusetts, Inc. v. Blake*, 417 Mass. 467, 631 N.E.2d 985, 989 n. 8 (Mass.).

Where no allegations give rise to the inference this occurred, Alan's MCRA-based claim against

Hackett, Martinez and So should be dismissed.

### H. Hackett, Martinez and So Are Entitled to Qualified Immunity

Qualified immunity shields public officials performing discretionary functions from liability

for civil damages "insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S.

800, 818 (1982). A right is "clearly established" if, at the time of the alleged violation, "the contours

of the right [are] sufficiently clear that a reasonable official would understand that what he is doing

violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  Qualified immunity principles

developed under 42 U.S.C. § 1983 apply equally to MCRA claims. *Howcroft v. Peabody*, 51 Mass. App.

Ct. 573, 595 (2001); *Duarte v. Healy*, 405 Mass. 43, 47 (1989).  As outlined above, Alan has asserted

no violation of a constitutional right because he voluntarily enrolled J.L. in kindergarten and chose

to subject J.L. to the very materials from which he sought to have J.L. opted out, he failed to tie his

---

[19] So did not seek to persuade Alan or J.L. to alter or to amend their religious beliefs—she merely
communicated with Alan in an effort to understand his opt-out request and invited him to resubmit
it with more clarity.[19]  (Hackett and Martinez are not alleged to have been part of these discussions.)

requests for curricular materials to any religious reason, and Defendants' conduct was not conscience-shocking. Therefore, he has not asserted a violation of any clearly-established constitutional right. Additionally, to the extent his or J.L.'s rights may have been violated, existing precedent has not placed the statutory or constitutional question "beyond debate." *Mullenix v. Luna*, 577 U.S. 7, 8 (2015). *Mahmoud* also did not address the voluntary nature of J.L.'s enrollment, any process by which school officials must give notice, or any timeframe for such notice to be given. Similarly, no authoritative or federal appellate court has provided any framework with sufficient specificity that would have caused a reasonable school official in Defendants' position to understand they could not present J.L. with mere images of gay-appearing characters or a book describing the existence of same-sex parents who love each other as part of a family[20] where *Mahmoud* addressed a school district that historically allowed and then prohibited religious-based opt-outs, a school curriculum purposefully designed to instruct on LGBTQ+ values, books conveying intense pro-LGBTQ+ messaging and teaching guides intended to shape students' thinking on LGBTQ+ issues, and plaintiffs who requested opt-outs for specific materials as opposed to all Health and DEI classes—all in the setting of compulsory education, no less. In short, *Mahmoud* presented a markedly different factual scenario than the one Defendants faced, and is silent as to any procedural contours—i.e., how a parent must request notice. Scattered, partial requests sent to an array of staff members, and a generic public records portal request, cannot clearly be said to trigger a First Amendment violation under *Mahmoud*. Moreover, no federal appellate case has ever held a student

---

[20] There is no reason why, for instance, the sex of, or the relationship between, the objectionable characters in *All Are Welcome* should be so casually determined when there is no text paired with their images that provides this information. The characters could be sisters, aunts, mother and daughter, or even man and woman. In *Families, Families, Families,* there is no paired text or instruction identifying the same-sex parents as gay—they could be parent and stepparent, or biological and adopted parents.

must be opted out of an entire class (nor is there any allegation LPS had previously allowed such an exemption in the past).

Where this Court held it "an open question whether a book that…merely features a depiction of a gay or lesbian couple, can constitute a substantial burden on plaintiff's free-exercise rights under *Mahmoud*," Defendants are entitled to qualified immunity. (Dkt. No. 37, p. 18 fn.12). And it is also an "open question" whether a book that references the existence of same-sex parents cross the line. In *Mahmoud*, the court stated, "*It is significant that this book does not simply refer to same-sex marriage as an existing practice. Instead, it presents acceptance of same-sex marriage as a perspective that should be celebrated.*" (Emphasis added). *Mahmoud*, 145 S. Ct. 2354; *see Mirabelli v. Bonta*, No. 25-8056, 2026 U.S. App. LEXIS 403, at *12 (9th Cir. Jan. 5, 2026) (*Mahmoud* described as a narrow decision focused on uniquely coercive curricular requirements). Here, the books to which Alan claims J.L. was unlawfully exposed merely—and at best—refer to the existing practice of same-sex parenting. Where *Mahmoud* addressed materials-plus-instruction designed to directly shape students' views on these issues, the constitutionality of Defendants' conduct cannot be "beyond debate."

