**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| ALAN L., on behalf of himself and his minor child, J.L., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No.: 1:25-cv-13047-FDS |
| | ) | |
| LEXINGTON PUBLIC SCHOOLS; LEXINGTON SCHOOL COMMITTEE; DR. JULIE HACKETT, in her individual and official capacity as Superintendent of the Lexington Public School District; DR. GERARDO J. MARTINEZ, in his individual and official capacity as Principal of Joseph Estabrook Elementary School and ANDREA SO, in her individual and official capacity as Director of Elementary Education, | ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

---

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Plaintiff, Alan L., on behalf of himself and his minor child, J.L. (hereinafter "Plaintiff"), responds herein to Defendants' Motion to Dismiss. This Court has already determined that Plaintiff is likely to succeed on the merits of his case. Mem. and Order Granting Preliminary Injunction (Doc. 37). In granting Plaintiff's Motion for Preliminary Injunction, the Court found that "this case is squarely controlled by *Mahmoud*" and that the materials at issue "are likely to impose a substantial burden on plaintiff's free-exercise rights." *Id.* at 16, 18. The Court further found that "defendants are unlikely to show that their policy and practices can survive strict scrutiny." *Id.* at 19. Defendants now seek to dismiss the very same claims on which this Court has already found Plaintiff likely to succeed. Their Motion to Dismiss contradicts this Court's preliminary injunction order at virtually every turn and should be denied in its entirety. (Plaintiff incorporates herein his

1

briefing on the preliminary injunction by reference).

**STATEMENT OF FACTS**

In the interests of judicial economy, Plaintiff incorporates the summary of facts contained in this Court's preliminary injunction ruling and does not burden the Court with their repetition.

**STANDARD OF REVIEW**

The legal standard is far more generous to plaintiffs at the motion to dismiss stage than it is for an injunction. To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Medina-Velázquez v. Hernández-Gregorat*, 767 F.3d 103, 108 (1st Cir. 2014) ("[W]e construe the well-pleaded facts in the light most favorable to the plaintiffs, . . . accepting their truth and drawing all reasonable inferences in plaintiffs' favor.").

**ARGUMENT**

I.    **Plaintiff Has Standing to Bring a Claim for the Violation of His Child's Constitutional Rights.**

Defendants argue that Plaintiff and J.L. lack standing because kindergarten attendance is voluntary in Massachusetts. Defs.' Mem. in Support of Mot to Dismiss at 5-6 (Doc. 45). This argument has already been rejected by this Court, although Defendants never explicitly address this Court's reasoning. In granting the preliminary injunction, this Court rejected Defendants' compulsory education argument:

> Defendants also note that the *Mahmoud* Court relied in part on the fact that education in Maryland is compulsory beginning at age five... By contrast, compulsory education in Massachusetts does not begin until the age of six... Again, that distinction is not sufficient to require a different result here.

Doc. 37 at 20-21. The Supreme Court has "repeatedly held that a State violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits." *Carson v.*

2

*Makin*, 142 S. Ct. 1987, 1996 (2022). When the government chooses to provide public benefits, it may not "condition the availability of [those] benefits upon a recipient's willingness to surrender his religiously impelled status." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U. S. 449, 462 (2017) (internal quotations marks and alterations omitted). Defendants' argument that attendance is "voluntary" does not eliminate injury. A violation of constitutional rights is an injury in fact regardless of whether the plaintiff could theoretically avoid future violations by discontinuing use of a public service. Otherwise, any plaintiff challenging government action could be told they have no standing because they could simply stop interacting with the government. Accordingly, this Court's legal conclusion was clear:

> Under well-established constitutional principles, defendants cannot force plaintiff to choose between foregoing the valuable benefit of having his child attend public kindergarten and exposing his child to materials that would burden his free exercise of religion.

Doc. 37 at 21. Plaintiff has standing for both past injuries, exposure to inappropriate books, and for his future injuries, Defendants' continuing refusal to provide adequate notice and opt-outs.

*Mahmoud* did not hold that Free Exercise protections apply only at the precise age when attendance becomes statutorily mandatory. The Court's analysis focused on whether the government substantially burdened religious exercise by requiring parents to choose between their faith and public education. That burden exists regardless of whether the child is five or six years old when exposed to objectionable content and is inherent in the nature of the government's provision of the benefit of public education. Defendants' interpretation would create an absurd constitutional framework where identical curriculum content triggers strict scrutiny for six-year-olds but receives only rational basis review for five-year-olds. The Free Exercise Clause does not operate on such arbitrary age distinctions.