With respect to Alan's due process claims, *Mahmoud* did not find a violation of due process, nor does any First Circuit precedent under somewhat-related factual scenarios. *See Brown v. Hot, Sexy & Safer Prods.*, 68 F.3d 525, 539 (1st Cir. 1995); *Parker v. Hurley,* 514 F.3d 87, 102 (1st Cir. 2008). Additionally, no federal case under the Due Process Clause has permitted parents to exempt their children from exposure to certain books used in public schools on religious grounds. *See, e.g., Parker v. Hurley,* 514 F.3d at 102 (refusal of school district to exempt children from exposure to materials that offended the parents' religious beliefs did not constitute a violation of substantive due process); *see also Foote v. Ludlow Sch. Comm.*, 128 F.4th 336, 353 (1st Cir. 2025)*; Littlefield v. Forney Independent School District,* 268 F.3d 275, 289-91 (5th Cir. 2001). In *Parker,* the court emphasized that the Substantive Due Process Clause did not grant parents the degree of control over public school

curricula they sought or impose a constitutional burden on the parents' rights. *Id.* at 102-103.  In

*Brown v. Hot, Sexy & Safer Productions*, the First Circuit held the Free Exercise Clause and the parents'

substantive due process rights were not violated by one instance of a school system's failure to

provide prior notice and an exemption for a specific high school assembly on human sexuality.  68

F.3d 525 (1st Cir. 1995).

  *Mahmoud* also provides no guidance as to what constitutes notice or when—or how—notice

to parents must be given.  While Massachusetts has promulgated 603 CMR 5.03 as a process to

resolve disputes under G.L. c. 71, § 32A, a statute providing notice to parents of materials that are

primarily sexual in nature, no similar statue exists in Massachusetts.  603 CMR 5.03 is instructive,

however, in terms of timing: it provides parents must submit appeals to the superintendent within

30 days (barring extenuating circumstances), and the superintendent shall respond within 15 days to

the parents' appeal.  See 603 CMR 5.03.  A still-dissatisfied parent may then appeal the issue to the

school committee, triggering another 30-day timeline for it to respond.  Id.  Only decisions of the

school committee are considered final local decisions.  Id.  Alan did not appeal to the

superintendent, or to the school committee, essentially providing LPS and the school committee

with no notice he was seeking notice.  The timing and character of  Defendants' responses—to

Alan's requests for curricular materials or opt-outs—was therefore certainly not "beyond debate."

As a result, Defendants are entitled to qualified immunity.

## V.  CONCLUSION

  WHEREFORE, Defendants respectfully request the Court **__DISMISS__** Counts I-VI of Alan's

Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), and on grounds of qualified immunity.

Respectfully submitted,

Defendants,
LEXINGTON PUBLIC SCHOOLS,
LEXINGTON SCHOOL COMMITTEE; DR.
JULIE HACKETT; DR. GERARDO J.
MARTINEZ and ANDREA SO,
By their attorney:

*/s/ Alexandra M. Gill*
Douglas I. Louison (BBO# 545191)
dlouison@lccplaw.com
Alexandra 'Sasha' M. Gill (BBO# 663040)
sgill@lccplaw.com
Louison, Costello, Condon & Pfaff, LLP
Ten Post Office Square, Suite 1330
Boston, MA  02109
617-439-0305

## CERTIFICATE OF CONSULTATION PURSUANT TO L.R. 7.1

Pursuant to Local Rule 7.1(a)(2), I certify that on January 5, 2026, counsel conferred via telephone regarding this motion and attempted in good faith to resolve or narrow the issue(s), but were unable to reach agreement.

*/s/ Alexandra M. Gill*
Alexandra 'Sasha' M. Gill

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through ECF system on January 20, 2025, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on this date. Email copies will be sent to those listed as non-participants on the ECF system.

*/s/ Alexandra M. Gill*
Alexandra 'Sasha' M. Gill