Defendants have renewed the same argument this Court rejected the first time, but the

analysis has not changed. *Mahmoud* was in no way dependent on the "compulsory nature of education." *Contra* Doc. 45 at 6. Rather, as this Court emphasized, *Mahmoud* held that "when the government chooses to provide public benefits, it may not 'condition the availability of those benefits upon a recipient's willingness to surrender his religiously impelled status.'" Doc. 37 at 22 (*quoting Mahmoud v. Taylor*, 606 U.S. 522, 561 (2025)); *see Sherbert v. Verner*, 374 U.S. 398, 404 (1963). Plaintiff's injury-in-fact is concrete and particularized: he must either (1) withdraw J.L. from kindergarten and forgo a valuable educational benefit, or (2) expose J.L. to instruction that substantially interferes with Plaintiff's ability to direct J.L.'s religious upbringing. J.L. has been exposed to instruction that directly contradicts and undermines Plaintiff's religious teachings, books and instruction celebrating same-sex relationships and presenting them as morally equivalent to biblical marriage. The ongoing nature of the injury—Defendants' continued refusal to provide notice and honor opt-out requests—constitutes a continuing violation. This is a classic unconstitutional condition. Defendants argue, Doc. 45 at 6 n. 9, that the condition is constitutional because "J.L. received precisely the same public benefit as his classmates." But *Mahmoud* directly forecloses this argument. All students received the same curriculum—yet the Supreme Court found a constitutional violation. The point is not whether J.L. receives differential treatment, but whether the government is conditioning a public benefit on the surrender of constitutional rights.

The "voluntary" nature of J.L.'s attendance proves too much. By Defendants' logic, any parent who enrolls a child in public school before the age of mandatory attendance would forfeit all constitutional protections. This would create a perverse incentive for school districts to violate constitutional rights of younger students while claiming such violations are "voluntary." Even accepting Defendants' characterization, the remedy for Plaintiff's "voluntary" enrollment is not denial of constitutional protections but rather the accommodations *Mahmoud* requires. If

Defendants believe J.L.'s attendance is voluntary, they remain free to inform Plaintiff of his option to withdraw his child. But they cannot use voluntary attendance to deny required accommodations.

## II. Plaintiff States Valid Claims Against Defendants Lexington Public Schools ("LPS") and the School Committee Under *Monell*.

Defendants argue that Plaintiff has not identified a municipal policy or custom sufficient to support liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Doc. 45 at 6-8. "*Monell* held that although a municipality may not be held liable under a theory of respondeat superior for an employee's constitutional violation, it may be held liable when 'execution of [the municipality's] policy or custom . . . inflicts the injury' and is the 'moving force' behind the employee's constitutional violation." *Saldivar v. Racine*, 818 F.3d 14, 20 (1st Cir. 2016) (quoting *Monell*, 436 U.S. at 694). "'Official municipal policy includes,' among other things, 'the acts of [the municipality's] policymaking officials.'" *Id.* Official municipal policy also includes "practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citing *Monell*, 436 U.S. at 691). Defendants' argument fails because Plaintiff has alleged both an unconstitutional policy and widespread practices that amount to custom. Plaintiff's Complaint specifically states:

> The violations described herein were not isolated incidents but rather resulted from official policies, customs, and practices of the District and School, including: a) a policy or custom of denying religiously-based opt-out requests; b) a policy or custom of refusing to provide curriculum materials to parents in advance; c) a policy or custom of requiring parents to identify the specific lessons or materials to which they object without providing the information necessary to make such objections; d) a policy or custom of refusing to honor requests to opt out from a category of objectionable materials, specifically including materials that promote or normalize LGBTQ identities or lifestyles; e) inadequate training of officials regarding parental constitutional rights; and f) deliberate indifference to known constitutional violations.

Complaint ¶ 69.

In addition, Defendants' own admissions—both in their preliminary injunction briefing

and in this motion—establish the existence of policies that violate Plaintiff's constitutional rights.

### A.  Plaintiff Sues Over an Explicit Policy.

Defendants claim that "no governmental policy, other than the one providing for religious opt-out requests and which Plaintiff does not challenge, is at issue here." Defs.' Opp. to Prelim. Inj. at 10 (Doc. 26). Defendants remarkably claim "no policy" exists while simultaneously: (1) citing their own Elementary Handbook policy; (2) admitting they have identified five books for opt-out; (3) articulating standards for which materials "encourage or promote LGBTQ+ lifestyles"; and (4) describing requirements parents must meet to obtain opt-outs. These contradictions reveal Defendants' real position: they have policies, but they want to escape *Monell* liability for them.

First and most importantly, Plaintiff does challenge the District's opt-out policy—which requires impossible specificity and allows the District to pick and choose which materials warrant opt-outs. The Defendants cannot credibly claim "no policy" exists. Their own Elementary Handbook—an official District publication signed by Superintendent Hackett—establishes an express policy governing curriculum accommodations:

> In accordance with district guidelines, families may request information from the building principal on available accommodations related to curriculum content.

Defs.' Opp. to Prelim. Inj., Ex. 4, at 4 (Doc. 26-4) (emphasis added).

This language establishes several critical facts for *Monell* purposes. First, the District has official "district guidelines" governing curriculum accommodations. These are not informal practices or individual decisions—they are formal District guidelines referenced in an official handbook. Second, the policy vests authority in "the building principal" to handle accommodation requests. This shows the District has designated official decision-makers (principals like Martinez) to implement these guidelines. Third, the policy limits parents to "request[ing] information" about "available accommodations"—it does not guarantee accommodations, does not specify what

accommodations are available, and places the burden on parents to navigate the District's process.

This is unquestionably an official District policy. It appears in the official handbook, it is presented as District-wide, and it describes general procedures applicable to all families. Under *Monell*, when an official policy causes constitutional violations, the municipality is liable. See *Monell*, 436 U.S. at 694.

The Handbook policy is facially inadequate under *Mahmoud*. The policy merely allows families to "request information" from the principal. It does not require the District to proactively provide notice of potentially objectionable materials. Under *Mahmoud*, schools must provide notice "in advance" whenever objectionable materials "or any other similar book is to be used in any way." 606 U.S. at 569. The Handbook policy puts the entire burden on parents to seek out information, rather than requiring schools to provide advance notice. Moreover, the policy speaks only of "available accommodations"—not required accommodations, not opt-outs as a matter of right, but merely what accommodations the District deems "available." This is precisely the problem *Mahmoud* addressed: schools cannot condition religious opt-outs on their own determination of what accommodations they are willing to provide. *See id.* at 567 (rejecting school board's claim that broader opt-outs would be "infeasible"). By stating families "may request" and referencing "available" accommodations, the policy makes clear that accommodations are discretionary, not mandatory. This contradicts *Mahmoud*'s holding that parents have a constitutional right to opt-outs—not a privilege subject to school officials' discretion.

### B. Defendants Have Admitted the Existence of a Policy.

Defendants cannot simultaneously claim they have "no policy" while admitting they identified only five books they will agree to opt J.L. out of and refusing the remainder of Plaintiff's opt-out requests. Doc. 26 at 19. This admission reveals the unconstitutional policy at the heart of

this case: the District reserves to itself the authority to determine which of Plaintiff's religious objections are sufficiently meritorious to warrant accommodation. This is precisely the type of official policy that supports *Monell* liability. Specifically, Defendants stated:

> Defendants have a policy of permitting opt-out requests for religious reasons and have been and will continue to be willing to exclude J.L. from content that encourages or promotes LGBTQ+ lifestyles, values and identities to the extent they can identify these notwithstanding Plaintiff's vague requests.

*Id.* This admission establishes a custom or policy: Defendants will "continue to be willing" to provide opt-outs only for content that they (not the parent) determine "encourages or promotes" objectionable values, and only "to the extent they can identify" such content "notwithstanding" the parent's requests. This is a systematic practice of substituting the District's judgment for the parent's judgment. These are institutional commitments about how the District will handle religious opt-out requests going forward.

As the Supreme Court has repeatedly emphasized, courts and government officials "must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim." *Employment Div. v. Smith*, 494 U.S. 872, 887 (1990); *see also Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989). Yet Defendants' policy does precisely that—it allows school officials to determine whether materials "encourage or promote" values that conflict with a parent's faith, rather than deferring to the parent's sincere religious objections.

In short, *Monell* arguments are for rogue actor cases, when an official acts in conflict with his municipality. Here, the municipal entity continues to adopt the very position it is being sued over, its outright refusal to honor religious accommodation requests. This selective accommodation is itself a policy that violates the Free Exercise Clause. As this Court recognized, materials that depict same-sex relationships (even without explicitly celebrating them) can substantially burden religious exercise. Doc. 37 at 17-18. By reserving authority to determine

8

which materials warrant opt-outs, Defendants have implemented a policy that denies adequate protection for Plaintiff's rights.

### C. This Court Has Already Properly Found the Policies to be Likely Unconstitutional.

In granting the preliminary injunction, this Court necessarily found that the Handbook policy likely fails to protect Plaintiff's constitutional rights. The Court held:

> Defendants have failed to show that denying plaintiff the specific notice and opt-out procedure he seeks here is necessary to serve [a compelling] interest.

Doc. 37 at 19. The "notice and opt-out procedure" Plaintiff seeks is more robust than what the Handbook policy provides. Accordingly, this Court has already determined that Defendants' policies and practices both exist and likely violate the First Amendment. The Court further noted Plaintiff's allegation that Defendants' system is "effectively unavailable because defendants require more specificity in [Plaintiff's] requests than he can provide." *Id.* at 20. In other words, Defendants' policies—the very policies articulated in Defendant Andrea So's correspondence—are unconstitutional.

The Court's conclusion was clear: while Defendants may have a policy allowing opt-outs on paper, the implementation of that policy—requiring specificity while withholding necessary information—violates the Free Exercise Clause. As this Court recognized, "defendants do have a system for religious opt-outs," and the constitutional violation arises from how that system operates in practice. *Id.* These emails serve as direct evidence of Defendants' unconstitutional policy of denying religious accommodations. Defendant So implemented the District's policies requiring specificity in opt-out requests, determining which materials warrant opt-outs, and denying categorical requests. These were not personal decisions; they were the application of official policies to Plaintiff's specific situation.

Defendants' policies and practices—the notice procedures they use, the opt-out process they have established, the specificity requirements they impose—do not survive strict scrutiny. These are policy-level failures, not individual mistakes. Under *Monell*, when a municipality's official policies cause constitutional violations, the municipality is liable. 436 U.S. at 694. This Court has already found that Defendants' policies violate the Constitution. That finding, combined with Plaintiff's allegations and Defendants' admissions, amply suffices to state a *Monell* claim.

### D.  Defendant So's Correspondence Reveals the Existence of a Policy.

Finally, Defendant So's correspondence to Plaintiff explicitly describes District policy requirements: "a request for a religious opt-out may be denied or returned for clarification if it does not clearly identify the specific required curriculum or instructional material at issue, or if it lacks sufficient detail to allow for meaningful review." Compl. ¶ 37. The language describes a general policy ("may be denied"), not a one-time decision. This is not merely Defendant So's personal preference or opinion; it is a policy requirement—demanding specificity from parents, that is applied District-wide. Defendant So is the Director of Elementary Education for the District. *Id.* ¶ 16. In this role, she is responsible for implementing District-wide curriculum policies. Her correspondence with Plaintiff was an official communication explaining District policy requirements for processing opt-out requests.

As explained above, this policy is unconstitutional as applied to Plaintiff's sincerely held religious objections. When a parent has sincere religious objections to an entire category of instruction (e.g., instruction that normalizes or promotes same-sex relationships), *Mahmoud* requires that the parent be able to opt out of all such instruction. The Supreme Court did not limit parents to opting out of individual books on a case-by-case basis after reviewing each one. Rather, *Mahmoud* held that parents must receive "notice . . . whenever one of the books in question or any

10

other similar book is to be used in any way." *Mahmoud*, 606 U.S. at 569.

The facts in this case do not support a scenario in which an individual employee made a snap judgment in the heat of the moment. These are deliberate policies about how the District will process religious opt-out requests and Defendants have defended those policies before this Court. Defendant So's correspondence shows careful thought about what requirements to impose. Defendants' litigation positions show institutional commitment to continuing these practices.[1] Plaintiff has more than adequately stated *Monell* claims against LPS and the School Committee. He has alleged official policies (as articulated by So and confirmed by Defendants' briefing), shown that these policies caused constitutional violations (as this Court has already found), and demonstrated that these policies will continue to cause violations going forward (as Defendants have committed to continuing their practices).

### III.    Plaintiff Has Sufficiently Alleged Claims Against the Individual Defendants.

Defendants argue that Hackett and Martinez should be dismissed because they are "markedly absent from Alan's factual allegations." Doc. 45 at 8-9. This argument ignores both the allegations in the Complaint and the law governing supervisory liability.

Plaintiff alleges that Hackett, as Superintendent, has "managerial and supervisory responsibilities over District policy" and "manage[s] and supervise[s] the school system" Compl. ¶¶ 10-12. At minimum, Hackett is liable for signing and implementing the facially inadequate Handbook policy. As Superintendent, she is responsible for district-wide policies including the accommodation policy in the Handbook.

---

[1] It also bears mentioning that Lexington's policy and practice of refusing parental requests to opt out of LGBTQ+ materials is not a recent development. The First Circuit's decision in *Parker v. Hurley,* 514 F.3d 87 (1st Cir. 2008) (overruled by *Mahmoud*, 606 U.S. at 569) dealt with Lexington's refusal *as far back as 2005* to honor religious parents' opt-out requests for these same types of materials. The court noted there that "[a]s the 2005-2006 school year began [the Superintendent] released a public statement explaining the school district's position that it would not provide parental notification for 'discussions, activities, or materials that simply reference same-gender parents or that otherwise recognize the existence of differences in sexual orientation.'" *Id.* at 93.

Martinez, as Principal, is "responsible for the supervision, operation, and management of the school and school property" and the "enforcement of District policy" *Id.* ¶¶ 14-15. Moreover, Martinez received Plaintiff's August 30 opt-out request and forwarded it to So for response. *Id.* ¶¶ 42-43. Martinez's role as Principal also makes him responsible for implementing the Handbook policy at Estabrook. He received Plaintiff's August 30 request, forwarded it to So, and bears responsibility for the District's response. His involvement is not merely ministerial—he is the "building principal" identified in the Handbook policy as the official responsible for handling accommodation requests.

All three individual defendants were involved in formulating, implementing, and enforcing the District's policies regarding religious opt-outs *Id.* ¶¶ 69, 86. These allegations are sufficient at the pleading stage. Supervisory officials can be held liable under § 1983 when they implement or enforce unconstitutional policies. Here, Hackett and Martinez are responsible for implementing the District's curriculum policies, including its approach to religious opt-outs. Their involvement in denying Plaintiff's requests is sufficient to state a claim.

## IV.    Plaintiff Sufficiently States a Claim Under § 1983 for Violation of His and J.L.'s First Amendment Right to Free Exercise of Religion.

Defendants' argument that Plaintiff fails to state a Free Exercise claim once again directly contradicts this Court's preliminary injunction order. The Supreme Court in *Mahmoud* held that government action that "substantially interferes with the religious development of a child" presumptively burdens parents' free-exercise rights. *Mahmoud*, 606 U.S. at 550. Such burdens are justified only if they satisfy strict scrutiny. *Id.* at 564.

Consistent with *Mahmoud*, this Court properly found that the books at issue here "are likely to impose a substantial burden on plaintiff's free-exercise rights." Doc. 37 at 18. The Court directly and correctly applied *Mahmoud*'s analysis:

> Families, Families, Families!, A Family is a Family is a Family, Stella Brings the Family, and Love Makes A Family, all appear to teach that any arrangement of people—of whatever sex—can be a family so long as they "love each other"—just as Uncle Bobby's Wedding taught that "two people can get married, regardless of whether they are of the same or the opposite sex, so long as they love each other."

*Id.* (quoting *Mahmoud*, 606 U.S. at 552).

Defendants unpersuasively argue that J.L. may not have been exposed to the challenged materials. Not only do Defendants' assertions lack certainty on this issue, they are disputed by Plaintiff. On a motion to dismiss, the Court must accept Plaintiff's factual allegations as true, and Plaintiff clearly and definitively alleges that J.L. was exposed to objectionable materials. Compl. ¶¶ 49, 55, 57. Defendants describe that statement as "conclusory" but that simply begs the point; the complaint clearly alleges that "the book was shown to Plaintiff's child." *Id.* at ¶ 52. It alleges who (J.L.), what (was shown), and what content (the book). That is precisely the type of factual matter that must be accepted as true on a motion to dismiss.

Moreover, as this Court recognized in its injunction order, whether J.L. was exposed to past materials is not dispositive for purposes of injunctive relief. Defendants expressly adopted a position of not being willing to opt Plaintiff out of materials that conflicted with his deeply held religious beliefs. It is thus immaterial even if –as Defendants attempt to suggest – J.L. was not present for every challenged book. Plaintiff seeks prospective relief—notice and opt-outs going forward. As this Court recognized, "whether J.L. was exposed to the book is not necessarily probative of whether he will be exposed to other, similar books in the future." Doc. 37 at 7 n.7. The Complaint clearly alleges that additional objectionable materials are scheduled to be taught, Compl. ¶¶ 60-68, that Defendants continue to refuse to provide adequate notice and opt-outs, *id.* ¶ 86, and that J.L. therefore faces ongoing constitutional violations. That is the crucial *Mahmoud* problem here, and the District's extensive factual arguments are immaterial. These allegations state

a claim.

Defendants' argument that Plaintiff did not initially link his requests to religious beliefs is also defunct. Doc. 45 at 10. Plaintiff alleges that he informed Defendants of his Christian faith on August 28, 2025, *see* Compl. ¶ 39, and provided further specific, detailed information about his religious beliefs in his August 30 and September 10 communications to Defendants. Compl. ¶¶ 43; 46. Defendants still refused to honor all of his religious opt out requests. Once Plaintiff articulated his religious objections, Defendants were obligated to provide notice and opt-outs. Their ongoing failure to do so from August 30 forward violates *Mahmoud*.

It also makes no difference that Defendants eventually provided materials requested by Plaintiff. As this Court indicated, Defendants' system was "effectively unavailable because defendants require more specificity in [Plaintiff's] requests than he can provide." Doc. 37 at 20. This is precisely what the Complaint alleges. *Mahmoud* requires meaningful notice—that is, notice sufficient to allow parents to make informed decisions about which materials conflict with their beliefs. By providing incomplete information, broken links, and delayed responses, Defendants failed to provide the notice *Mahmoud* requires.

Finally, Defendants' reliance on *Parker v. Hurley*, 514 F.3d 87 (1st Cir. 2008), for the proposition that schools need not shield students from "religiously offensive" ideas is unpersuasive. *Parker* was decided seventeen years before *Mahmoud*. The Supreme Court's recent decision fundamentally changed the landscape of parental rights in public education. *Parker*'s holding that "exposure" to diverse viewpoints does not burden Free Exercise rights cannot survive *Mahmoud*'s explicit recognition that requiring children "to submit their children to instruction that poses 'a very real threat of undermining' the religious beliefs and practices that the parents wish to instill" constitutes a substantial burden. *Mahmoud*, 606 U.S. at 530 (quoting *Yoder*, 406 U.S. at

218).

Most fundamentally, *Mahmoud* does not establish a tiered system where some religiously objectionable content must be accommodated while other content may be imposed. The Court held that when instruction "poses 'a very real threat of undermining' the religious beliefs and practices that the parents wish to instill," strict scrutiny applies. *Mahmoud*, 606 U.S. at 530. The question is whether the content threatens to undermine the parents' religious instruction—not whether school officials or courts agree that it does so, or whether they find the parents' concerns reasonable. Plaintiff has clearly articulated his sincerely held religious beliefs regarding marriage, sexuality, gender, and the moral framework he is teaching his child. He has identified content that conflicts with those beliefs. Under *Mahmoud*, that is sufficient. The remedy is not for Defendants to conduct a "deliberative process" to determine which of Plaintiff's religious concerns are valid to the school, but rather to provide the notice and accommodations that respect his constitutional rights while allowing the school to pursue its educational mission with students whose parents do not object.

**V.    Plaintiff States Valid Due Process Claims.**

**A.    Substantive Due Process**

Defendants argue that their conduct was not "conscience-shocking" and therefore does not violate substantive due process. Doc. 45 at 12-14. This argument misapplies the relevant legal standard. The "shocks the conscience" standard articulated by Defendants applies only to executive action cases where no fundamental right is implicated. *County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998). Where, as here, a legislative policy is at issue rather than executive action only and a fundamental right is at stake (such as the right to direct one's child's religious upbringing), the proper inquiry is whether the government action satisfies strict scrutiny – not whether it shocks the conscience. *Foote v. Ludlow Sch. Comm.*, 128 F.4th 336, 346 (1st Cir. 2025);

*Kenyon v. Cedeno-Rivera*, 47 F.4th 12, 24 (1st Cir. 2022).

The Supreme Court has long recognized a fundamental right of parents to direct the upbringing and education of their children, including their religious development. *See Meyer v. Nebraska*, 262 U.S. 390, 403 (1923); *Pierce v. Society of Sisters*, 268 U.S. 510, 534-35 (1925); *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972); *Troxel v. Granville*, 530 U.S. 57, 65-66 (2000). This Court recognized this fundamental right in its preliminary injunction order:

> For more than a century, the Supreme Court has recognized a substantive due-process right of parents to direct the upbringing and education of their children... In *Wisconsin v. Yoder*, 406 U.S. 205, 234 (1972), the Court expanded that doctrine to recognize a right to oversee the religious development of one's children, grounded in the First Amendment's Free Exercise Clause.

Doc. 37 at 14.

Under strict scrutiny, Defendants must show their actions were narrowly tailored to serve a compelling governmental interest. As this Court has already found, "defendants are unlikely to show that their policy and practices can survive strict scrutiny." *Id.* at 19.

While *Mahmoud*, like this case, focused primarily on the Free Exercise Clause, that case is also grounded in the parental due process right. As the Supreme Court has explained, *Yoder* was a hybrid rights case because the parents relied on both their substantive due process rights to "direct the education of their children" and the Free Exercise Clause. *Smith*, 494 U. S., at 881 n. 1. *Yoder*, in other words, provides the basis for a substantive due process right to opt out from objectionable education.

## B.    Procedural Due Process

Defendants argue that Plaintiff cannot establish a procedural due process violation because they eventually provided *some* curriculum materials and corresponded with him. Doc. 45 at 14-15. This argument fails. Plaintiff has a constitutionally protected liberty interest in directing the

religious upbringing of his child. *Troxel*, 530 U.S. at 65-66; *Yoder*, 406 U.S. at 232. This liberty interest cannot be taken away without due process of law. "The basic guarantee of procedural due process is that, 'before a significant deprivation of liberty or property takes place at the state's hands, the affected individual must be forewarned and afforded an opportunity to be heard at a meaningful time and in a meaningful manner.'" *González-Droz v. González-Colón*, 660 F.3d 1, 13(1st Cir. 2011) (*quoting Amsden v. Moran*, 904 F.2d 748, 753 (1st Cir. 1990)).

Defendants failed to provide adequate process in multiple ways. Defendants provided incomplete curriculum information, broken links, and delayed responses. Notice that cannot be acted upon is not meaningful notice. By the time Defendants provided curriculum materials, J.L. had already been exposed to objectionable content. Notice *after the fact* is not notice for purposes of due process. Defendants demanded that Plaintiff identify "specific lessons" and "specific materials" while simultaneously withholding the detailed information necessary to make such identifications. This Catch-22 denied Plaintiff any meaningful opportunity to protect his rights. Further, when Plaintiff submitted opt-out requests based on clearly-stated religious beliefs, Defendants refused to honor them, demanding ever-greater specificity. Defendants repeatedly denied Plaintiff a meaningful opportunity to be heard.

### VI.     Plaintiff States a Valid Claim Under Article 46, § 1 of the Massachusetts Constitution.

Defendants also argue that the state's interest in DEI education is compelling and defeats Plaintiff's claim under the Massachusetts Constitution. Doc. 45 at 15-16. This argument fails. Article 46, § 1 of the Massachusetts Constitution provides strong protection for religious exercise, often exceeding federal protections. *See Attorney Gen. v. Desilets*, 418 Mass. 316, 321-23 (1994) (explicitly declining to follow post-*Smith* federal weakening of protections). Under Massachusetts law, government actions that substantially burden religious exercise must satisfy strict scrutiny,

requiring the government to prove *both* a compelling interest and narrow tailoring. *Care & Protection of Eve*, 496 Mass. 42, 54 n. 7 (2025).

Even assuming the state has a compelling interest in teaching about diversity, equity and inclusion (which Plaintiff does not concede applies to LGBTQ+ content for kindergarteners), that interest must be pursued through narrowly tailored means. Defendants have not argued—much less proven—that refusing to provide religious opt-outs is narrowly tailored. In fact, providing religious opt-outs is the epitome of narrow tailoring—it allows the state to teach the vast majority of students while accommodating the sincere religious beliefs of the few who object. As this Court recognized, "defendants have failed to show that denying plaintiff the specific notice and opt-out procedure he seeks here is necessary to serve [a compelling] interest." Doc. 37 at 19. The same analysis applies to the state constitutional claim.

## VII.    Plaintiff States a Valid Claim Under the Massachusetts Civil Rights Act.

Defendants argue that Plaintiff has not alleged "threats, intimidation or coercion" sufficient to support an MCRA claim. Doc. 45 at 16-17. This argument misconstrues both the Complaint's allegations and MCRA's requirements. "Coercion" under MCRA means "the use of physical or moral force to compel [another] to act or assent." *Freeman v. Planning Bd. of W. Boylston*, 419 Mass. 548, 565 (1995). Coercion need not involve physical threats; it can include "moral force"— that is, pressure that compels someone to act against their will.

Plaintiff alleges that Defendants used the coercive force of school policies and J.L.'s compelled attendance (once enrolled in kindergarten) to force J.L. to receive instruction that violates Plaintiff's religious beliefs. Compl. ¶¶ 103-106.  Defendants exposed J.L. to objectionable materials despite Plaintiff's clearly-stated religious objections, using the authority of the school and classroom setting to compel J.L.'s participation. These actions constitute "moral force to

compel [Plaintiff] to act or assent"—specifically, to assent to J.L. receiving instruction that violates Plaintiff's religious beliefs. This satisfies MCRA's coercion requirement.

### VIII.    Individual Defendants Are Not Entitled to Qualified Immunity.

Defendants argue that Hackett, Martinez, and So are entitled to qualified immunity because the law was not clearly established. Doc. 45 at 17-20. This argument fails for multiple reasons. As a threshold matter, qualified immunity shields officials from damages liability only—it does not bar prospective injunctive relief. *Morse v. Frederick*, 551 U.S. 393, 400 n. 1 (2007).  To the extent Plaintiff seeks injunctive relief (which he does), qualified immunity is not a defense.

Nonetheless, and even for damages claims, the law is and was clearly established. After *Mahmoud*, it was clearly established that parents have a constitutional right to opt their children out of instruction that substantially interferes with their religious development; schools must provide adequate notice of such instruction; and schools cannot prohibit religious opt-outs or make them effectively unavailable. *See Mahmoud*, 606 U.S. at 556. Moreover, even before *Mahmoud*, these general principles were clearly established. *Yoder* (1972) and *Pierce* (1925) established that government cannot substantially interfere with parents' ability to direct their children's religious upbringing. A reasonable official should and would have known that refusing to provide requested curriculum to a parent, substituting their own judgment for that of a parent regarding what constitutes a burden on parents' religious beliefs, and refusing to accommodate sincerely held religious objections to curriculum materials, would violate these established rights.

Defendants argue that various factual differences between this case and *Mahmoud* (e.g., the nature of specific books, the timing of requests) mean the law was not clearly established. But officials are not entitled to qualified immunity simply because the facts are not identical to prior cases. As the Supreme Court has explained, officials "can still be on notice that their conduct

violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). That Families, Families, Families! uses animals instead of humans, does not change the clearly established law that parents have a right to notice and opt-outs for instruction that substantially interferes with their children's religious development. A reasonable official would have understood that books conveying normative messages about same-sex relationships and families might substantially interfere with some parents' religious instruction.

## CONCLUSION

Plaintiff has stated valid claims under well-established constitutional and statutory principles. Defendants' Motion to Dismiss seeks to relitigate issues this Court has already decided and asks this Court to reach conclusions directly contrary to its prior order. For these reasons and those stated above, Defendants' Motion to Dismiss should be DENIED in its entirety.

Dated: February 3, 2026

JORDAN SEKULOW*
  (D.C. Bar No. 991680)
STUART J. ROTH**
  (D.C. Bar No. 475937)
ANDREW EKONOMOU*
  (GA Bar No. 242750)
OLIVIA F. SUMMERS*
  (D.C. Bar No. 1017339)
/s/ Nathan J. Moelker
NATHAN MOELKER*
  (VA Bar No. 98313)
THE AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Avenue, NE
Washington, D.C. 20002
Telephone: (202) 546-8890
Facsimile: (202) 546-9309
nmoelker@aclj.org

ABIGAIL SOUTHERLAND*
  (TN Bar No. 026608)
THE AMERICAN CENTER FOR LAW & JUSTICE

625 Bakers Bridge Ave., Suite 105-121
Franklin, Tennessee 37067
Telephone: (615) 599-5572

SAMUEL J. WHITING
MASSACHUSETTS LIBERTY LEGAL CENTER
  (Massachusetts Bar No. 711930)
sam@mafamily.org

\* Admitted Pro Hac Vice.

## CERTIFICATE OF SERVICE

I, Nathan J. Moelker, hereby certify that on February 3, 2026, the foregoing document was filed electronically using the Court's CM/ECF system, which will send notification of this filing to all registered participants. Paper copies will be sent to those indicated as non-registered participants.

*/s/ Nathan J. Moelker*
Nathan J. Moelker